UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GINA McINTOSH, MATIS NAYMAN and FELIPE DE CASTRO LUNA, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>KATAPULT HOLDINGS, INC., LEE EINBINDER, HOWARD KURZ, ORLANDO ZAYAS, KARISSA CUPITO, and DEREK MEDLIN,<br><br>　　　　　　Defendants. | Case No. 1:21-cv-07251-JPO |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

COOLEY LLP
Aric H. Wu
Brian M. French
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
bfrench@cooley.com

COOLEY LLP
Koji F. Fukumura (pro hac vice)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
kfukumura@cooley.com

September 23, 2022

*Attorneys for Defendants Katapult Holdings, Inc., Lee Einbinder, Howard Kurz, Orlando Zayas, Karissa Cupito, and Derek Medlin*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

BACKGROUND ............................................................................................................................... 3

      A.     Katapult's Business And Rapid Growth ............................................................... 3

      B.     The Merger Announcement ................................................................................ 4

      C.     FinServ Issues The Proxy, And FinServ's Shareholders Approve The Merger .................................................................................................................. 6

      D.     Katapult Announces Q1 2021 Results And Reaffirms Guidance .......................... 7

      E.     E-Commerce Retail Sales Decline Precipitously, And Katapult Pulls Guidance ............................................................................................................. 7

      F.     This Lawsuit.......................................................................................................... 9

LEGAL STANDARDS .................................................................................................................. 10

ARGUMENT .................................................................................................................................. 11

I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) ........................... 11

      A.     The Guidance Statements Are Protected Under The PSLRA Safe Harbor For Forward-Looking Statements ...................................................................... 12

            1.     The Guidance Statements Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language ...................... 13

            2.     Plaintiffs Fail To Allege Particularized Facts Giving Rise To A Strong Inference That Any Defendant Made The Guidance Statements With Actual Knowledge They Were False Or Misleading ................................................................................................. 15

      B.     Plaintiffs Fail To State A Scheme-Liability Claim .............................................. 20

      C.     Medlin Did Not "Make" The Guidance Statements Under *Janus* ...................... 21

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(a) ........................... 21

      A.     Plaintiffs Fail To State A "Pure Omission" Claim .............................................. 22

      B.     The Allegedly Omitted Information Was, In Fact, Widely Publicized .............. 22

      C.     Plaintiffs Fail To Plead Negligence .................................................................... 25

III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a) ........................... 25

CONCLUSION ............................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA*,
47 F.3d 47 (2d Cir. 1995)........................................................................................................15

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs.*,
2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................................25

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)..............................................................................16, 17

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007).......................................................................................................3

*In re Avon Prods. Sec. Litig.*,
2009 WL 848017 (S.D.N.Y. Feb. 23, 2009).............................................................................3

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)........................................................................14, 23, 25

*Bay Harbour Mgmt. LLC v. Carothers*,
282 F. App'x 71 (2d Cir. 2008) ..............................................................................................16

*In re Bemis Sec. Litig.*,
512 F. Supp. 3d 518 (S.D.N.Y. 2021)......................................................................................10

*In re Carter-Wallace Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)......................................................................................................19

*In re Columbia Pipeline*,
405 F. Supp. 3d 494 (S.D.N.Y. 2019)......................................................................................10

*In re Curaleaf Holdings Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) .......................................................................................14

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*,
553 F.3d 187 (2d Cir. 2009).....................................................................................................16

*Enzo Biochem v. Harbert Discovery Fund*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021).........................................................................10

*In re eSpeed Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)......................................................................................15

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018).......................................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Furlong Fund v. VBI Vaccines*,
  2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ...........................................................................22

*Gonzales v. Nat'l Westminster Bank*,
  847 F. Supp. 2d 567 (S.D.N.Y. 2012)..........................................................................................3

*Gray v. Wesco Aircraft Holdings*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020)................................................................................ *passim*

*Heinze v. Tesco*,
  971 F.3d 475 (5th Cir. 2020) ....................................................................................................22

*Ho v. Duoyuan Glob. Water*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)........................................................................................21

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)........................................................................................................17

*Jacquemyns v. Spartan Mullen Et Cie*,
  2011 WL 348452 (S.D.N.Y. Feb. 1, 2011)................................................................................16

*Janus Cap. Grp. v. First Derivative Traders*,
  564 U.S. 135 (2011)............................................................................................................11, 21

*Jaroslawicz v. M&T Bank*,
  962 F.3d 701 (3d Cir. 2020)......................................................................................................25

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)........................................................................................10

*Lau v. Opera Ltd.*,
  527 F. Supp. 3d 537 (S.D.N.Y. 2021)........................................................................................23

*In re Longtop Fin. Techs. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013).........................................................................................3

*Maloney v. Ollie's Bargain Outlet Holdings*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)..................................................................................10, 17

*Menaldi v. Och-Ziff Cap. Mgmt.*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017)........................................................................................20

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................................23, 24

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page(s)**

*In re Mindbody Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020)..................................................................20

*In re N. Telecom Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................16

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Xerox*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)..................................................................12

*Omnicare v. Laborers Dist. Couns. Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................20

*In re Pfizer Sec. Litig.*,
  538 F. Supp. 2d 621 (S.D.N.Y. 2008)....................................................................3

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
  11 F.4th 90 (2d Cir. 2021) .................................................................................20

*Resnik v. Swartz*,
  303 F.3d 147 (2d Cir. 2002)...............................................................................22

*In re Rockwell Med. Sec. Litig.*,
  2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .......................................................17

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................................11

*SEC v. Rio Tinto plc*,
  41 F.4th 47 (2d Cir. 2022) .................................................................................20

*Shields v. Citytrust Bancorp*,
  25 F.3d 1124 (2d Cir. 1994)...............................................................................19

*Slayton v. Am. Express*,
  604 F.3d 758 (2d Cir. 2010)......................................................................... *passim*

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)..................................................................21

*Tellabs v. Makor Issues & Rights*,
  551 U.S. 308 (2007)......................................................................................1, 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Tung v. Bristol-Myers Squibb*,
412 F. Supp. 3d 453 (S.D.N.Y. 2019)..................................................................................25

*In re Vivendi Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................................................22

*In re Waste Mgmt. Data Breach Litig.*,
2022 WL 561734 (S.D.N.Y. Feb. 24, 2022).......................................................................25

*Wielgos v. Commonwealth Edison*,
892 F.2d 509 (7th Cir. 1989) .......................................................................................23, 24

