**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GINA McINTOSH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>KATAPULT HOLDINGS, INC., LEE EINBINDER, HOWARD KURZ, ORLANDO ZAYAS, and KARISSA CUPITO,<br><br>Defendants. | Case No. 1:21-cv-07251-JPO<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURIITES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Matis Nayman and additional plaintiff Felipe de Castro Luna (collectively, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things: (i) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (ii) United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Katapult Holdings Inc., ("Katapult," or the "Company") f/k/a FinServ Acquisition Corp. ("FinServ"); (iii) communications with former employees; (iv) analysts' reports and advisories about the Company; and (v) information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## I.  **INTRODUCTION**

1.      This is a federal class action brought individually and on behalf of all persons and entities other than Defendants that: (a) purchased or otherwise acquired Katapult securities between June 15, 2021 and August 9, 2021, both dates inclusive  (the "Class Period") and/or (b) beneficially owned and/or held FinServ common stock as of FinServ Acquisition Corp.'s stockholders of record at the close of business on May 11, 2021 (the "Record Date") and were eligible to vote at FinServ's June 7, 2021 special meeting (collectively, the "Class").

2.      Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      Katapult claims to be a "next-generation platform for digital and mobile-first commerce focused on the non-prime consumer."  Katapult purportedly provides point-of-sale lease-purchase options for non-prime consumers (*i.e.* consumers with credit scores that are higher than those of subprime borrowers, but lower than those of prime borrowers) who cannot access traditional financing products.

4.      Katapult allegedly "solves critical consumer pain points by transforming the way non-prime consumers shop for durable goods" and claims merchants benefit from "higher retail conversion and greater marketing spend efficiency by reaching this underserved segment."

5.      In other words, when the first creditors at a point of sale reject a consumer's request for credit as too high risk, they can arrange to pass that application along to Katapult, enabling Katapult to extend the credit.

6.      FinServ was a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

7.      On December 18, 2020, FinServ announced that it had entered into a definitive merger agreement with legacy Katapult whereby the combined company would operate as Katapult and its shares would trade on NASDAQ under the new symbol "KPLT."

8.      FinServ touted legacy Katapult as "[a] leading e-commerce POS, lease purchase platform provider focused on the estimated $50 billion of annual nonprime consumer durable goods e-commerce spend" with an "[e]stablished position in e-commerce ecosystem with significant platform support from top- tier e-commerce retailers, leading e-commerce platforms and lending partners."

9.      On June 9, 2021, Katapult announced that it had completed the merger.  On June 10, 2021, Katapult announced that its shares and warrants would begin trading on the NASDAQ Stock Market under the symbols "KPLT" and "KPLTW" respectively.

10.     On June 15, 2021, just two weeks before the second quarter of 2021 ended, the Defendants reiterated that fiscal year gross originations would fall in the range of $375-$425 million and revenue in the range of $425-$475 million.  These ranges cover the same forecasts as those first announced in December of 2020 and reiterated again in April of 2021.

11.     On August 10, 2021, Katapult shocked the market when it issued a press release announcing disappointing financial results for the second quarter of 2021 including a net loss of $8.1 million, compared to $5.1 million in net income for the second quarter of 2020. The Company further disclosed that it "observed meaningful [negative] changes in both e-commerce retail sales

forecasts and consumer spending behavior" and retracted its full year 2021 guidance, claiming it could not "accurately predict our consumer's buying behaviors for the remainder of the year."

12.    During the conference call associated with the shocking financial results, Defendants also revealed that "with historically high savings rate and low delinquency rates some consumers buoyed by stimulus and a recovering jobs market, we are observing prime providers stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume."

13.    On this news, the Company's share price opened down 40% and ultimately fell $5.47 per share, or *more than 56%*, to close at $4.26 per share on August 10, 2021, on unusually heavy trading volume.

14.    Beginning with its announcement of the business combination between FinServ and Katapult, and throughout the Class Period, Katapult misrepresented and omitted to state two critical facts about its business: (i) first, the Proxy Statement / Prospectus filed on May 18, 2021 in connection with the business combination between FinServ and Katapult (the "Prospectus") failed to disclose the *most critical risk factor* and known trend that Katapult faced – namely, the fact that prime lenders who competed directly with Katapult for customer financing could and would, based on credit market conditions, simply extend credit further down the credit spectrum rather than passing those less desirable customers to Katapult, eating into Katapult's target market customers; and (ii) second, the fact that the Company reiterated that it would achieve its full year 2021 financial guidance on June 15, 2021 in the face of the Company's financial results to date when the announcement was made. In fact, the quarter came to a close only two weeks later and the Company withdrew the guidance during an August 2021 conference call.

15.     While the federal securities laws permit a Company to be optimistic about its future, they do not permit a Company to mislead investors about goals known to be impossible to achieve.

16.     Here, as set forth below, Defendants were aware of the serious and significant risk that prime providers above Katapult in the credit spectrum – or those upstream in what Katapult referred to as the "waterfall" – could simply decide to stretch further down the credit spectrum to capture consumer transactions at Katapult's highest score bands, which would negatively impact their bottom line.

17.     In fact, the Prospectus disclosed *nothing*, whatsoever, about the following: (i) Katapult's "waterfall" system of payments whereby Katapult only gets access to customers who have been passed over by lenders above Katapult in the credit lending chain; (ii) how prime lenders could open up their lending spectrum and directly cannibalize Katapult's target client; (iii) that the cyclical nature of the business cycle would directly affect Katapult's bottom line; and (iv) how lending and credit would have a dynamic effect on Katapult's business model.

18.     The failure to disclose this risk and known trend in the Prospectus violated Section 14 of the Exchange Act because the omissions were misleading and created an impression of a state of affairs that differed in a material way from the one that actually existed.

19.     Furthermore, in reaffirming annual guidance on June 15, 2021 just *two weeks* prior to the close of the financial quarter, Defendants misled investors.  In fact, Defendants reaffirmed annual guidance despite having achieved *only approximately 30%* of the midpoint estimate for gross originations of the yearly financial targets by June 15 (as set forth more fully below).

20.     As a consequence, despite reaffirming annual guidance (that would be pulled weeks later), achieving the stated performance was impossible, and the Company knew as much. Accordingly, Katapult's statements "that fiscal year Gross Originations would fall in the range of

$375-$425 million and Revenue in the range of $425-$475 million" violated Section 10(b) of the Exchange Act.

21.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

22.    Claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.     Venue lies in the Southern District of New York pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, because Defendants transact business in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.  In addition, Katapult's principal executive offices were located in this District during part of the relevant time.

25.    In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

## III. **PARTIES**

### A. **Plaintiffs**

26.     Lead plaintiff Matis Nayman, as set forth in his lead plaintiff certification, beneficially owned and/or held FinServ common stock as of May 11, 2021 and was eligible to vote at FinServ's June 7, 2021 special meeting.

27.     Additional Plaintiff Felipe de Castro Luna, as set forth in a previously filed Certification (ECF No. 26-4), acquired Katapult securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

28.     The proposed Class includes the above-named Plaintiffs and all persons and entities other than Defendants that: (i) purchased or otherwise acquired Katapult securities during the Class Period and/or (ii) beneficially owned and/or held FinServ common stock as of May 11, 2021 and were eligible to vote at FinServ's June 7, 2021 special meeting.

### B. **Defendants**

29.     Defendant Katapult is incorporated under the laws of Delaware with its principal executive offices located in Plano, Texas. Katapult's common stock and warrants trade on the NASDAQ Stock Market under the symbols "KPLT" and "KPLTW" respectively. Before the merger closed on June 9, 2021, FinServ's common stock traded on the NASDAQ exchange under the symbol "FSRV," its redeemable warrants under the symbol "FSRVW," and its units under the symbol "FSRVU."

30.     Defendant Orlando Zayas ("Zayas") was the CEO of legacy Katapult prior to the merger, and the CEO of Katapult after the merger.

7

31.     Defendant Karissa (Long) Cupito ("Cupito") was the CFO of legacy Katapult prior to the merger, and the CFO of Katapult after the merger.

32.     Defendant Derek Medlin ("Medlin") was the COO of legacy Katapult and the COO of Katapult after the merger.  Medlin was, at the relevant time, one of Katapult's two most highly compensated executive officers other than the principal executive officer.

33.     All references to the "Katapult Individual Defendants" in this Amended Complaint refer to Katapult, Zayas, Medlin and Cupito.

34.     Defendant Lee Einbinder ("Einbinder") was the Chief Executive Officer ("CEO") of FinServ prior to the merger, and a member of Katapult's board of directors after the merger.

35.     Defendant Howard Kurz ("Kurz") was the Chief Financial Officer ("CFO") of FinServ prior to the merger.

36.     All references to the "FinServ Defendants" in this Amended Complaint refer to Einbinder and Kurz.

37.     The Court has personal jurisdiction over the Katapult Individual Defendants and the FinServ Defendants because the Katapult Individual Defendants and the FinServ Defendants conducted substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to the Katapult Individual Defendants' and the FinServ Defendants' contacts with this District.  The Katapult Individual Defendants' and FinServ Defendants' actions are controlled by the Company.  The Katapult Individual Defendants' and FinServ Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in New York. Further, the Katapult Individual Defendants and FinServ Defendants have transacted business, maintained substantial contacts, purposefully targeted investors, and committed other overt acts in furtherance of the unlawful acts alleged herein in this District, as well as throughout the United

States.  The unlawful acts of the Katapult Individual Defendants and FinServ Defendants have been directed at, have targeted, and have had the effect of causing injury to investors who are citizens or nationals of the United States, and to investors who reside in, are located in, or are doing business in this District, as well as throughout the United States.