*In re Willis Towers Watson plc Proxy Litig.*,
937 F.3d 297 (4th Cir. 2019) ..............................................................................................22

*Zerman v. Ball*,
735 F.2d 15 (2d Cir. 1984)..................................................................................................24

**Statutes and Rules**

15 U.S.C.
§ 78u-4 .....................................................................................................................10, 15, 16
§ 78u-5 .....................................................................................................................12, 13, 15

Fed. R. Civ. P. 9(b) .......................................................................................................................10

## **PRELIMINARY STATEMENT**

No one has a crystal ball. Markets are complex, and predicting financial results—particularly amid a global pandemic—is always uncertain. Companies know that. Investors know that. And Congress knew that when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Too "often," Congress found, plaintiffs' lawyers "file frivolous 'strike' suits" based on "a company's announcement of bad news, not evidence of fraud." S. Rep. No. 104-98, at 4 (1995). Congress thus enacted the PSLRA as "a check against abusive litigation," imposing "exacting pleading requirements" and exempting most forward-looking statements from federal securities liability. *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007).

In June 2021, Katapult merged with FinServ, a special purpose acquisition company. Katapult then announced Q1 2021 financial results and reaffirmed its guidance for the rest of the year. Its guidance was optimistic, and for good reason: Katapult had seen nothing but exponential growth for years. In 2019, its revenue doubled. In 2020, its revenue almost tripled. And in Q1 2021, not only did Katapult's revenue nearly double again year-over-year, but also Wayfair—the merchant partner representing over 70% of Katapult's business—reported soaring revenue growth of close to 50% year-over-year. Naturally, Katapult also expected to see the traditional boost in consumer spending during the Q4 retailer holiday sales season (*e.g.*, Halloween, Black Friday, Christmas), an annual phenomenon which had enabled Katapult to generate most of its originations in the second halves of 2018, 2019, and 2020.

As the summer wore on, however, the economic clouds began to darken for e-commerce. The Fourth of July weekend, an important holiday for retailers, was a dud. In late July, Amazon (an e-commerce bellwether) missed its quarterly sales estimate for the first time in three years and warned of falling retail demand. On August 5, 2021, Wayfair reported that its Q2 U.S. revenue fell over 15% year-over-year, and that its Q3 revenue-to-date was down even more, sounding the alarm

1

about "the most complex macro environment" in decades. Faced with these indicators, Katapult decided to pull its full-year guidance on August 10, 2021. Katapult's stock price then fell as investors, too, tempered their expectations.

From this case study in a company responsibly updating its outlook, Plaintiffs somehow infer fraud. They insist Defendants must have had "actual knowledge" Katapult's guidance would be "impossible to achieve." ¶¶ 15, 165.[1] Plaintiffs base that conclusion—not on documents, witnesses, or even a motive—but on the mere failure of the forecast to pan out. It is a textbook example of alleging "fraud by hindsight," *i.e.*, the very thing Congress enacted the PSLRA to prevent. The law does not require clairvoyance. The best a company can do is provide a good-faith forecast and advise investors of the risks. That is exactly what Katapult did here.

The Amended Complaint asserts three causes of action under the Securities Exchange Act of 1934 (the "Exchange Act"). Each should be dismissed.

Plaintiffs Do Not State A Section 10(b) Claim. Katapult's guidance and one Defendant's related statement are protected under a PSLRA safe harbor because they were identified as forward-looking and accompanied by meaningful cautionary language. The safe harbor also protects these forward-looking statements for the independent reason that Plaintiffs allege no particularized facts giving rise to a strong inference that the statements were made with actual knowledge they were false or misleading.

Plaintiffs Do Not State A Section 14(a) Claim. Plaintiffs cannot pursue a "pure omission" theory without identifying a duty to disclose the omitted information, and they identify none. Besides, the allegedly omitted information here was, in fact, widely publicized.

---

[1] "¶" refers to paragraphs of the Amended Complaint ("AC"). "Ex." refers to the exhibits attached to the Declaration of Brian M. French, filed concurrently herewith. Unless otherwise noted, all emphasis is added, and all internal citations, quotation marks, and alterations are omitted.

2

<u>Plaintiffs Do Not State A Section 20(a) Claim.</u> Plaintiffs do not allege an underlying violation, or even that all Defendants exercised actual control over the challenged statements.

For these reasons—and more, below—the AC should be dismissed with prejudice.

**BACKGROUND[2]**

**A.      Katapult's Business And Rapid Growth**

Defendant Katapult Holdings, Inc. is a publicly traded, e-commerce focused financial technology company offering lease-purchase options to non-prime U.S. consumers. Ex. 1 at 104. Consumers with non-prime credit, who comprise an estimated 38% of all U.S. consumers, often lack sufficient cash or credit to obtain everyday durable goods, such as electronics, computers, home furnishings, and appliances. *Id.* at 105. Katapult helps these underserved consumers obtain the goods they need, while also helping merchants reach a previously inaccessible segment of the population. *Id.* at 104.

Katapult does most of its business through Wayfair, one of the world's largest online furniture and home goods stores. *Id.* at 126. In 2020, for example, "Wayfair represented approximately 72%" of Katapult's origination dollars. *Id.* at 50. For that reason, Katapult has always cautioned investors that its own performance may depend, in large part, on Wayfair's performance. *See, e.g., id.* at 50 ("The concentration of a significant portion of our business and transaction volume with a limited number of merchants, or type of merchant or industry, exposes

---

[2] On a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference," *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007), as well as "matters of which a Court may take judicial notice," *In re Pfizer Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008). The Court may take judicial notice of "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012); "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018); and "analyst reports," *In re Avon Prods. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009).

3

us disproportionately . . . to the economic performance of those merchants or industry[.]”).