38.     The Katapult Individual Defendants and FinServ Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  The Katapult Individual Defendants and the FinServ Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Katapult Individual Defendants and FinServ Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Katapult Individual Defendants and the FinServ Defendants are liable for the false statements and omissions pleaded herein.

39.     The Katapult Individual Defendants and the FinServ Defendants are collectively referred to herein this Section as "the Individual Defendants."

40.     The Company, the Katapult Individual Defendants, the FinServ Defendants are collectively referred to herein as "Defendants."

IV.    **VIOLATIONS OF THE EXCHANGE ACT**

A.    **Background Concerning SPACS**

41.    Special Purpose Acquisition Companies, or "SPACs," are publicly traded blank-check companies "that raise money with the sole purpose of buying a company to take it public."[1] SPAC sponsors, including high-profile Wall Street bankers, raise capital by completing an Initial Public Offering (IPO) for a shell company, fundraising primarily from institutional investors, and discounting these purchases to raise large sums quickly. SPACs then have a set period, typically two years, to announce an acquisition target and complete a merger with a private company.

42.    This time pressure, combined with the almost-guaranteed profits for SPAC sponsors and leadership, has created a proliferation of low-quality deals and poor due diligence, often resulting in huge losses for retail investors. One key problem with SPACs is that the investors who bankroll them do not necessarily have a stake in the long-term success of the companies they bring public. The misaligned incentives for SPAC sponsors, who are given a "promote," or 20% stake, in the public company following the merger with a private company, gives them an all-but-guaranteed profit, putting retail investors at increased risk and allowing companies with significant weaknesses to bypass the disclosures required of a traditional IPO.

43.    The SPAC process has resulted in poor outcomes for companies taken public and their retail investors, but it has been a boon for Wall Street insiders. In 2021, nearly half of all companies with less than $10 million of annual revenue that went public through a SPAC "have failed or are expected to fail to meet the 2021 revenue or earnings targets they provided to

---

[1] *The Wall Street Journal*, "Led by 'Mr. SPAC,' Credit Suisse Cashes In on Blank-Check Spree," Margot Patrick and Amrith Ramkumar, February 5, 2021, https:// www.wsj.com/articles/led-by-mr-spac-credit-suisse-cashes-in-on-blank-check-spree-11612527389.

investors."[2]  These companies fell short on revenue projections by an average of 53%.[3]  A study of 47 SPACs that went public between January 2019 and June 2020 found that median returns were a negative 14.5% three months after the SPAC's merger, with six and twelve-month returns continuing to decline.[4]

44.    The Office of Senator Elizabeth Warren recently issued a report entitled "The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders."[5]   The Report found that "SPACs and SPAC sponsors are abusing loopholes and gaps in current securities law, and are using them to take advantage of retail investors and enrich themselves. Regulators and Congress should act quickly to close loopholes and protect investors and the market."

45.    In short, in recent years, SPACs like FinServ have become magnets for fraud, which has caused great concern among U.S. regulators and investors as well.  The SEC has criticized SPACs because of their apparent tendency to encourage fraud.

46.    As John Coates, Acting Director, Division of Corporate Finance at the SEC has stated:

> Some . . . practitioners and commentators have claimed that an advantage of SPACs over traditional IPOs is lesser securities law liability exposure for targets and the public company itself.  They sometimes specifically point to the Private Securities Litigation Reform Act (PSLRA) safe harbor for forward-looking statements, and suggest or assert that the safe harbor applies in the context of de-SPAC transactions but not in conventional IPOs.  This, such observers assert, is the reason that sponsors, targets, and others

---

[2] *The Wall Street Journal*, "SPAC Startups Made Lofty Promises. They Aren't Working Out." Heather Somerville and Eliot Brown, February 25, 2022, https://www.wsj. com/articles/spac-startups-made-lofty-promises-they-arent-working-out-11645785031.

[3] *Id*.

[4] Harvard Law School Forum on Corporate Governance, "A Sober Look at SPACs," Emily Ruan, Michael      Klausner,      Michael      Ohlrogge,      November      19,      2020, https://corpgov.law.harvard.edu/2020/11/19/a-sober-look-at-spacs/.

[5] https://www.warren.senate.gov/imo/media/doc/SPACS.pdf

involved in a []SPAC feel comfortable presenting projections and other valuation material of a kind that is not commonly found in conventional IPO prospectuses.[6]

47.    The possibility of lower risk for securities law liability for company misstatements naturally entices such SPACs to take liberties that other publicly traded companies would not in their disclosures, and so encourages SPACs to mislead the investing public.

48.    In the view of the SEC, any claim that the securities laws do not adequately cover SPACs "is overstated at best, and potentially seriously misleading at worst."

49.    SPACs also create perverse incentives for their key employees.  Because key employees of SPACs will lose their employment at the end of the life of the SPAC, they have an incentive to find a suitable target for acquisition without fail in order to obtain employment at the acquired company.  They also have incentives to choose one target over another based on the differing compensation they may receive through becoming an employee at different targets. These incentives may cause key employees to overlook problems at a target company they favor, or to present a target company in misleadingly favorable light to ensure the company is acquired

**B.    Formation and Purpose of the FinServ SPAC**

50.    FinServ was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

51.    According to Finserv's Registration Statement filed in connection with its initial public offering in 2019, "We currently intend to concentrate our efforts in identifying businesses in the financial services industry with an equity value of approximately $500 million to $1.5

---

[6] John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, U.S. Sec. & Exch. Comm'n (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws?utm_medium=email&utm_source=govdelivery.

billion, with particular emphasis on businesses that are providing or changing technology for traditional financial services ("FinTech"), asset and wealth management, and specialty finance companies. We believe the creation and delivery of financial services products for consumers and businesses will undergo the most dramatic change over the next several years. There has been a rise in the level of sophistication and interconnectivity between innovative technology and financial services providers, and we expect this trend to continue and accelerate. We believe that there are many potential targets within the financial services space that could become attractive public companies. These potential targets exhibit a broad range of business models and financial characteristics that range from very high growth innovative companies to more mature businesses with established franchises, recurring revenues and strong cash flows."

52.    On November 5, 2019, FinServ Acquisition Corp. consummated its initial public offering (the "IPO") of 25,000,000 units (the "Units"), including 3,000,000 Units issued pursuant to the partial exercise of the underwriters' over-allotment option. Each Unit consists of one share of Class A common stock of the Company, par value $0.0001 per share ("Class A Common Stock") and one half of one redeemable warrant of the Company (each whole warrant, a "Warrant"), with each whole Warrant entitling the holder thereof to purchase one share of Class A Common Stock for $11.50 per share. The Units were sold at a price of $10.00 per Unit, generating gross proceeds to FinServ of $250,000,000.

53.    On November 5, 2019, simultaneously with the consummation of the IPO, the Company completed the private sale (the "Private Placement") of an aggregate of 665,000 Units (the "Private Placement Units") to FinServ Holdings LLC (the "Sponsor"), generating gross proceeds to the Company of $6,650,000. Each Private Placement Unit consists of one share of Class A common stock and one-half of one redeemable warrant.

54.     In addition, the 6,325,000 shares of Class B common stock of the Company (the "Founder Shares") held by the Sponsor (prior to the exercise of the over-allotment) included an aggregate of up to 825,000 Founder Shares subject to forfeiture by the Sponsor to the extent that the underwriters' over-allotment option was not exercised in full. Since the underwriters exercised the over-allotment option in part, the Sponsor forfeited 75,000 Founder Shares on November 5, 2019. The Founder Shares forfeited by the Sponsor were cancelled by the Company.

55.     A total of $250,000,000, comprised of $245,600,000 of the proceeds from the IPO (which amount includes $9,350,000 of the Underwriters' deferred discount) and $4,400,000 of the proceeds of the sale of the Private Placement Units, was placed in a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., maintained by Continental Stock Transfer & Trust Company, acting as trustee.

56.     FinServ's liquidation deadline was November 5, 2021.  As a consequence, FinServ had to complete an acquisition prior to that date or be liquidated.

C.     **Katapult's Company History**

57.     Katapult claims to be a "next-generation platform for digital and mobile-first commerce focused on the non-prime consumer." Katapult provides point-of-sale lease-purchase options for non-prime consumers who cannot access traditional financing products. Katapult allegedly "solves critical consumer pain points by transforming the way non-prime consumers shop for durable goods" and claims merchants benefit from "higher retail conversion and greater marketing spend efficiency by reaching this underserved segment."

58.     Katapult was originally formed as a corporation under the laws of the State of Delaware on March 12, 2012 as Neuralcash, Inc. It subsequently changed its name to Cognical Inc. on June 10, 2013, and started doing business as Zibby on September 2, 2014. On June 24,

2016, Cognical Holdings Inc. was formed and Cognical Inc. became a wholly owned subsidiary of Cognical Holdings Inc. On January 29, 2020, Cognical Holdings Inc. and Cognical Inc. changed their names to Katapult Holdings, Inc. and Katapult Group, Inc., respectively.

59.    Katapult's principal executive offices were located at Katapult Holdings, Inc., P.O. Box 20019, Greeley Square, 4 East 27th Street, New York, NY 10001, and are now located in Plano, Texas.