Katapult also generates business through “waterfall” arrangements with prime lenders, such as Affirm. ¶ 61. Online retailers often give customers the option to apply for credit at the checkout page (*i.e.*, “buy now, pay later”). If the prime lender—Affirm, say—denies the application, the customer will often cancel the transaction altogether. But through a waterfall arrangement, any application Affirm declines will automatically “fall” to Katapult, giving Katapult the opportunity to approve it. ¶¶ 61-63 (“If Affirm declines the application the data is electronically transmitted, and we have the opportunity to approve that consumer.”). Although Katapult has no control over which applications Affirm passes along or how many, Katapult nonetheless benefits from the incremental business. ¶ 63 (“So we love the waterfall, because it captures us consumers that applied and got turned down for whatever reason.”).[3]

Between 2018 and 2020, Katapult experienced tremendous, exponential growth. As the table below shows, Katapult's revenue doubled in 2019 and nearly tripled in 2020:

| $ in millions[4] | 2018 | 2019 | 2020 |
|---|---|---|---|
| **Revenue** <br> *YoY Growth* | $43.1 | $91.9 <br> *113%* | $247.2 <br> *169%* |

### B.    The Merger Announcement

On December 18, 2020, FinServ Acquisition Corp. (“FinServ”), a special purpose acquisition company (“SPAC”), announced a definitive merger agreement with Katapult. ¶ 59. FinServ made the announcement in a press release, to which it attached a Katapult investor presentation. Ex. 2. The presentation included Katapult's full-year 2021 forecasts—projecting $455 million in revenue, $402 million in originations, and $70 million in EBITDA. ¶ 60; Ex. 2 at

---

[3] Katapult also has similar waterfall arrangements with other prime lenders. ¶ 62.

[4] Ex. 3 at 2; Ex. 1 at 125.

4

47. The presentation also cautioned investors that Katapult's forecasts were "subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions," "risks related to the concentration of Katapult's business among a relatively small number of merchants," and "the impact of the COVID-19 pandemic," such that "actual results could differ materially from the results implied by these forward-looking statements." Ex. 2 at 13.

Following the merger announcement, Katapult publicly discussed its waterfall arrangements on multiple occasions. Katapult reminded investors that it gets the opportunity to approve waterfall applications only if prime lenders decline them first, meaning prime lenders ultimately control how many such applications "fall" to Katapult. *See, e.g.*, ¶ 61 ("*if* Affirm declines that application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer"); ¶ 62 ("*If* Affirm declines the application the data is electronically transmitted, and we have the opportunity to approve that consumer."). Katapult's CEO, Orlando Zayas, also explained that Katapult's waterfall application volume necessarily changes when prime lenders adjust their lending criteria in response to changing economic conditions: "We are in a waterfall situation where, when the economy gets rough, the prime lenders tighten up. We're actually a beneficiary of that because we see a better credit quality than we've seen in the past get turned down, and we can still manage that risk." Ex. 4 at 3. Notably, around the same time, Affirm disclosed that it was refining its risk model in response to "improved macroeconomic conditions." Ex. 5 at 2.

On April 21, 2021, Katapult adjusted its full-year guidance, projecting $425-$475 million in revenue, $375-425 million in originations, and $50-$60 million in EBITDA. ¶ 66; Ex. 6 at 47.

Katapult's guidance assumed a 2021 growth rate that was, if anything, modest compared to its recent historical growth rate:

| $ in millions[5] | 2019 | 2020 | 2019 to 2020 Growth Rate | 2021 Forecast | Forecasted 2020 to 2021 Growth Rate (Low-High) |
|---|---|---|---|---|---|
| **Revenue** | $91.9 | $247.2 | 169.1% | $425 - $475 | 71.9% - 92.2% |
| **Gross Originations** | $102.5 | $236.4 | 130.5% | $375 - $425 | 58.7% - 79.8% |
| **EBITDA/(Loss)** | $(4.9) | $40.2 | N/A[6] | $50 - $60 | 24.5% - 49.3% |

Within weeks, Amazon (an e-commerce bellwether) and Wayfair posted stellar Q1 2021 results. On April 29, 2021, Amazon announced a net-sales increase of 44% year-over-year. Ex. 7 at 5. And on May 6, 2021, Wayfair reported that net revenue had increased almost 50% year-over-year. Ex. 8 at 5.

**C.    FinServ Issues The Proxy, And FinServ's Shareholders Approve The Merger**

On May 18, 2021, FinServ filed the final Rule 424(b)(3) prospectus and proxy statement (the "Proxy"). ¶ 71; Ex. 1. Although the Proxy asked FinServ shareholders to approve the merger, it did not mince words about the risks or the uncertainty around Katapult's projections. Across 35 pages of detailed "Risk Factors," the Proxy warned investors that Katapult's business could suffer from "changes in factors affecting discretionary spending for nonprime consumers," including "disposable consumer income," "availability of credit," and "COVID-19," that could "reduce demand for [its] products and services resulting in lower revenue"; that Wayfair represented 72% of Katapult's origination dollars in 2020, "expos[ing Katapult] disproportionately

---

[5] Ex. 3 at 2-4; Ex. 6 at 47.

[6] No EBITDA growth rate is listed here due to the difficulty expressing, in percentage terms, Katapult's extraordinary EBITDA growth from negative $4.9 million in 2019 to positive $40.2 million in 2020.

to . . . [Wayfair's] economic performance"; that "strategic actions" by other market participants could impact Katapult's stock price; that Katapult's "estimates of market opportunity and forecasts of market growth may prove to be inaccurate," making it "difficult to sustain" its previous "rapid growth"; and that Katapult's "revenue and operating results may fluctuate" and could "vary from quarter to quarter and by season." Ex. 1 at 47, 49-51, 68.

Informed of the risks, FinServ's shareholders voted to approve the merger on June 7, 2021. ¶ 75. The merger closed on June 9, 2021. *Id.*

### D.    Katapult Announces Q1 2021 Results And Reaffirms Guidance

On June 15, 2021, Katapult announced Q1 2021 results. Consistent with its full-year projections, year-over-year, Katapult's revenue climbed 88%, its gross originations 71%, and its EBITDA 122%. Ex. 9 at 4. Katapult also added 26 new merchants in the first quarter. Ex. 10 at 6.

Katapult also reaffirmed its full-year guidance from April 2021. ¶ 78; Ex. 9 at 5. "[G]iven the data we have today," Katapult's CFO, Karissa Cupito, said, "we continue to believe that this guidance is reasonable and appropriate." ¶ 80. Cupito explained that Katapult "anticipate[d] the majority [its] growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021." ¶ 86; Ex. 10 at 9. This, she noted, was due to "traditional retailer seasonality," *i.e.*, increased consumer spending during the Q4 retailer holiday sales season (*e.g.*, Halloween, Black Friday, Christmas). Ex. 10 at 7, 11. In 2019, for example, Katapult generated 65% of its full-year originations in the second half of the year (and only 13% in Q1). Ex. 6 at 46.

As always, Katapult reminded investors that its forecasts were inherently uncertain, might not pan out, and were subject to the detailed risk factors identified in its SEC filings and the Proxy. Ex. 9 at 6; Ex. 10 at 4.