**D.    Merger of FinServ and Katapult**

60.    On December 18, 2020, FinServ issued a press release entitled "Katapult to Become a Publicly Traded Company through Merger with FinServ Acquisition Corp." Therein, FinServ, in relevant part, stated:

> New York, NY, December 18, 2020 – Katapult Holding, Inc. ("Katapult"), an e- commerce focused financial technology company, and FinServ Acquisition Corp. (NASDAQ: FSRV) ("FinServ"), a special purpose acquisition company, today announced that they have entered into a definitive merger agreement. Upon closing of the transaction, the combined company (the "Company") will operate as Katapult and plans to trade on Nasdaq under the new symbol "KPLT". The transaction reflects an implied pro forma combined enterprise value for the Company of approximately $1 billion.
>
> Katapult is a leading provider of e-commerce point-of-sale ("POS") purchase options for nonprime US consumers. Katapult's fully digital, next generation technology platform provides consumers with a flexible lease purchase option to enable them to obtain essential durable goods from Katapult's network of top tier e-commerce retailers. Katapult's sophisticated end-to-end technology platform provides both a seamless integration with merchants and exceptional customer experiences.
>
> Orlando Zayas, CEO of Katapult, stated, "Today's announcement marks the beginning of an exciting new chapter in our history and we are delighted to be entering into this transaction with FinServ to become a publicly traded company. Since our inception, Katapult's goal has always been to provide a clear, transparent, and attractive transaction solution for nonprime consumers to access the essential products they need for everyday living. Today, we are serving over

150 merchants and 1.4 million consumers with our leading technology platform and e-commerce POS solution. This transaction will allow us to accelerate our growth opportunities and continue to build the premier company that provides consumers access to the goods they need and deserve through a flexible lease purchase transaction. It is an honor to lead Katapult's strategic direction and my pleasure to continue to work with our great team to continue to grow this business."

Lee Einbinder, CEO of FinServ, stated, "After a comprehensive search process, in which we examined numerous business combination opportunities, Katapult emerged as the most impressive partner, exceeding all of our criteria for a successful transaction. Katapult has a differentiated and best-in-class technology platform, with significant opportunities to continue its growth trajectory by expanding its merchant and consumer base. We are pleased to help facilitate Katapult's listing on Nasdaq, and excited to be partnering with their entire management team as they continue to lead Katapult's expansion as a publicly listed company."

Brian Hirsch, Co-founder & Managing Partner of Tribeca Venture Partners and Director of Katapult, stated, "Katapult's next generation technology platform, which provides a seamless digital experience for both consumers and merchants, ease of use and quick integration, and sophisticated risk modelling has helped fuel the company's explosive growth over the past three years under Orlando's leadership. This transaction provides Katapult with an even greater ability to strategically invest in its organic growth based on the large addressable market they serve."

Under the terms of the proposed Transaction, FinServ will merge with Katapult at a pro forma combined enterprise value of approximately $1 billion and equity value of $962 million, representing EV/EBITDA multiples of 14.1x and 6.6x projected EBITDA for 2021 and 2022, respectively. Total consideration paid to Katapult's existing shareholders will be $833 million.

Cash proceeds of the transaction will fund up to $325 million of cash consideration to Katapult's existing shareholders and $50 million of cash to Katapult's balance sheet. The cash components of the transaction will be funded by FinServ's cash in trust of $250 million (assuming no redemptions) as well as a $150 million private placement of common stock at $10 per share from various institutional investors, led by Tiger Global Management and Neuberger Berman Funds, that will close concurrently with the merger. The balance of the consideration to Katapult's equity holders will consist of equity in the Company. Existing Katapult

equity holders have the potential to receive an earnout for additional shares of equity if certain price targets are met as set forth in the definitive merger agreement. Katapult's current equity holders will own approximately 50% of the pro forma company, assuming no cash redemptions.

The transaction is expected to close during the first half of 2021 and remains subject to approval by FinServ stockholders representing a majority of the outstanding FinServ voting power, the effectiveness of a registration statement to be filed with the Securities and Exchange Commission (the "SEC") in connection with the transaction, the expiration of the HSR Act waiting period, and other customary closing conditions. The Boards of Directors of both Katapult and FinServ have unanimously approved the contemplated transaction.

61.    On the same day, the defendants issued an investor presentation that presented estimated financial results of $402 million in LTD originations, $455 million in revenue and $70 million in EBITDA for fiscal year 2021.

62.    The projections for 2021 and beyond contained hockey-stick like projections illustrating massive growth in the coming years, as follows:



63.    During a conference call held in connection with the merger announcement, Defendant Zayas explained Katapult's main source of revenue and most important business contact as follows:

> Our best and leading industry integrations come from our prime lending waterfall with select prime lenders, like Affirm. Affirm chose to integrate with us, creating a waterfall, where the application is input once, and with the consumer's consent, if Affirm declines that application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer. Affirm markets this solution as Affirm Connect to their merchants. Since we signed the agreement with Affirm last year, we have already integrated 50 of their merchants on the Affirm Connect waterfall. We have tremendous opportunity with Affirm, and have identified around 900 merchants where the waterfall between our companies would expand growth opportunities.

64.    Defendant Cupito broke down the component parts of the forecast as follows:

Turning to slide 36, since 2018, we have doubled the business for three years in a row and we are on track to double the business again in 2021. When you look at the $402 million in originations forecasted for 2021, it's made up of two components. First, existing merchants. 70% of this number comes from the annualized origination run rate of our existing merchants on the platform today.

The second component is our near-term pipeline, which makes up the remaining 30% of the $402 million and consists of merchants that are in advanced stages of our sales cycle. The potential annual volume of these merchants is estimated at close to $300 million, but we've only incorporated $120 million of this potential volume into our forecast. I would note that what is not contemplated in the originations forecast are the additional merchants that will come from our own organic sales efforts and through our partnerships with companies such as Shopify and Affirm, which provides us further confidence in delivering on these projections.

65.    On January 20, 2021, FinServ and legacy Katapult were featured at the Northland Capital SPAC Investor Conference. During the conference, Defendant Zayas discussed the waterfall partnership arrangement with Affirm as follows:

Our first partner, Affirm realized that having a solution for their declines was important to their retailers. They noted as many e-commerce retailers have, that consumers declined for credit will disappear. Affirm liked that we had an application flow identical to theirs, and we were already in several merchant side by side and our consumers were treated with the same transparency and respect. They chose to integrate with us creating a waterfall where the application is only input once. If Affirm declines the application the data is electronically transmitted, and we have the opportunity to approve that consumer.

Affirm actually markets this as Affirm Connect to their merchants. Since we signed the agreement last year, we've already integrated over 50 of the merchants on Affirm Connect waterfall. We have a tremendous opportunity with Affirm. Together we've identified over 900 merchants where the waterfall between our companies would benefit them.

The Affirm partnership is just one of the many that we're working on. Every prime lender from synchrony to TD Bank has realized there's an opportunity to improve sales for the merchants and capture a new market. We'd like to come up with a waterfall integration from prime lenders to us with a direct offer for those

consumers, what we call self-identifiers. Offering the merchant a waterfall and a direct integration is the best solution to capture every possible sale.

66.    During the same conference, Defendant Zayas further explained as follows:

So when we talked, when we first approached Affirm, I think they were getting pressure from retailers to improve their approval rate, as all the prime lenders do. I don't think it's any different, I think retailers aren't satisfied unless they have 100% approval on financing.

And so, we talked to them about the waterfall idea of somebody applies for Affirm, they get declined, that data comes to us automatically, it's seamless, its frictionless, its quick. And then we return a result, hopefully, an approval, and a window will pop up and say, unfortunately you were declined by Affirm, but good news, you're approved by Katapult. And here's your terms. So that's how it started.

And what it provides for the merchant is that, you capture that consumer who possibly got declined and may leave. You're catching an incremental consumer. And so, that's how it started. And then right now, we're literally arm and arm with their sales team going out to discuss the opportunity, but in fact, we have a conversation directly with the merchant as well. And we sign a merchant agreement with that merchant so it's a merchant-by-merchant signup process.

And we will also discuss with the merchant about having a Katapult button as well in their checkout for those self-identifiers. And people that say, look, I might have applied for Affirm, I might have applied for synchrony somebody else, I got declined. I want a no credit required option, as we like to call it.

And so we like both. So we love the waterfall, because it captures us consumers that applied and got turned down for whatever reason. And then we'd like to direct opportunity. And that's how it works with Affirm partnership now, and we see it blossoming. I mean, I think now, especially going public, we're going to have the name recognition out there that retailers are going to say, yes, I need this, we need to capture this consumer; we need to capture those declines that are walking out the door, basically.

67.    During the same conference call, Defendant Einbinder explained the business

model's purported resiliency as follows:

Now, there are other folks trying to get into it. But Katapult is, and I think the team will tell you this has been their mission from since this management team started running the company, is to be only in the e-commerce sector and online in a digital way. And their technology has proved out and that's why we've done our own due diligence with their key merchants, and that's why the merchants loved them.

And *we think the business model is resilient*. *This is a company that will do well, whether it's a good economy or bad economy*, and actually with COVID, actually there's benefits and the company will talk about that. So we think the company is only scratching the surface, we think there's tremendous upside. The stock market is obviously reacted well since the announcement. But even with that and we'll talk about valuation at the end, we think this is still a very compelling valuation, we think there's still a lot of room to run both by the management team to deliver on the projections that they'll share with you and for the stock as well.

(Emphasis added).