### E.    E-Commerce Retail Sales Decline Precipitously, And Katapult Pulls Guidance

As the summer wore on, the economic environment for e-commerce took a turn for the

worse. Consumer spending fell over the Fourth of July weekend, an important holiday for American retailers. ¶ 85. On July 29, 2021, Amazon missed its quarterly sales estimate for the first time in three years and warned of falling retail demand for the remainder of the year. Ex. 11. Most troublingly of all for Katapult, on August 5, 2021, Wayfair announced that its Q2 U.S. revenue had nosedived over 15% year-over-year (Ex. 12 at 4), and that its Q3 revenue-to-date was "down in the high-teens" (Ex. 13 at 9), sounding the alarm about an unprecedented macroeconomic environment:

> We need to acknowledge that this is probably the murkiest moment in 2021. Frankly, it's the most complex macro environment to read that I've seen in my entire career. Every public company is having to base its comments on only a few weeks of data, all while the macro and public health picture is rapidly changing. We believe we'll get to a better view of consumer behavior as people settle into their normal routines post summer.

Ex. 13 at 10; *see id.* at 4 (discussing "bottlenecks at nearly every point in the supply chain").

Faced with these indicators, Katapult decided to pull its guidance on August 10, 2021. ¶ 83. On an investor call, Cupito echoed Wayfair's comments from a few days earlier:

> We are in a very complex macroeconomic environment, to say the least. Since our last call, we observed meaningful changes in both e-commerce and retail sales forecast[s] and consumer spending behavior, and in the past few weeks, the onset of new policies from the COVID-19 variants. Beginning with the data that became available after our earnings call we then validated as many online retailers released earnings over the past few weeks, the consensus in the market suggests e-commerce sales will likely slow for the balance of the year. Coupled with developments, consumer spending in July appear to be shifting away from durable good categories in favor of travel, clothing and entertainment.

Ex. 14 at 17-18. Zayas made similar observations, stating:

> On the macro front, it is a rapidly changing and complex environment that we have not previously faced in our business, which makes forecasting difficult. Since our Q1 earnings call and continuing today, many new developments emerge[d] that have impact on our business. Starting in late June and noticeably picking up during the July 4th weekend, we began seeing macro headwinds consistent [with] what

you've heard from several retailers. First, we observed our consumers shift their focus towards new spending categories and away from durable goods as summer activities increased and restrictions abated. Coupled with this consumer category expenditure, external data has become available suggesting e-commerce sales will likely slow for the balance of the year.

Ex. 14 at 14. Zayas also noted that prime lenders had begun loosening their lending standards in response to changing economic conditions, "stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume." ¶ 88.

For all that, Katapult still achieved year-to-date ("YTD") revenue of $158.1 million, representing an increase of 53% year-over-year. Ex. 14 at 14. Katapult also added 31 new merchants in the second quarter, bringing the total number of new merchants for the first half of the year to 57. Ex. 14 at 15. But Katapult's stock price declined. ¶ 98. And on August 27, 2021, this litigation began.

### F. This Lawsuit

In the AC, Plaintiffs allege that Defendants Katapult, Zayas, Cupito, and Katapult COO Derek Medlin violated Section 10(b) of the Exchange Act when Katapult issued its full-year guidance on June 15, 2021, and when Cupito called the guidance "reasonable and appropriate" later that day. ¶¶ 114, 117, 159. Plaintiffs also allege that Defendants Katapult, Zayas, FinServ CEO Lee Einbinder, and FinServ CFO Howard Kurz violated Section 14(a) of the Exchange Act when FinServ filed the Proxy on May 18, 2021 without including certain (already public) details about Katapult's business. ¶¶ 190-191, 193, 199. Lastly, Plaintiffs allege that the individual Defendants are liable as control persons under Section 20(a) of the Exchange Act—Zayas, Cupito, and Medlin in connection with the Section 10(b) claim, and Zayas, Einbinder, and Kurz in connection with the Section 14(a) claim. ¶¶ 171, 204.

## LEGAL STANDARDS

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Plaintiffs must plead (i) a material misrepresentation or omission, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) reliance, (v) loss causation, and (vi) damages. *Maloney v. Ollie's Bargain Outlet Holdings*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021) (Oetken, J.). To state a claim under Section 14(a), 15 U.S.C. § 78n(a), Plaintiffs must plead (i) a material misrepresentation or omission, (ii) negligence, (iii) that the proxy solicitation itself, rather than the alleged defect in the solicitation materials, was an "essential link" in accomplishing the transaction, and (iv) loss causation. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).

Both claims are subject to the PSLRA's heightened pleading requirements. *See Maloney*, 518 F. Supp. 3d at 777 (Section 10(b)); *In re Bemis Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021) (Section 14(a)). Under the PSLRA, the AC must not only identify each statement and omission alleged to have been misleading, but also specify "the reason or reasons why" each is misleading. 15 U.S.C. § 78u-4(b)(1)(B). For all allegations "made on information and belief"—here, all nonpublic information in the AC—the AC "shall state with particularity all facts on which that belief is formed." *Id.* And, for the Section 10(b) claim, the AC must "state with particularity facts giving rise to a strong inference that [Defendants] acted with [scienter]." *Id.* § 78u-4(b)(2)(A).

Both claims are also subject to Rule 9(b), which requires the AC to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "While there is no requirement . . . that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a), when plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." *In re Columbia Pipeline*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (cleaned up); *see also Enzo Biochem v. Harbert Discovery Fund*, 2021 WL 4443258, at *8 (S.D.N.Y. Sept. 27, 2021) ("[W]hether Rule 9(b)'s

10

heightened pleading standard applies to a particular case turns on the nature of the plaintiff's allegations, not the elements of the legal cause of action."). Here, the AC squarely contends that Section 14(a) Defendants Einbinder and Kurz (FinServ's CEO and CFO, respectively) "had an incentive to take liberties," "to overlook problems," and "to present [Katapult] in [a] misleadingly favorable light to ensure the acquisition." ¶ 141; *see* ¶¶ 16-18 (alleging, in a string of paragraphs about the Proxy, that "Defendants were aware of the serious and significant risk" posed by Katapult's waterfall arrangements). The AC also features a multipage, fraud-focused diatribe against SPACs and their sponsors, ¶¶ 41-49 (accusing SPACs like FinServ of being "magnets for fraud," "encourag[ing] fraud," and "creat[ing] perverse incentives for their key employees"), which could only be addressed to Einbinder and Kurz. The AC even characterizes the Proxy's omissions as "misleading" and "untrue" (*e.g.*, ¶¶ 189, 193, 195-198), terms "classically associated with fraud," *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) ("Plaintiffs assert that their Section 11 claims do not sound in fraud, but the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." (cleaned up) (emphases in original)).