68.     The Company's January 29, 2021 preliminary registration statement included the same projections as set forth above:

| *(USD in millions)* | Year Ending December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020E | | 2021E | | 2022E[1] | | 2023E | |
| Originations[2] | $ | 201 | $ | 402 | $ | 606 | $ | 867 |
| Revenue | $ | 250 | $ | 455 | $ | 799 | $ | 1,133 |
| Adjusted EBITDA[3][4] | $ | 40 | $ | 70 | $ | 151 | $ | 216 |
| Net Income[4] | $ | 27 | $ | 47 | $ | 95 | $ | 142 |

_____

(1)     Includes 53 weeks.
(2)     Originations are defined as the dollar amount of leases originated.
(3)     Adjusted EBITDA is defined as earnings before interest expense and other fees, provision for income taxes, depreciation and amortization on fixed assets, loss on extinguishment of debt, impairment on leased assets, stock compensation expense, and other one time nonrecurring expenses.
(4)     Net Income excludes the impact of stock compensation, loss on extinguishment of debt, non-cash income tax provision, and other one time nonrecurring expenses.

69.     On April 21, 2021, in connection with an Analyst Day presentation, defendants reiterated that "our expectations for the financial performance of our business remain unchanged."

70.     More specifically, Defendants reiterated that originations would be between $375 and $425 million, revenue would be between $425 and $475 million.

71.    Notably, although the midpoint of these ranges was the same as the guidance first issued in December 2020, the April 2021 presentation presented ranges rather than specific midpoint figures.

72.    On May 5, 2021, Defendants filed the final amendment to the Form S-4 registration statement in connection with new FinServ shares to be issued in connection with the FinServ and Katapult merger.

73.    Attached to the Registration Statement was the preliminary proxy statement/prospectus that provided FinServ shareholders with information about the proposed merger.

74.    On May 14, 2021, the SEC notified the marketplace and the defendants that the Form S-4 registration statement was effective.

75.    On May 18, 2021, FinServ filed its final and Prospectus on Form 424b3 soliciting stockholder approval of the merger.

76.    The Prospectus detailed various risk factors that Katapult faced as a business going forward, and disclosed information about the company, its business model and other information concerning the proposed merger.

77.    But, as set forth more fully below, the Prospectus contained material misrepresentations or omissions that that caused the plaintiffs injury, failed to disclose known trends and affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

78.    On May 19, 2021, FinServ issued a press release entitled "FinServ Acquisition Corp. Announces Effectiveness of Registration Statement and Special Meeting Date for Proposed Business Combination with Katapult Holdings, Inc." Therein, FinServ, in relevant part, stated:

> NEW YORK--(BUSINESS WIRE)--FinServ Acquisition Corp., Inc. ("FinServ") (NASDAQ: FSRV) announced today that the U.S. Securities and Exchange Commission (the "SEC"), has declared effective its Registration Statement on Form S-4 (as amended, the "Registration Statement"), which includes a definitive proxy statement/prospectus in connection with FinServ's special meeting of stockholders (the "Special Meeting") to approve the proposed business combination with Katapult Holdings, Inc. ("Katapult").

> FinServ Acquisition Corp.'s stockholders of record at the close of business on May 11, 2021 (the "Record Date") are entitled to receive notice of the Special Meeting and to vote the shares of common stock of FinServ owned by them at the Special Meeting. The Special Meeting will be held on June 7, 2021, at 2:00 p.m. Eastern Time, via a virtual meeting at the following address: https://www.cstproxy.com/finservacquisition/sm2021. Registration will begin on June 3, 2021 at 9:00 a.m. Eastern Time. FinServ Acquisition Corp. stockholders entitled to vote at the Special Meeting will need the control number that is printed on their respective proxy cards to enter the Special Meeting.

79.    On June 9, 2021, the Company issued a press release entitled "Katapult Completes Business Combination with FinServ Acquisition Corp. & Announces Timing of First Quarter 2021 Financial Results Conference Call." Therein, Katapult stated, in relevant part:

> NEW YORK, June 09, 2021 (GLOBE NEWSWIRE) -- Katapult Holdings, Inc., an e-commerce focused financial technology company, and FinServ Acquisition Corp. ("FinServ"), a special purpose acquisition company, today announced that they have completed their previously announced merger. The business combination was approved at a special meeting of stockholders of FinServ on June 7, 2021, and closed today, June 9, 2021. The combined company now operates as Katapult Holdings, Inc. ("Katapult") and Katapult's common shares and warrants will begin trading on the Nasdaq Stock Market under the ticker symbols "KPLT" and "KPLTW", respectively, starting tomorrow, June 10, 2021.

> Katapult's management team, led by CEO Orlando Zayas, will continue to execute the growth strategy of the Company. Brian Hirsch, Managing Partner at Tribeca Venture Partners and one of the original investors in Katapult will serve as Chairman of Katapult's newly formed Board of Directors.

Orlando Zayas, CEO of Katapult, stated, "Taking our company public is a testament to the hard work and dedication of the entire Katapult team. We would like to thank the FinServ team for their belief in our success, and we look forward to their continued partnership as stockholders and members of our Board. We are thrilled to embark on this next stage in our company's history and excited to see the opportunities ahead of us for strong growth and long-term value creation."

Lee Einbinder, CEO of FinServ, stated, "We are pleased to complete the merger with Katapult, and I am very excited to continue to work with the Katapult team to execute on their growth plan. Katapult's differentiated and best-in-class fintech platform, growing roster of high-quality merchant partners, and expanding customer base make it well-positioned for a strong growth trajectory."

80.     On June 10, 2021, the Company issued a press release entitled "Katapult Announces First Day of Trading." Therein, Katapult stated, in relevant part:

NEW YORK, June 10, 2021 (GLOBE NEWSWIRE) -- Katapult Holdings, Inc. (NASDAQ: KPLT), a leading e-commerce focused financial technology company, today announced it will begin trading its common shares and warrants on the Nasdaq Stock Market under the Ticker "KPLT" and "KPLTW" respectively.

Katapult Holdings Inc. and FinServ Acquisition Corp., a special acquisition company, closed their previously announced merger on June 9, 2021, and the combined company now operates as Katapult Holdings Inc.

"Today is the mark of a very important milestone for Katapult and I am immensely proud of our team and their dedication to our mission to bring nonprime consumers the same buying power as a prime consumer. We have seen significant revenue growth and look forward to working with the amazing team at FinServ to continue executing our growth strategy," said Orlando Zayas, CEO of Katapult, who will continue to lead the company.

**E.      Katapult Reaffirms Full Year Guidance**

81.     Just five days later, on June 15, 2021, the Company issued a press release entitled "Katapult Announces First Quarter 2021 Financial Results." This was Katapult's first quarterly earnings report as a public company.

82.     Therein, Katapult stated, in relevant part:

NEW YORK, June 15, 2021 (GLOBE NEWSWIRE) -- Katapult Holdings, Inc. ("Katapult" or the "Company") (NASDAQ: KPLT), an e-commerce focused financial technology company, today announced financial results for the first quarter ended March 31, 2021.

"We are pleased to report strong first quarter 2021 results and excited to begin a new chapter as a publicly traded company. Our results reflect solid execution and a strong positive trajectory in our business as we continue to onboard more merchants and drive growth with our existing customers," said Orlando Zayas, CEO of Katapult. "Looking to the remainder of 2021 and beyond, we are excited about the breadth of opportunities available to us to continue to expand our business and build long-term shareholder value."

\*       \*       \*

2021 Financial Guidance

As of June 15, 2021, Katapult anticipates FY 2021 Gross Originations, Revenue and Adjusted EBITDA to be in the following ranges:

- Gross Originations: $375-$425 million

- Revenue: $425-$475 million

83.    In short, the Defendants reiterated that, as of June 15, 2021, they anticipated that fiscal year gross originations would fall in the range of $375-$425 million and revenue in the range of $425-$475 million. These ranges were the *very same* as those first announced in December of 2020 (midpoint ranges) and reiterated again in April of 2021.

84.    During the conference call concerning the quarterly earnings report, at which each of the Katapult Individual Defendants participated in, Defendant Cupito reiterated as follows: "given the data *we have today*, we continue to believe that this guidance is reasonable and appropriate." (Emphasis added).

85.    During the same call, in response to a question about expiration of stimulus and other changing macroeconomic factors could affect Katapult's results, Defendant Zayas stated as follows:

25

Vincent Caintic

Moving to the first question. Just on -- maybe a follow up on the commentary for the second quarter. So first quarter, great results, and it seems to have been strong for the majority of the lease-to-own players. And with that strength, I guess, there was -- we saw significant help from government stimulus, tax refunds and so forth. And so I'm wondering when you're thinking about the rest of 2020, does the expiration of those stimulus tax refunds and so on have an effect on your model or how you're thinking?

Orlando Zayas

Yes. Thanks for the question, Vince. We don't think that the stimulus changes are going to affect our year. The consumer is obviously really strong right now, and they have been pretty resilient, thanks to the government stimulus as well as obviously, unemployment is dropping and people are going back to work. So we don't think there's going to be any effect. And as you remember, we're -- during recessionary times, we actually performed pretty well. And we've seen that obviously happen, but we don't really think there's going to be any impact. But we're going to monitor things for the rest of the year and see how things play out.

86.    As set forth more fully below, the statements concerning the fiscal guidance presented on June 15, 2021 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Katapult was experiencing declining e-commerce retail sales and consumer spending that began *in the spring of 2021* (as set forth below); (2) that prime lenders were reaching down the credit spectrum or "waterfall" to cannibalize Katapult's best customers; (3) that as of June 15, 2021 (which represented 45% of the fiscal year completed), Katapult had achieved only 27-31% of the projected gross originations for the year, 31-34% of the projected revenue, and 30-36% of the projected adjusted EBIDTA and, consequently, there was no way that Katapult could possibly achieve the annual guidance that it had repeatedly presented to investors.