## ARGUMENT

Under any pleading standard, the result is the same: Plaintiffs do not state an Exchange Act claim because they do not plead an actionable misstatement or omission, scienter, negligence, or that every Defendant "made" a statement under *Janus Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011).

## I.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)

Plaintiffs challenge two statements under Section 10(b). Both were made on June 15, 2021. The first is Katapult's full-year 2021 guidance. ¶ 114; Ex. 9 at 5. The second is Cupito's remark

11

on a related investor call that, "given the data we have today, we continue to believe that this guidance is reasonable and appropriate." ¶ 117; Ex. 10 at 9. According to Plaintiffs, these two statements—*i.e.*, the "Guidance Statements"—were materially false and misleading because it was "impossible" for Katapult to meet those year-end forecasts. ¶¶ 15, 20, 116, 118. Plaintiffs assert their Section 10(b) claim against Katapult, Zayas, Cupito, and Medlin. ¶ 159.

Plaintiffs' challenge fails for three reasons. *First*, the Guidance Statements are protected under the PSLRA safe harbor for forward-looking statements. *Second*, Plaintiffs do not state a separate scheme-liability claim. *Third*, Medlin did not "make" either of the Guidance Statements.

### A. The Guidance Statements Are Protected Under The PSLRA Safe Harbor For Forward-Looking Statements

In the PSLRA, Congress created a "safe harbor for forward-looking statements." 15 U.S.C. § 78u-5. The safe harbor provides that a defendant "shall not be liable" for any forward-looking statement that is either (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," (ii) "immaterial," or (iii) not "made with actual knowledge by [the speaker] that the statement was false or misleading." *Id.* § 78u-5(c). "Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy *any one* of these three categories." *Okla. Firefighters Pension & Ret. Sys. v. Xerox*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox*, 771 F. App'x 51 (2d Cir. 2019); *see also Slayton v. Am. Express*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive.").

The Guidance Statements are protected under two, independent prongs of the safe harbor. Both were identified as forward-looking and accompanied by meaningful cautionary language, and neither was made with actual knowledge it was false or misleading. *See Gray v. Wesco Aircraft*

12

*Holdings*, 454 F. Supp. 3d 366, 395 (S.D.N.Y. 2020) ("Either cautionary language or an absence of knowledge is alone sufficient to trigger the safe harbor."), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

**1.    The Guidance Statements Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language**

The Guidance Statements were unmistakably forward-looking and identified as such. They fit squarely within the PSLRA's definition of forward-looking statements, as both addressed "a projection of revenues" and "other financial items," "future economic performance," and related "assumptions." 15 U.S.C. § 78u-5(i)(1). Both were expressly identified as forward-looking. *See* Ex. 9 at 6 (cautioning that the press release contains forward-looking statements, including "statements regarding estimates and forecasts of financial and performance metrics"); Ex. 10 at 4 ("[T]his call will contain forward-looking statements regarding future events and financial performance."). "Linguistic cues" likewise confirm both were forward-looking. *Compare Slayton*, 604 F.3d at 769 ("facts," "circumstances," and "linguistic cues" can identify a forward-looking statement, including "cues like 'we expect' or 'we believe'"), *with* ¶ 114 ("Katapult *anticipates* FY 2021 Gross Originations, Revenue and Adjusted EBIDTA to be in the following ranges"), *and* ¶ 117 ("we continue to *believe* that this guidance is reasonable and appropriate"). Plaintiffs cannot carve out Cupito's comment, as an expression of "confidence" in projections is "forward-looking within the meaning of the PSLRA safe harbor." *Gray*, 454 F. Supp. 3d at 387, 390 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement.").

The Guidance Statements were also accompanied by extensive, meaningful cautionary language. Katapult cautioned that actual results were "difficult or impossible to predict and *will differ* from assumptions," including due to "risks and uncertainties" from changes in "business, market, financial, political and legal conditions," the "uncertainty of the projected financial

13

information," "the concentration of Katapult's business among a relatively small number of merchants," "the effects of competition on Katapult's future business," and "the impact of the COVID-19 pandemic." Ex. 9 at 6; *see* Ex. 10 at 4. Katapult also reminded investors to carefully consider the detailed risk factors identified in its SEC filings and the Proxy. Ex. 9 at 6; Ex. 10 at 4. The Proxy included *35 pages* of highly specific "Risk Factors," warning, for example, that:

- Katapult's business could suffer from "changes in factors affecting discretionary spending for nonprime consumers," including "disposable consumer income," "availability of credit," and "COVID-19";

- Wayfair represented 72% of Katapult's origination dollars in 2020, "expos[ing Katapult] disproportionately to . . . [Wayfair's] economic performance";

- "[S]trategic actions" by other market participants could impact Katapult's stock price; and

- Katapult's "estimates of market opportunity and forecasts of market growth may prove to be inaccurate," making it "difficult to sustain" its previous "rapid growth."

Ex. 1 at 47, 49-51, 68. Katapult even highlighted its guidance as a specific estimate it may fail to achieve. *Id.* at 68.

All of this cautionary language easily satisfies the standard for the PSLRA safe harbor. *See, e.g.*, *Slayton*, 604 F.3d at 771, 773 (cautionary language must "convey[] substantive information" but "need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor"); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk."), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *In re Curaleaf Holdings Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) ("There is no requirement that a Company disclose its risk in any magic words preferred by plaintiffs.").

The PSLRA safe harbor alone compels dismissal of Plaintiffs' Section 10(b) claim.

14

### 2.    Plaintiffs Fail To Allege Particularized Facts Giving Rise To A Strong Inference That Any Defendant Made The Guidance Statements With Actual Knowledge They Were False Or Misleading

That the Guidance Statements were identified as forward-looking and accompanied by meaningful cautionary language should end the matter. But the Guidance Statements are inactionable for another, independent reason: Plaintiffs do not allege they were made with "actual knowledge" they were false or misleading.

The PSLRA requires Plaintiffs to plead particularized facts creating a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Under the safe harbor's "actual knowledge" prong, "the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Gray*, 454 F. Supp. 3d at 381 (quoting *Slayton*, 604 F.3d at 773); *see* 15 U.S.C. § 78u-5(c)(1)(B).