F.    **Disclosures at the End of the Class Period**

26

87.    On August 10, 2021, Katapult issued a press release disclosing poor financial results for the second quarter of 2021, eliminated its prior financial guidance, and disclosed that it lacked visibility into its consumers' buying behaviors. Specifically, Katapult stated, in relevant part, as follows:

> PLANO, Texas, Aug. 10, 2021 (GLOBE NEWSWIRE) -- Katapult Holdings, Inc. ("Katapult" or the "Company") (NASDAQ: KPLT), an e-commerce focused financial technology company, today announced financial results for the second quarter ended June 30, 2021.
>
> ***
>
> Guidance
>
> Since our Q1 earnings call and continuing to date, many new developments emerged that have an impact to our business. We observed meaningful changes in both e-commerce retail sales forecasts and consumer spending behavior, and in the past few weeks, the onset of new policies from the COVID-19 variants. Given the current macro trends and uncertainty to accurately predict our consumer's buying behaviors for the remainder of the year, we believe it is best to remove explicit guidance for the remainder of 2021. While the short-term outlook may not be 100% clear, we do continue to believe in our mission, our core business fundamentals, and are extremely pleased with the progress of our strategic investments that will drive long-term growth. We expect to have more insight into these new and evolving patterns by our third quarter earnings call.

88.    The market was shocked.  During the conference call discussing the quarter's results and associated withdrawal of fiscal guidance for the remainder of the year, the Defendants disclosed a number of shocking and previously undisclosed developments.

89.    First, Defendant Zayas stated the following: "Starting in late June and noticeably picking up during the July 4th weekend, we began seeing macro headwinds consistent what you've heard from several retailers. First, we observed our consumer shift their focus towards new spending categories and away from durable goods as summer activities increased and restrictions

abated. Coupled with this consumer category expenditure external data has become available suggesting e-commerce sales will likely slow for the balance of the year."

90.     This revelation flew in the face of the comments that were made on June 15, 2021 – just two weeks before the end of the quarter – when the Defendants "anticipated the majority of our growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021."

91.     Indeed, according to the Defendants' version of events, no more than 15 days after reaffirming annual guidance, Defendants "started seeing macro headwinds" that *completely* reversed the statements made less than two weeks before that date.

92.     Furthermore, Defendant Zayas revealed that "another key market factor that we monitor is activity of prime credit and financing providers that o☐er solutions to consumers with higher quality credit or repayment histories. With historically high savings rate and low delinquency rates some consumers buoyed by stimulus and a recovering jobs market, we are observing prime providers stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume."

93.     In other words, under the Company's "waterfall" arrangement with its partners, fewer customers were being denied credit by the initial lending entity because those entities were expanding the pool of customers they would lend to. But for every additional marginal customer that the initial lending entity decided to do business with, Katapult was left with one fewer customer reaching itself in the waterfall paradigm.

94.     As Defendant Zayas bluntly put it, Katapult's competitors – those lending entities above it in the "waterfall" setup – "opened up to try to get volume."

95.     Analysts were stunned by the revelation and *every* question posed by analysts inquired about the newly revealed dynamic.

96.    For example, the very first question posed at the earnings conference call was as follows: "I wanted to ask about the competitive environment. And I guess, specifically about the -- your comments about prime providers sort of moving down market into the original -- and your traditional kind of lower prime base. What is your view about the degree to which is a more sort of permanent shift? I guess, in other words, has the competitive environment become more challenging on a lasting basis?"

97.    The second analyst followed up on the first question: "I just wanted to follow up on Ramsey's question on kind of -- on the prime kind of stretching a bit deep. Would you say that's kind of traditional providers or more of like the new entrants into the prime financing market that you're seeing stretched?"

98.    In response, Defendant Zayas revealed that Katapult's partners were reaching down the credit spectrum to, quite simply, cannibalize Katapult's business:

> I would say -- hi, Kyle. This is Orlando. Thanks for the questions. I would definitely say it's more of the traditional providers. Yeah, and you're right, some of the BNPLs have jumped into the space, but I think they're focused on a much di☐erent customer. They're really not that -- while you can stretch out the payments over four, for example, with Afterpay or others, we don't really think we are competing with that because our ALV is higher. And that's not something usually as somebody split over for, but we definitely see it -- and some of the retailers, where we have a waterfall with -- at Wayfair at Citi. We obviously have the A☐rm partnership on the waterfall. And we've looked -- ***starting in the spring,*** we looked at our score bands and how many score bands are flowing to us, especially in the waterfall. And we're seeing that the higher score bands are minimized a little bit. So we have evidenced that they're definitely buying deeper because some of our higher score bands are not -- I don't want to say disappearing, but they've been minimized. And so it's clear evidence that they've gone deeper. And I think if you just look at any of the major prime providers, they've all talked about delinquencies being down and their profitability going up and they've released some of the COVID restrictions that they've had before.

(Emphasis added).

99.     The next analyst *also* inquired about the newly disclosed dynamic as follows: "Not to beat a dead horse with this issue of prime lenders sort of dropping down. But I cover Aaron's and Progressive and Rent-A-Center. And they haven't said *anything* about that phenomenon. So I guess I'm trying to understand why is that *unique* to Katapult when Aaron's, Progressive and Rent-A- Center are seeing no such phenomenon?" (Emphasis added).

100.     In response, Defendant Zayas described the waterfall partnership, Katapult's *unique* position in the waterfall, and revealed that its dynamic could shift immediately based on economic factors:

> One thing that's really unique about the Katapult solution is that in many of our environments -- we're in a waterfall environment *where we are receiving declines from prime providers* and that allows us additional insight as we can see trending and detail analytics as to what's happening in our base through application flow all the way through conversion. And really simply and there have been various outside stimulus, the trends in supply and demand have changed was as they needed -- the change -- the character of what those above us are approving. And just like last year when we saw a tightening during uncertainty, but for stimulus, *we have seen that loosening occur.*

101.     Defendant Zayas conceded that this was a known risk that Katapult had seen in the past as follows:

> And this is *something that we've seen before often on throughout the years*. I think this is *fairly common*, but in our position in the waterfall, we have more visibility into it.

(Emphasis added).

102.     At least one analyst covering Katapult believed that management's explanations for the sudden downturn were not credible. Loop Capital stated: "With top-line growth slowing substantially, lease originations declining YoY, bad debt expense spiking, profit margins deteriorating, and guidance being withdrawn, we have a difficult time sugarcoating Katapult Holdings' [] disappointing 2Q 2021 results. In addition, *we found several of management's*

***explanations for the slowdown inconsistent with what we have heard from other industry players***
(including Aaron's, PROG Holdings, and Rent-A-Center). We believe Katapult management is
now firmly entrenched in the proverbial "penalty box," and think the company is a "show me
story" unlikely to receive the benefit of the doubt from many investors. We are slashing our price
target to $7 from $12 . . ."  (Emphasis added).

103.    On the shocking news that Katapult would pull its guidance and the revelation about
the known trends, the Company's share price fell $5.47, or ***more than 56%***, to close at $4.26 per
share on August 10, 2021, on unusually heavy trading volume.

**G.    Post Class Period Events**

104.    On August 13, 2021, *Seeking Alpha* published an article that summarized the fact
that Katapult "quickly removed their guidance" a few days earlier.  The article characterized the
announcement as "shocking" and calling into question the "credibility of management."

105.    On November 9, 2021, Katapult held its third quarter 2021 earnings call.  During
the call, Defendant Cupito discussed the purported cyclical nature of Katapult's business model as
follows:

> I would note that there is [*sic*] some elements that counters
> cyclicality to our business. As we discussed on our last call,
> historically high savings rates and low delinquency rates earlier this
> year with the prime providers slightly stretching down the credit
> spectrum to capture some consumer transactions and our highest
> score bands.
>
> Now as the credit environment normalizes any modest deterioration
> in macro consumer credit levels can be positive for our company as
> we expect prime credit providers will tighten their underwriting,
> leading to higher quality consumers coming down into our market
> and improving the overall quality of our customer pool.

106.    During the same call, Defendant Zayas explained that the merchants above Katapult

in the waterfall system would tighten lending as credit default rates rose and that, as a consequence,

those customers would then flow to Katapult in response:

> Mark Argento
>
> Okay that is helpful and then just one quick one. In terms of I know you had mentioned it seems like overall broader consumer credit default rates are starting to pick up a little bit partially as a result of probably less stimulus in the market to a degree. In terms of a buy now, pay later guys, it seems like maybe they were stretching their bands a little bit in terms of how far down the credit spectrum they are willing to go. And do you anticipate maybe that tightening back up if credit default rates start to pick up a little bit stimulus isn't as robust?
>
> Orlando Zayas
>
> Yes, no, Mark, that is exactly what we believe is going to happen, I mean the early signs, the recent announcements that delinquencies on the prime side are starting to increase. So that is a natural tendency *is for them to tighten up, especially in the lower credit bands. And those are the customers that will flow to us* and kind of, that is why we stated in the prepared remarks that we are starting to see more credit normalization.

(Emphasis added).

107.    During Katapult's fourth quarter 2021 financial earnings call, the CFO described,

in great detail, the concept and practice behind the "waterfall" partnership which formed the basis

of Katapult's business model as follows:

> We are also partnered with select prime lenders to offer waterfall integration. A waterfall is where the consumers declined application will flow from the prime lender to others automatically, giving the consumer the best option for their credit situation. Our first waterfall partner realized that having a solution for their declines was important to their retailers. They chose to integrate with us creating a waterfall where the consumer only has to submit the application once. If the prime lender declines the application, the data is electronically transmitted to us and we have the opportunity to approve this customer. E-commerce retailers understand that when a consumer is searching for financing and payment flexibility, it's

important to give them the best offer for their credit situation where they may lose that customer to another retailer.