Here, Plaintiffs here do not even meaningfully attempt to plead a motive to deceive.[7]

---

[7] To be sure, Plaintiffs allege that (i) Einbinder and Kurz had "an incentive to take liberties," and (ii) Zayas's Katapult stock was subject to a lock-up period that expired on June 16, 2021. ¶¶ 141-143. But Plaintiffs do not claim Einbinder or Kurz violated Section 10(b), so their motives are irrelevant. As for the lock-up, Plaintiffs appear to misread FinServ's Proxy; the language they quote refers to a lock-up period for FinServ's "Chief Executive Officer," *i.e.*, Einbinder, not Zayas. *Compare* ¶ 142, *with* Ex. 1 at 137. But even assuming Zayas was subject to the same lock-up, Plaintiffs do not allege that he (or any other Defendant) sold Katapult stock during the putative class period. This makes the expiration date of any such lock-up irrelevant, and the absence of stock sales further "undermines" any inference of scienter. *See, e.g.*, *Acito v. IMCERA*, 47 F.3d 47, 54 (2d Cir. 1995) (defendants' lack of stock sales "undermines plaintiffs' claim that defendants" acted with scienter); *In re eSpeed Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) (holding that defendants' lack of stock sales during the putative class period undermined

Absent a motive, Plaintiffs' scienter allegations must be "correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*, 553 F.3d 187, 199 (2d Cir. 2009); *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 531 (S.D.N.Y. 2020) ("Having failed to demonstrate a remotely plausible, personalized motive, Plaintiffs must make an even stronger showing of intent using other facts.").

Rather than plead particularized facts showing Defendants' actual knowledge of falsity, Plaintiffs speculate that: (i) Katapult tracked its YTD results in real time; (ii) Defendants actually saw those results before they issued full-year guidance on June 15, 2021; (iii) the results made the guidance "impossible to achieve"; and (iv) Defendants actually knew the results made the guidance "impossible to achieve." ¶¶ 15, 165. Factual support in the AC for that speculation is not merely thin; it is nonexistent.

*First*, Plaintiffs allege no facts showing that Katapult tracked its YTD results in real time. Plaintiffs cannot hang their hat on Zayas's August 10, 2021 discussion of "macro headwinds" "in late June" and "the July 4th weekend" (¶¶ 133, 138); that shows only that Katapult had a sense of its performance over a month later, not in real time. Nor is it even relevant that Katapult tracked short-term delinquencies,[8] "touted its technological acumen," or made individual leasing decisions

---

motive allegations); *In re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders . . . is inconsistent with an intent to defraud shareholders.").

[8] This allegation also falls short of the PSLRA pleading standard. Allegations made on "information and belief," such as this one (¶ 134), must state "with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). But the AC provides no such detail; Plaintiffs' belief is not attributed to any document, witness, or other source. It appears to be based on nothing more than speculation. Thus, "the court is not required to presume that the allegations are true." *Jacquemyns v. Spartan Mullen Et Cie*, 2011 WL 348452, at *7 (S.D.N.Y. Feb. 1, 2011); *see also Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 76-77 (2d Cir. 2008) (affirming dismissal of "allegations pled on only information and belief but lacking particularized facts").

with "speed" (¶¶ 134, 136-137), as none of it has anything to do with how quickly Katapult tabulated its overall financial results.

Courts in this District consistently reject far stronger allegations than these. In *Maloney*, for example, this Court held that plaintiffs had failed to plead that defendants had actual knowledge—or even acted with recklessness—that their sales projections were false, despite confidential-witness allegations that defendants received daily reports and "real-time information" contrary to their statements. 518 F. Supp. 3d at 780-82 (noting that plaintiffs had failed to "specify exactly what information was contained" in those reports). The Court held the same in *AT&T/DirectTV Now* despite confidential-witness allegations that defendants "had access to various real-time, performance metrics" and received "operational review packages" contrary to their statements. 480 F. Supp. 3d at 531. Meanwhile, Plaintiffs here identify no reports, no witnesses, no communications—nothing at all indicating Katapult tracked its YTD results in real time. Naked speculation is not enough. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

*Second*, even if Katapult tracked its YTD results in real time, Plaintiffs allege no facts suggesting Zayas, Cupito, or Medlin actually saw those results before Katapult issued its guidance on June 15, 2021. Indeed, the AC is silent on what information any individual Defendant saw or received at any point before Katapult issued its guidance. Plaintiffs cannot cure that problem with a boilerplate "core operations" allegation (*see* ¶ 132); even if the doctrine survived the PSLRA,[9] it "cannot establish scienter on its own," much less "actual knowledge." *Maloney*, 518 F. Supp. 3d

---

[9] *See, e.g.*, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (rejecting plaintiff's core operations argument as "plainly insufficient to raise a strong inference of scienter"); *In re Rockwell Med. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (same).

17

at 781. Nor can Plaintiffs lean on Cupito's passing reference to "the data we have today" (¶ 80), which does no more than beg the only relevant question: What data did the individual Defendants actually have that day?

*Third*, Plaintiffs' theory fails for another, more fundamental reason: Katapult's YTD results as of June 15, 2021 did not make its full-year guidance "impossible to achieve." If, as Plaintiffs speculate, Katapult had achieved $145.3 million in revenue as of June 15, 2021, then Katapult would have needed $304.7 million in additional revenue to hit the mid-point of its guidance. ¶ 119. That additional revenue would have represented 98% growth year-over-year from the same period in 2020—substantially *lower* growth than Katapult achieved in *both* 2019 and 2020. *See supra* at 4 (revenue growth of 113% in 2019 and 169% in 2020); Ex. 3 at 2-4; Ex. 9 at 5; Ex. 14 at 4.

Plaintiffs also ignore that Katapult expected to benefit from traditional retailer seasonality, *i.e.*, increased consumer spending during the Q4 retailer holiday sales season (*e.g.*, Halloween, Black Friday, Christmas). When Katapult issued guidance on June 15, 2021, Cupito explained that Katapult "anticipate[d] the majority [its] growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021." ¶ 86. And that made perfect sense: Katapult generated most of its originations in the second half of each of the preceding three years. For example, in 2019, Katapult generated only 35% of its originations in the first half of the year (13% in Q1, 22% in Q2), with the other 65% coming in the second half of the year. Ex. 6 at 46. Katapult generated 39% of its annual originations *in Q4 alone* in both 2019 and 2020. *Id.* Thus, when Plaintiffs contend that achieving ~33% of its full-year projections on June 15 made those projections "impossible to achieve," they simply ignore Katapult's (and the wider industry's) historical trends. *See* ¶¶ 118-120.