108.     In other words, while the business combination between Katapult and the retailer above Katapult in the waterfall provides flexibility for both the seller of the goods and the consumer buying them, Katapult's particular unique (secondary) position in the waterfall makes it *completely* reliant on the entity above it in the waterfall declining the initial application.

109.     Only then, after an initial declination, does Katapult have the opportunity to lend to the potential customer. And as a consequence of its self-identified *unique* position in the waterfall, Katapult was exposed to the known risk that prime lenders could simply expand the scope of customer that it would extend credit to. Because the waterfall is a zero sum game, each additional customer served by the prime lender "up the waterfall" meant one less customer flowing "down the waterfall" to Katapult.

110.     Indeed, this existential business threat was "something that we've seen before often on throughout the years" according to Defendant Zayas.

111.     On March 28, 2022, Infinitum Partners, L.P., a significant stockholder of Katapult, announced that it had delivered an open letter to the Katapult board of directors.

112.     The letter recounted the deterioration that surfaced in the Company's Q1 2021 financials. Specifically, that bad debt expense had increased by 44%, from $3.4 million in Q1 2020 to $4.9 million in Q1 2021. "Nevertheless, management essentially re-affirmed guidance in June 2021, with only a slight drop in EBITDA expectations due to 'public company costs.'"

113.     The letter next observed as follows: "However, just two months later, during the Q2 2021 earnings call, Katapult abruptly withdrew guidance and missed expectations that it had only recently re-affirmed."

114.    The conclusion was damning:  "In our view, the company must have known what Q2 2021 would look like at the time of the Q1 2021 earnings call, which was held on June 15th, two weeks before the end of Q1 2021. Affirming guidance at that time was, in our view, *at best incompetent or, worse, blatantly dishonest and misleading*."  (Emphasis added).

115.    The letter urged Katapult management to commence a full strategic review.

116.    On May 2, 2022, *Seeking Alpha* published another article concerning Katapult.  In that article, the author observed that despite "the tailwind from the [buy now pay later] market and the growth in e-commerce, Katapult is still struggling to grow its revenue."  The continued disappointing earnings results were "very disappointing given the favorable backdrop."

117.    Furthermore, the author noted that "Katapult and Affirm have a waterfall partnership, which means applications declined on Affirm's platform will be sent to Katapult's platform instead.  This should *benefit* Katapult as Affirm traffic is a lot higher," but that had not taken place at all.  Rather, despite increasing traffic to Affirm, Katapult had not seen its waterfall of application increase as a consequence.

118.    Just a week later, during Katapult's first quarter 2022 earnings call, the Defendants affirmed that very same point as follows:

> Josh Siegler, Analyst
>
> And I know we've talked for a couple quarters now about the potential positive impact of prime lenders tightening their underwriting and what impact that could have on Katapult's book of business. Are you starting to see that play out in any way or is that more of a back half of 2022 story?
>
> Karissa Cupito, CFO
>
> At this point, we have not seen that play out. There's usually a lag where our consumers are impacted first by some of these macro headwinds, inflation, et cetera. But we're anticipating that at some point this year, it's going to move up the credit spectrum and impact

> more prime type consumers where the prime lenders would
> ultimately have to tighten, but we have not seen it yet.

119.    The first quarter 2022 results were poor.  The Company "recorded total revenue of

$59.9 million in first quarter 2022 compared to $80.6 million in the prior year, a decrease of $20.7

million."

120.    On August 9, 2022, the Company announced second quarter 2022 financial results:

"Recorded total revenue of $53.0 million in second quarter 2022 compared to $77.5 million in the

prior year, a decrease of $24.5 million. $8.0 million of this decline was attributable to the

Company's adoption of ASC 842 as of January 1, 2022."

121.    During the conference call, defendants revealed that prime lenders *continued* to

reach down and cannibalize Katapult's business, in effect shutting off the flow of water

downstream in the waterfall arrangement:

> While we have not yet seen an impact from the prime lenders
> tightening above us, we are seeing early signals that lead us to
> believe that the tightening will eventually occur. These signals
> include the rapid reduction of consumer cash reserves across the
> nation as wages are not keeping pace with inflation and higher credit
> utilization. Should this prime tightening happen as we expect, we
> believe this will positively impact both our lease portfolio
> performance and our origination volume.

**H.    The June 2021 Release Misled Investors About 2021 Financial Guidance**

122.    The Class Period begins on June 15, 2021.  On that day, the Company issued a press

release entitled "Katapult Announces First Quarter 2021 Financial Results." Therein, Katapult

stated, in relevant part:

> 2021 Financial Guidance
>
> As of June 15, 2021, Katapult anticipates FY 2021 Gross
> Originations, Revenue and Adjusted EBITDA to be in the following
> ranges:
>
> •    Gross Originations: $375-$425 million

•    Revenue: $425-$475 million

123.    In short, the Defendants reiterated that, as of June 15, 2021, they anticipated that fiscal year gross originations would fall in the range of $375-$425 million and revenue in the range of $425-$475 million.  These ranges were the *very same* as those first announced in December of 2020 and reiterated again in April of 2021.

124.    The statements in the paragraph above were materially false and misleading because: (1) Katapult was experiencing declining e-commerce retail sales and consumer spending that began in the Spring of 2021; (2) prime lenders were reaching down the credit spectrum or "waterfall" to cannibalize Katapult's best customers; (3) as of June 15, 2021 (which represented 45% of the fiscal year completed), Katapult had achieved only 27-31% of the projected gross originations for the year, 31-34% of the projected revenue, and 30-36% of the projected adjusted EBIDTA and, consequently, there was no way that Katapult could possibly achieve the guidance that it had repeatedly presented to investors.

125.    During the conference call concerning the quarterly earnings report, Defendant Cupito reiterated as follows: "given the data *we have today*, we continue to believe that this guidance is reasonable and appropriate."   (Emphasis added).

126.    The statements in the paragraph above were materially false and misleading because: (1) Katapult was experiencing declining e-commerce retail sales and consumer spending that began in the Spring of 2021; (2) prime lenders were reaching down the credit spectrum or "waterfall" to cannibalize Katapult's best customers; (3) as of June 15, 2021 (which represented 45% of the fiscal year completed and more than 90% of the first and second quarters completed), Katapult had achieved only 27-31% of the projected gross originations for the year, 31-34% of the projected revenue, and 30-36% of the projected adjusted EBIDTA and, consequently, there was

no way that Katapult could possibly achieve the guidance that it had repeatedly presented to investors.

127.    Each of defendants Medlin, Zayas and Cupito spoke at length during the June 15, 2021 conference call.

128.    Below is a chart representing Katapult's financial results (in millions) as of June 15, 2021 using an estimate of second quarter results to June 15 based on the full quarter's subsequently announced results:

|  | First Quarter 2021 | Second Quarter 2021 as of June 15 (estimated based on 83.5% of Second Quarter Actuals) | Total as of June 15, 2021 (calculated as Q1 Actuals plus 83.5% of Q2 Actuals) | June Projections as to 2021 Total | Percent of 2021 Projection Reached by June 15, 2021 (45% of year completed) |
|---|---|---|---|---|---|
| Gross Originations | $63.7 | $53.8 (full quarter $64.4) | $117.5 | $375-$425 | 27% - 31% |
| Revenue | $80.6 | $64.7 (full quarter $77.5) | $145.3 | $425-$475 | 31% - 34.2% |
| Adjusted EBITDA | $14.7 | $3.26 (full quarter $3.9) | $17.96 | $50-$60 | 30% - 36% |

129.    Accordingly, Katapult wildly misrepresented the fact that it could still achieve its 2021 financial guidance for the full year on June 15, 2021, when it could not.

130.    Indeed, as one of Katapult's largest shareholders observed, "the company must have known what Q2 2021 would look like at the time of the Q1 2021 earnings call, which was held on June 15th, two weeks before the end of Q1 2021. Affirming guidance at that time was, in our view, *at best incompetent or, worse, blatantly dishonest and misleading*." (Emphasis added).

**I.    Undisclosed Adverse Facts**

131.    The market for Katapult's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures

to disclose, Katapult's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Katapult's securities relying upon the integrity of the market price of the Company's securities and market information relating to Katapult, and have been damaged thereby.

132.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Katapult's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Katapult's business, operations, and prospects as alleged herein.

133.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Katapult's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**J.      Loss Causation**

134.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

135.    During the Class Period, Plaintiff and the Class purchased Katapult's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### K.    Additional Scienter Allegations

136.    The allegations in this subsection relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

137.    Defendants knew, or were reckless in not knowing, what the second quarter of 2021 financial results looked like as of June 15, 2021.  Consequently, reaffirming full year guidance at that time was, as one of the Company's largest shareholders put it, *at best incompetent or, worse, blatantly dishonest and misleading*.

138.    Indeed, during the August 2021 conference call, Defendant Zayas conceded that the negative trends first showed up *in the spring of 2021* as follows:

> starting in the spring, we looked at our score bands and how many score bands are flowing to us, especially in the waterfall. And we're seeing that the higher score bands are minimized a little bit. So we have evidenced that they're definitely buying deeper because some of our higher score bands are not -- I don't want to say disappearing, but they've been minimized. And so it's clear evidence that they've gone deeper. And I think if you just look at any of the major prime providers, they've all talked about delinquencies being down and their profitability going up and they've released some of the COVID restrictions that they've had before.

139.    In addition, the phenomenon of prime lenders loosening their lending standards and "reaching down" the credit spectrum was "something that we've seen before often on throughout the years."