Predicting that historical trends would continue in Q3 and Q4 2021 might have been optimistic. But it was certainly not "impossible." And it would take far more than the AC's conclusory allegations here to demonstrate otherwise. *See, e.g.*, ¶ 20 (merely declaring that "achieving the stated performance was impossible").

*Fourth*, as if all that were not enough, Plaintiffs allege no facts—none—suggesting Zayas, Cupito, or Medlin actually knew the YTD results made Katapult's guidance "impossible to achieve." Actual knowledge is a subjective inquiry. Thus, even if there were objectively "no way that Katapult could possibly achieve the annual guidance" (¶ 82), it would not avail Plaintiffs. The Second Circuit explained precisely this point in *Slayton*:

> We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry—they must show actual subjective knowledge. Therefore, even if we were to conclude, based on the alleged facts, that the risk that losses would exceed $182 million was *so obvious that defendants must have been aware of it*, this would not avail the plaintiffs.

*Slayton*, 604 F.3d at 776 n.9 (cleaned up). Here, Plaintiffs offer no facts concerning any individual Defendant's actual, subjective knowledge—except, of course, for Defendants' public statements indicating they sincerely believed in Katapult's guidance. *See, e.g.*, ¶¶ 60, 65-66.

In sum, the AC does not give rise to *any* inference of scienter, let alone a "strong" one. The far more compelling inference is that Defendants provided a good-faith forecast based on Katapult's historical track record, and simply did not anticipate the economic headwinds they ultimately encountered. *In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) ("[E]ven if the defendants turned out to be wrong about predicted financial performance, 'misguided optimism is not a cause of action, and does not support an inference of fraud.'" (quoting *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129 (2d Cir. 1994))). Plaintiffs therefore fail "to surmount the high bar of actual knowledge," and their Section 10(b) claim should be dismissed. *Gray*, 454 F.

19

Supp. 3d at 395.[10]

### B.        Plaintiffs Fail To State A Scheme-Liability Claim

In vague, boilerplate terms, Plaintiffs appear to suggest Defendants violated Rules 10b-5(a) and (c). ¶¶ 160-163. To the extent Plaintiffs really assert a scheme-liability claim, it fails.

A scheme-liability claim requires "something *beyond* misstatements and omissions." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original) ("[M]isstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions." (emphases in original)); *see also In re Mindbody Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020) (dismissing Rule 10b-5(a) and (c) claim "because it is indistinguishable from the misstatements and omissions alleged under" Rule 10b-5(b)); *Menaldi v. Och-Ziff Cap. Mgmt.*, 277 F. Supp. 3d 500, 520 (S.D.N.Y. 2017) (Oetken, J.) (plaintiffs cannot "merely repackage the misrepresentation allegations" into a scheme-liability claim). Accordingly, Plaintiffs must allege that other "deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 105 (2d Cir. 2021).

Here, Plaintiffs allege nothing beyond the Guidance Statements themselves. Any scheme-liability claim would therefore be "indistinguishable" from Plaintiffs' misstatement claim and fail as a matter of law. *Mindbody*, 489 F. Supp. 3d at 217.

---

[10] For the same reasons, the Guidance Statements are also inactionable statements of opinion under *Omnicare v. Laborers District Counsel Construction Industry Pension Fund*, 575 U.S. 175 (2015). *See id.* at 186 (holding that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong"); *Gray*, 454 F. Supp. 3d at 400 ("Plaintiff also has failed to allege facts supporting the strong inference that either Wesco's management or board did not hold the beliefs they professed.").

#### C.       Medlin Did Not "Make" The Guidance Statements Under *Janus*

Medlin did not "make" the Guidance Statements, so he cannot be liable for either one under Section 10(b). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142. But Plaintiffs do not allege that Medlin had *any* authority over either Guidance Statement, let alone "ultimate" authority. In fact, the AC mentions Medlin's name only four times—once in the caption and three times when the AC defines terms. ¶¶ 32-33. He did not sign the press release or related Form 8-K. Ex. 9; *see In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) ("Because he did not sign those filings, he did not 'make' the statements they contained."). And he cannot be liable merely for attending an investor call. *See Ho v. Duoyuan Glob. Water*, 887 F. Supp. 2d 547, 572 at n.13 (S.D.N.Y. 2012) (holding that *Janus* precludes making one party liable for failing to correct another party's statement on an investor call). For this independent reason, Plaintiffs' Section 10(b) claim against Medlin should be dismissed.

### II.       PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(a)

Plaintiffs challenge the May 18, 2021 Proxy under Section 14(a). But they do not challenge any particular statement therein. Rather, Plaintiffs insist the *entire* Proxy was false and misleading because it omitted that, under Katapult's waterfall arrangements, (i) Katapult received only those applications rejected by prime lenders, and (ii) prime lenders could and, under certain economic conditions (*e.g.*, higher savings rates, lower delinquency rates), would loosen their lending standards and leave fewer applications for Katapult. ¶ 181. Plaintiffs assert their Section 14(a) claim against Katapult, Zayas, Einbinder, and Kurz. ¶¶ 190-191, 193, 199.

Plaintiffs' challenge fails for three independent reasons. *First*, a "pure omission" is inactionable absent a duty to disclose, and Plaintiffs identify none. *Second*, the allegedly omitted

information was, in fact, widely publicized. *Third*, Plaintiffs fail to allege facts showing that any individual Defendant acted negligently.

### A.      Plaintiffs Fail To State A "Pure Omission" Claim

An omission can violate Section 14(a) only "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002); *see also Gray*, 454 F. Supp. 3d at 401 ("The plain language of Rule 14a-9 requires a plaintiff to show both materiality *and* a false or misleading statement as a result of the omission.").[11] A "pure omission"—*i.e.*, one that does not make any affirmative statement false or misleading—"is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Vivendi Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).

The AC identifies no SEC regulation or other source creating a duty to disclose the allegedly omitted information, and there is none. For this simple reason, Plaintiffs' Section 14(a) claim should be dismissed. *See Furlong Fund v. VBI Vaccines*, 2016 WL 1181710, at *6 (S.D.N.Y. Mar. 25, 2016) (dismissing pure omission claim under Section 14(a) where plaintiff "neglected to identify any SEC regulation imposing a duty on defendants to disclose" the information).

### B.      The Allegedly Omitted Information Was, In Fact, Widely Publicized

Even if Plaintiffs' "pure omission" claim were not otherwise foreclosed, it would still fail.