140.    This representation stands in stark contrast to Defendant Einbinder's comments that *"This is a company that will do well, whether it's a good economy or bad economy."*

141.    As originations for Katapult accounted for all of Katapult's business and operations throughout the Class Period, the results were Katapult's core business, and all Defendants, and through them Katapult, would have had robust knowledge of significant aspects of the results, and knew about or recklessly disregarded Katapult's financial position as of June 15, 2021 as a consequence.

142.    Furthermore, Defendant Zayas himself revealed that Katapult tracked results on a nearly daily basis in real time as follows: "Starting in late June and noticeably picking up during the July 4th weekend, we began seeing macro headwinds consistent what you've heard from several retailers. First, we observed our consumer shift their focus towards new spending categories and away from durable goods as summer activities increased and restrictions abated."

143.    Futhermore, upon information and belief, Katapult tracked delinquencies that were as short as a single day, and Katapult tracked sales and collections using software where all data was housed and that any individual with administrative rights could view that information at any time.

144.    In addition, Katapult's Vice President of Finance and Payments, Gregory S. Wildeman, who "oversaw all financial strategic decision-making" and who reported directly to the CEO, resigned his position in August 2021.

145.    Furthermore, the Company regularly touts its high tech, cutting-edge operational abilities.  For example, the Company uses a "fully digital, next generation technology platform" to serve its customers.

146.    Indeed, the Company regularly touted its technological acumen and speed in making decisions as to extending credit, noting its ability to make decisions in "5 seconds or less" when determining whether to lend to a customer.

147.    Defendant Zayas confirmed that Katapult was able to review financial results on a very granular level when he purported to explain the disappointing financial results as follows: "Starting in late June and *noticeably picking up during the July 4th weekend*, we began seeing macro headwinds consistent what you've heard from several retailers."

148.    The false and misleading June 15, 2021 statements were made *less than one week* after Katapult finally announced that the merger had been completed and that Katapult shares would trade on the open market.

149.    The June 15, 2021 earnings release was Katapult's first as a publicly traded company and, consequently, Defendants had every reason to reaffirm guidance that had been presented since the merger with FinServ was first announced.

150.    Defendants also had an incentive to take liberties in touting the quality of Katapult as an acquisition target because they stood to gain favorable employment by ensuring the SPAC successfully acquired a company that could employ them rather than returning the acquisition funds to investors.  SPACs also create perverse incentives for their key employees.  As stated above, because key employees of SPACs will lose their employment at the end of the life of the SPAC, they have an incentive to find a suitable target for acquisition without fail in order to obtain employment at the acquired company.  They also have incentives to choose one target over another

based on the differing compensation they may receive through becoming an employee at different targets. These incentives may cause key employees to overlook problems at a target company they favor, or to present a target company in misleadingly favorable light to ensure the acquisition.

151.    For example, "in connection with the Transactions, on the Closing Date, the Company entered into Lock-Up Agreements (each, a "Lock-Up Agreement"), with substantially all of the holders of Katapult securities prior to the consummation of the Merger. The lockups under the Lock-Up Agreements are subject to certain customary exceptions and are subject to early termination upon the occurrence of certain transactions or in the event that the closing sale price of New Katapult common stock exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after the Closing Date."

152.    According to a June 9, 2021 press release, defendants Einbinder, Zayas, Cupito and Medlin were holders of Katapult securities as of the date of the consummation of the Merger.

153.    In addition, "in connection with the consummation of the transactions contemplated by the Merger Agreement (the "Transactions"), on the Closing Date, the Company, FinServ Holdings LLC, a Delaware limited liability company (the "Sponsor"), the holders of Founder Shares, and certain other holders of New Katapult common stock (collectively, the "A&R RRA Parties"), entered into an Amended and Restated Registration Rights Agreement (the "A&R RRA"). In accordance with the A&R RRA, the A&R RRA Parties and their permitted transferees are entitled to, among other things, customary registration rights, including demand, piggyback and shelf registration rights. The A&R RRA also provides that the Company will pay certain expenses relating to such registrations and indemnify the registration rights holders against (or make contributions in respect of) certain liabilities which may arise under the Securities Act.

"Founder Shares" are shares of FinServ's Class B Common Stock, initially purchased by the Sponsor in a private placement and a subsequent dividend thereon prior to FinServ Acquisition Corp.'s initial public offering, and the shares of Class A Common Stock issuable upon the conversion thereof."

154.    Defendants Zayas, Cupito and Medlin signed the A&R RRA as "new holders."

155.    In addition, In August 2020, Katapult granted Orlando Zayas, Derek Medlin and Karissa Cupito an aggregate of 17,500,000 restricted shares of Katapult's common stock. Such shares vest only upon a Liquidation Event, which is generally defined as any liquidation, dissolution, or winding up of Katapult (including a consolidation, stock exchange, or merger with another company), a business combination transaction between Katapult and a special purpose acquisition company, or SPAC, for the purpose of taking Katapult public, or an initial public offering. The number of shares that vest will depend upon the achieved liquidation price per common share (or, in the case of an initial public offering, the per common share offering price) and is contingent upon the recipient's continuous employment with Katapult through such liquidation event. In connection with the closing of the merger, Katapult expects 15% of such shares (*i.e.*, 2,625,000 shares) to vest and the remaining 85% of such shares (*i.e.,* 14,875,000 shares) to be permanently forfeited.

156.    Also in connection with the Merger, defendant Zayas received 5,761,683 shares of Common Stock, including 511,679 earn out shares. "One-half of the earn out shares will vest if the closing price of the Common Stock equals or exceeds $12.00 per share and one-half will vest if the closing price of the Common Stock equals or exceeds $14.00 per share, in each case over any 20 trading days within any 30 consecutive trading day period ending prior to the expiry of six years from the closing date of the Transaction (the "Earn Out Period"), subject to adjustments as

a result of certain events prior to the expiration of the Earn Out Period (as set forth in the Merger Agreement).

157.    

158.    

159.    Indeed, just 10 days after the closing of the transaction, on June 19, 2021, the Katapult Board of Directors received an update 





160.    As a consumer leasing company, the lifeblood of Katapult's revenues are lease originations. In recognition of the critical importance of these financials,





161.    Given the crucial importance of these financials, starting in the spring of 2021, Katapult officers and directors started to include FinServ fiduciaries in these updates. For instance, on March 5, 2021, Legacy Katapult CEO Zayas forwarded to Defendant Einbinder and others the



██ Defendant Zayas noted that the presentation ███████████████



163.    Einbinder was alarmed by the financials and on March 6, 2021, he replied to Zayas
as follows:  Einbender asked
the following questions:

      a.    ████████████████████████████████████████████

         ████████████████████████████████

         █████████████████████████████████████

      d.    ████████████████████████████████████████

164.    Einbinder forwarded his questions, as well as the March 5, 2021 "█████████████
██████," to Defendant Kurz and Steven Handwerker, FinServ's Head of Business Development.
On March 16, 2021, Einbinder, Kurz, Zayas, and Cupito met to discuss these financials.

165.    On April 9, 2021, Cupito emailed below to the Legacy Katapult Board *and* included
Einbinder:



166.    On May 18, 2021, FinServ issued the Registration Statement in connection with the de-SPAC Transaction. The Registration Statement contained the same extremely aggressive projections included in the December 18, 2020 investor presentation and the January 29, 2021 preliminary registration statement:

| (USD in millions) | Year Ending December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020E | 2021E | 2022E[1] | 2023E |
| Originations[2] | $ 201 | $ 402 | $ 606 | $ 867 |
| Revenue[5] | $ 250 | $ 455 | $ 799 | $ 1,133 |
| Adjusted EBITDA[3][4] | $ 40 | $ 70 | $ 151 | $ 216 |
| Net Income[4] | $ 27 | $ 47 | $ 95 | $ 142 |

167.    Given the bi-weekly updates that the Defendants received between the signing and closing of the transaction, as well as the timing of this presentation, it is inescapable that the Defendants knew that Katapult would not and could not meet its guidance before the stockholder vote on June 9, 2021 and that Katapult would not and could not meet its guidance when such guidance was reiterated on June 15, 2021.

168.    Indeed, on June 19, 2021, just ten days after the closing of the transaction, Cuptio sent an email to the Katapult Board of Directors showing that Katapult would ███████████





169.    Of equal significance is the fact that  starting in late June and noticeably picking up during the July 4th weekend" as Defendant Zayas had stated,



170.    Nevertheless, neither Legacy Katapult nor FinServ made corrective disclosures to the market to reflect Katapult's true financial condition. Had they done so, such disclosures likely would have jeopardized the parties' ability to close the de-SPAC Transaction, since revealing Katapult's actual outlook could lead to (a) FinServ stockholders rejecting the deal and/or (b) sufficient FinServ stockholders exercising their Redemptions Rights, such that the Trust became depleted, the merger agreement's minimum cash condition was not met, and Legacy Katapult could walk away from the transaction.

**L.    Additional Reliance Allegations**

171.    To the extent Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine, in that, among other things: (a) Defendants made public misrepresentations or

51

failed to disclose material facts during the Class Period; (b) the omissions and misrepresentations were material to a reasonable investor; (c) the Company's securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; (e) Plaintiffs and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts; (f) the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market; (g) as a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ; (h) the Company regularly communicated with public investors via established market communication mechanisms, including inter alia regular dissemination of press releases on the national circuits of major newswire services and other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and (i) the Company was followed by numerous securities analysts all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

172.    As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s).  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company.  Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the

Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

173.    During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations.    These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

174.    The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's common stock.  The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

175.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

176.    To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Plaintiffs are entitled to a presumption of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).  Defendants were obligated to disclose, but failed to disclose, material

facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

## M.    Class Action Allegations

177.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class" as defined above); and who were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant who is a natural person; (iii) any person who was an officer or director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors in interest, or assigns of any such excluded person.