---

[11] *Cf. Heinze v. Tesco*, 971 F.3d 475, 483 (5th Cir. 2020) ("Heinze is left with only a pure-omission theory that is untethered to any specific false or misleading representation in the proxy statement. Such pure-omission claims are not cognizable. The texts of Section 14(a) and SEC Rule 14a-9 do not provide a freestanding cause of action to challenge any and all material omissions from proxy statements. Instead, they allow an omission-based claim only if the proxy statement 'omits to state any material fact necessary in order to make the *statements therein* not false or misleading.'" (emphasis in original) (quoting 17 C.F.R. § 240.14a-9(a))); *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 306 (4th Cir. 2019) (rejecting the argument "that the omission of a material fact is actionable [under Section 14] even if it doesn't make an affirmative statement false or misleading").

"Where allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information." *Bank of Am.*, 980 F. Supp. 2d at 576; *see, e.g.*, *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) ("[T]here is no duty to disclose information to one who reasonably should be aware of it."); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("It is pointless and costly to compel firms to reprint information already in the public domain." (quoting *Wielgos v. Commonwealth Edison*, 892 F.2d 509, 517 (7th Cir. 1989) (Easterbrook, J.))). And here, the market understood exactly how Katapult's waterfall arrangements worked.

Katapult made crystal clear that it gets the opportunity to approve waterfall applications only if prime lenders decline them first. During an investor call in December 2020, Zayas explained that, under Katapult's arrangement with Affirm, "*if* Affirm declines [an] application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer." ¶ 61. He said the same at an investor conference in January 2021: "*If* Affirm declines [an] application the data is electronically transmitted, and we have the opportunity to approve that consumer." ¶ 62. And the list goes on. *See, e.g.*, Ex. 15 at 2 (November 2019: "*If* customers are denied financing with Affirm, they automatically get considered by Katapult."); Ex. 4 at 3 (March 2021: "*If* Affirm declines a purchase, they send the data to [Katapult].").

There is simply no other way to interpret these disclosures. They are basic conditional statements: *If* Affirm declines an application, Katapult can approve it. Zayas never said Katapult gets to decide whether Affirm approves an application. Nor did he suggest Affirm had limitations on which applications it could approve or how many. Indeed, when Plaintiffs try to muster an example of Defendants' revealing "the truth," they point to a post-class period statement that is almost identical to what Zayas disclosed *before* the class period: "*If* the prime lender declines the

application, the data is electronically transmitted to us and we have the opportunity to approve this customer." ¶¶ 102-104. It was thus abundantly clear to the market that Katapult occupied a "secondary" position in the waterfall. ¶ 103.

The market was equally clear on the risks associated with Katapult's position in the waterfall. The market knew that online retailers see a finite number of financing applications, meaning Affirm's lending decisions necessarily affect the number of applications that "fall" to Katapult. Investors also knew that Affirm—a free, self-interested economic actor—could modify its lending standards at any time, to any degree, and for any reason; as Affirm told investors in February 2021, it was "continuously mak[ing] refinements to [its] risk model" in response to changing economic conditions, including "delinquency rates," to maximize profits. Ex. 5 at 2, 4. It was thus "apparent to all serious observers and most casual ones" that Affirm might, at any point, (i) tighten its lending standards and leave more applications for Katapult, or (ii) loosen its lending standards and leave fewer applications for Katapult. *Wielgos*, 892 F.2d at 515; *see* Ex. 16 at 12 (analyst acknowledging that Affirm could loosen its lending standards at any time and "enter[] the non-prime space"). Not to mention, that was precisely the dynamic Zayas discussed in his March 2021 interview: "We are in a waterfall situation where, when the economy gets rough, the prime lenders tighten up. We're actually a beneficiary of that because we see a better credit quality than we've seen in the past get turned down, and we can still manage that risk." Ex. 4 at 3.

As for the risk that economic conditions (*e.g.*, savings rates, delinquency rates) could affect market participants and their behavior (¶ 181), that is "so basic that any investor could be expected to know it." *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984); *see, e.g.*, *Merrill Lynch & Co.*, 272 F. Supp. 2d at 250 ("Federal securities laws do not require a company to state the obvious."); *Wielgos*, 892 F.2d at 515 ("Issuers need not 'disclose' Murphy's Law or the Peter Principle, even

though these have substantial effects on business."). But it was amply disclosed in any event. *See, e.g.*, Ex. 1 at 47, 56, 68 (warning that Katapult's performance was subject to numerous economic risks, including changing "economic conditions," "customer demand," "consumer spending," "disposable consumer income," "consumer debt and availability of credit," and "strategic actions" by other market participants); *cf. Bank of Am.*, 980 F. Supp. 2d at 579 ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

This is, in short, an omission claim without an omission.

### C.    Plaintiffs Fail To Plead Negligence

Plaintiffs wholly fail to allege that Defendants acted negligently with respect to the Proxy. The AC contains nothing more than a single, conclusory allegation of negligence (¶ 193), unsupported by any factual allegation indicating an individual Defendant knew or should have known the Proxy was false or misleading. That fails as a matter of law. *See In re Waste Mgmt. Data Breach Litig.*, 2022 WL 561734, at *4 (S.D.N.Y. Feb. 24, 2022) (rejecting "conclusory allegations" that defendant "failed to take reasonable measures"); *Jaroslawicz v. M&T Bank*, 962 F.3d 701, 718 (3d Cir. 2020) ("general allegations of negligence do not suffice").

### III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a)

Absent a primary violation under Sections 10(b) or 14(a), Plaintiffs' Section 20(a) claims necessarily fail. *Tung v. Bristol-Myers Squibb*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019). Plaintiffs also fail to allege that Medlin—whose name is practically absent from the AC—exercised "*actual* control over" any statement. *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs.*, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30, 2018) (emphasis in original).

### CONCLUSION

For all these reasons, the AC should be dismissed with prejudice.

25

Dated: September 23, 2022

Respectfully submitted,

COOLEY LLP

By: */s/ Aric H. Wu*
    Aric H. Wu

Aric H. Wu
Brian M. French
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
ahwu@cooley.com
bfrench@cooley.com

Koji F. Fukumura (*pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
Fax: (858) 550-6420
kfukumura@cooley.com

*Attorneys for Defendants Katapult Holdings, Inc., Lee Einbinder, Howard Kurz, Orlando Zayas, Karissa Cupito, and Derek Medlin*

26