178.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent(s), or its domestic depositary(ies), and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

179.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

180.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigations. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

181.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether the Defendants' acts and omissions as alleged herein violated the federal securities laws; (b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects, and management of the Company; (c) whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period; (d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements; (e) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and (f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

182.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### N.    No Safe Harbor

183.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Amended Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.    Additionally, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified specifically as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

184.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Katapult who knew, or recklessly disregarded the risk, that the statement was false when made.

## V.    CLAIMS UNDER SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT

### A.    Count I: For Violations of Section 10(B) of the Exchange Act of 1934 and SEC Rule 10b-5 (Against Katapult and the Katapult Individual Defendants)

185.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

186.    This Count is asserted against the Defendants identified in the Count above, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

187.    During the Class Period, Defendants made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in an effort to maintain artificially high market prices for Katapult's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

188.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Katapult's financial well-being and prospects, as specified herein.

189.    Defendants made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Katapult's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Katapult and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

190.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

191.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Katapult's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

192.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of

Katapult's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Katapult's securities during the Class Period at artificially high prices and were damaged thereby.

193. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Katapult was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Katapult securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

194. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

195. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**B.    Count Two: For Violations of Section 20(a) of the Exchange Act of 1934 (Against the Katapult Individual Defendants)**

196. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.   This Count is asserted against the Katapult Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

198.   The Katapult Individual Defendants acted as controlling persons of Katapult within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Katapult Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Katapult Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

199.   In particular, the Katapult Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

200.   As set forth above, Katapult and the Katapult Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Katapult Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Katapult Individual

Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## VI.    CLAIMS UNDER SECTIONS 14(A) and 20(A) OF THE EXCHANGE ACT

201.    The claims in Counts Three and Four below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Prospectus Claims").  The Prospectus Claims are brought on behalf of investors who beneficially owned and/or held FinServ common stock as of the Record Date of May 11, 2021 (the "Record Date") and were eligible to vote at FinServ's June 7, 2021 special meeting.  The Prospectus Claims are based solely on negligence.  They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness in these non-fraud claims.

202.    The basis of the Prospectus Claims are that Defendants' statements issued to solicit shareholder approval of the merger, including the Prospectus, the documents incorporated into the Prospectus, contained misstatements and/or omissions of material facts.

203.    The Prospectus states, in its Q&A section, that "It is a proxy statement because the board of directors of FinServ is soliciting proxies using this proxy statement/prospectus from its stockholders."

204.    The cover letter to shareholders on the Prospectus states, "FinServ and Katapult are sending you this proxy statement/prospectus to ask you to vote in favor of these and the other matters described in this proxy statement/prospectus."

205.    Defendants' proxy solicitations consist of the Prospectus Form 424(b)(3) filed on May 18, 2021.

206.    The Prospectus solicitations were materially false and misleading.

61

207.    In particular, the Prospectus failed to disclose, in any fashion whatsoever, the following: (a) the nature of Katapult's waterfall relationship with other lenders, whereby Katapult *only* had the opportunity to serve a customer when the lender above Katapult declined to lend to a customer; (b) the fact that prime lenders could and would simply "reach down" the credit spectrum and cannibalize Katapult's entire customer base; (c) the fact that these risks were known and knowable to Katapult at the time the Prospectus was issued; (d) how high savings rates and low delinquency rates would cut against (rather than in favor of) Katapult's entire business model; (e) the fact that Katapult's particular position within the waterfall makes it *completely* reliant on the entity above it in the waterfall declining the initial application; (f) the fact that Katapult occupied a subsequently self-identified *unique* position in the waterfall, which exposed the Company to the known risk that prime lenders could simply expand the scope of customer that it would extend credit to; (g) the fact that the waterfall is a zero sum game, and the consequence was that each additional customer served by the prime lender "up the waterfall" meant one less customer flowing "down the waterfall" to Katapult.  In short, the Prospectus failed to disclose that the "waterfall" could simply be turned off all together by prime lenders above Katapult at any time, and that this was a known trend at the time the Prospectus was issued.

208.    In fact, there is just *one reference* to the "waterfall" lending spectrum in the *entire* Prospectus, and it utterly fails to disclose *any* of the relevant features of Katapult's business model.

209.    The Prospectus also disclosed *nothing*, whatsoever, about how customer savings rates and/or payment delinquency rates would affect the credit spectrum that provided Katapult its customer base.    Indeed, the Prospectus does not even *mention* the terms "savings rate" "delinquency rate" or "spectrum" a single time.

210.    The materially false and misleading statements and omissions set forth above proximately caused foreseeable losses to Plaintiffs and members of the Class, as the risks concealed by the false and misleading statements and omissions materialized through the corrective disclosures set forth above.

211.    Plaintiffs argued that they may recover "out-of-pocket" losses suffered as a result of the misstatements and omissions contained in the Prospectus.  In particular, Plaintiffs' out-of-pocket damages are equal to the diminution in the value of their personally held shares that occurred after corrective disclosures revealed the truth behind the Prospectus' representations.

212.    S.E.C. Reg. S-K governs the items to be disclosed in the non-financial statement portion of registration statements, proxy statements, and annual and quarterly reports filed with the SEC. 17 C.F.R. § 229.10. Item 303 of SEC Reg. S-K requires that the section of the SEC filings, entitled Management's Discussion and Analysis of Financial Condition and Results of Operations, disclose specific information regarding liquidity, capital resources, and results of operations, along with such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations. 17 C.F.R. § 229.303.

213.    In particular, a registrant must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed."   17 C.F.R. § 229.303(b)(2)(ii).

214.    The Prospectus fails to describe the known trends set forth above.

215.    In the alternative, the following statement in the Prospectus false or misleading:

"**Waterfall partnerships**:    A waterfall is where the application will flow from the prime lender to other financing and lease-purchase options automatically; this gives the consumer the best option for their situation. Katapult's technology supports a sophisticated integration with these partners and ensures a smooth and efficient customer transaction experience during application and checkout."

A.    **Count Three: For Violations of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9 (Against Katapult and the FinServ Defendants and Defendant Zayas)**

216.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

217.    This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

218.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all former shareholders of FinServ who held shares of FinServ common stock as of the Record Date and were entitled to vote at the FinServ special meeting on June 7, 2021 with respect to the merger.

219.    Defendants' statements issued to solicit shareholder approval of the merger, including the Prospectus, and the documents incorporated therein, and other proxy solicitation materials, contained statements that, at the time and in light of the circumstances under which they

were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

220.    Defendants named in this Count were required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on June 7, 2021.

221.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Prospectus Statement and other proxy solicitation materials.

222.    By means of the Prospectus and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the merger and solicited proxies from Plaintiffs and other members of the Class.

223.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading.  Defendants were required to ensure that the Prospectus and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.  These Defendants also acted negligently in failing to update the Prospectus.

224.    The solicitations described herein were essential links in the accomplishment of the merger.

225.    Plaintiffs and other members of the Class eligible to vote on the merger were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to

make a fully informed decision in voting on the merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

226.    The false and misleading statements and omissions in the Prospectus and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the merger and/or whether to exercise their conversion right to receive Katapult stock.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Prospectus, additional proxy solicitation materials, and in other information reasonably available to stockholders.

227.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

228.    The untrue statements and omissions caused economic injury when the truth was revealed at the end of the Class Period and Katapult shares suffered a significant diminution in value.  In this way, Plaintiff alleges any loss causation requirements associated with this claim.

229.    Each of the defendants named in this count allowed their names to be used and included in the Prospectus.

230.    This claim is brought within the applicable statute of limitations.

231.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a9.

**B.    Count Four: For Violations of Section 20(a) of the Exchange Act In Connection with the Prospectus Claims (Against the FinServ Defendants and Defendant Zayas)**

232.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

233.    This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

234.    This Count is asserted against the FinServ Defendants and Defendant Zayas and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

235.    The Defendants acted as controlling persons of Katapult within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

236.    In particular, the Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The

Defendants also reviewed the Merger Agreement and voted to approve the merger, signed the Prospectus and solicited approval of the merger.

237.    As set forth above, Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

238.    The solicitations described herein were essential links in the accomplishment of the merger.

239.    Plaintiffs and other members of the Class eligible to vote on the merger were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

240.    The false and misleading statements and omissions in the Prospectus and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Prospectus, additional proxy solicitation materials, and in other information reasonably available to stockholders.

241.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

242.    This claim is brought within the applicable statute of limitations.

243.    By reason of the foregoing, the Defendants violated Section 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a).

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of

the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of

the Class against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.    Awarding such other and further legal or equitable relief as the Court deems just

and proper.

## VIII.    **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable in this Action.


Dated:  November 4, 2022                        Respectfully submitted,

                                                                 **WOLF HALDENSTEIN ADLER**
                                                                   **FREEMAN & HERZ LLP**

                                                                   /s/ Matthew M. Guiney
                                                                   Matthew M. Guiney
                                                                   270 Madison Avenue
                                                                   New York, New York 10016
                                                                   Telephone: (212) 545-4600
                                                                   Facsimile: (212) 686-0114
                                                                   guiney@whafh.com

                                                                   *Lead Counsel for Plaintiffs and the Class*

69

Brian Schall (Pro Hac Vice forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel*

**CERTIFICATE OF SERVICE**

I, Matthew M. Guiney, hereby certify that a true and correct duplicate copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on November 4, 2022.  Parties may access this filing through the Court's CM/ECF system.

/s/ Matthew M. Guiney