UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GINA McINTOSH, MATIS NAYMAN and FELIPE
DE CASTRO LUNA, individually and on behalf of
all others similarly situated,

               Plaintiffs,

    v.

KATAPULT HOLDINGS, INC., LEE EINBINDER,
HOWARD KURZ, ORLANDO ZAYAS, KARISSA
CUPITO, and DEREK MEDLIN,

               Defendants.

Case No. 1:21-cv-07251-JPO

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

COOLEY LLP
Aric H. Wu
Brian M. French
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
bfrench@cooley.com

COOLEY LLP
Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121-1117
Tel: (858) 550-6000
kfukumura@cooley.com

January 9, 2023

*Attorneys for Defendants Katapult Holdings,
Inc., Lee Einbinder, Howard Kurz, Orlando
Zayas, Karissa Cupito, and Derek Medlin*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND .......................................................................................................................... 3

      A.     Katapult's Business And Rapid Growth ................................................................. 3

      B.     The December 2020 Merger Announcement ........................................................... 5

      C.     FinServ Issues The Proxy, And FinServ's Shareholders Approve The Merger .................................................................................................................... 6

      D.     Katapult Announces Strong Q1 2021 Results And Reaffirms Its April 2021 Guidance ...................................................................................................... 7

      E.     E-Commerce Retail Sales Decline Precipitously, And Katapult Pulls Guidance .............................................................................................................. 8

      F.     This Lawsuit ......................................................................................................... 9

LEGAL STANDARDS ............................................................................................................. 10

ARGUMENT ............................................................................................................................. 12

I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) ........................... 12

      A.     The Guidance Statements Are Protected Under The PSLRA Safe Harbor For Forward-Looking Statements ........................................................................ 13

               1.     The Guidance Statements Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language ...................... 13

               2.     Plaintiffs Fail To Allege Particularized Facts Giving Rise To A Strong Inference That Any Defendant Made The Guidance Statements With Actual Knowledge They Were False Or Misleading ........................................................................................... 15

                        a.     Plaintiffs Fail To Allege A Valid Motive ........................ 16

                        b.     The SAC's Cited Documents Do Not Show Actual Knowledge That The Guidance Statements Were False Or Misleading ........................................................ 17

      B.     Medlin Did Not "Make" The Guidance Statements Under Janus ...................... 22

II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(a) ........................... 23

      A.     Plaintiffs Fail To State A "Pure Omission" Claim ............................................. 23

**TABLE OF CONTENTS**
(continued)

**Page**

1.   The Structure And Risks Of Katapult's Waterfall Arrangements Were Widely Publicized ........................................................................... 25

2.   Prime Lenders' Loosening Of Lending Standards Was Not A Known, Material Trend Under Item 303 ................................................. 27

B.   Plaintiffs Fail To Allege A False Or Misleading Statement In The Proxy .......... 29

III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a).......................... 30

CONCLUSION................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Grp.*,
   47 F.3d 47 (2d Cir. 1995)..............................................................................................17

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs.*,
   2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ..........................................................30

*In re AT&T/DirecTV Now Sec. Litig.*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020).........................................................................17

*ATSI Commc'ns v. Shaar Fund*,
   493 F.3d 87 (2d Cir. 2007)............................................................................................3

*In re Avon Prods. Sec. Litig.*,
   2009 WL 848017 (S.D.N.Y. Feb. 23, 2009)..................................................................3

*In re Axis Cap. Holdings Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006).........................................................................16

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013).............................................................15, 25, 27

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)
   Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010).........................................................................29

*In re Bemis Sec. Litig.*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021).........................................................................11

*Blackmoss Invs. v. ACA Cap. Holdings*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...............................................................28

*In re Carter-Wallace Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000)..........................................................................................22

*In re Columbia Pipeline*,
   405 F. Supp. 3d 494 (S.D.N.Y. 2019).........................................................................11

*In re Coty Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .......................................................24, 28

*In re Curaleaf Holdings Sec. Litig.*,
   519 F. Supp. 3d 99 (E.D.N.Y. 2021) ...........................................................................15

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018).........................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase,*
 553 F.3d 187 (2d Cir. 2009)....................................................................................16, 17

*Enzo Biochem v. Harbert Discovery Fund,*
 2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021)..............................................................11

*In re eSpeed Sec. Litig.,*
 457 F. Supp. 2d 266 (S.D.N.Y. 2006).........................................................................17

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.,*
 336 F. Supp. 3d 196 (S.D.N.Y. 2018)...........................................................................3

*Furlong Fund v. VBI Vaccines,*
 2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ..............................................................29

*Ginx v. Soho All.,*
 720 F. Supp. 2d 342 (S.D.N.Y. 2010)..........................................................................19

*Gonzales v. Nat'l Westminster Bank,*
 847 F. Supp. 2d 567 (S.D.N.Y. 2012)...........................................................................3

*Gray v. Wesco Aircraft Holdings,*
 454 F. Supp. 3d 366 (S.D.N.Y. 2020)................................................................ *passim*

*Greco v. Qudian,*
 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)...........................................................19, 21

*Gutman v. Lizhi,*
 2022 WL 4646471 (E.D.N.Y. Oct. 1, 2022)................................................................24

*Heinze v. Tesco,*
 971 F.3d 475 (5th Cir. 2020) ....................................................................................24

*Ho v. Duoyuan Glob. Water,*
 887 F. Supp. 2d 547 (S.D.N.Y. 2012)..........................................................................22

*Holbrook v. Trivago,*
 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)..............................................................24, 28

*Jackson v. Abernathy,*
 960 F.3d 94 (2d Cir. 2020).......................................................................................21

*Janus Cap. Grp. v. First Derivative Traders,*
 564 U.S. 135 (2011)..............................................................................................12, 22

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................................11

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)................................................................................................17

*Kelley v. Rambus*,
  2008 WL 5170598 (N.D. Cal. Dec. 9, 2008).....................................................................29

*Lau v. Opera*,
  527 F. Supp. 3d 537 (S.D.N.Y. 2021)................................................................................25

*Livingston v. Cablevision Sys.*,
  966 F. Supp. 2d 208 (E.D.N.Y. 2013) ................................................................................30

*In re Longtop Fin. Techs. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013)..................................................................................3

*Maloney v. Ollie's Bargain Outlet Holdings*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)....................................................................10, 11, 21

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)...........................................................................25, 27

*In re N. Telecom Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000)................................................................................17

*Nguyen v. MaxPoint Interactive*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017)................................................................................27

*Noto v. 22nd Century Grp.*,
  35 F.4th 95 (2d Cir. 2022) .................................................................................................23

*Okla. Firefighters Pension & Ret. Sys. v. Xerox*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)...........................................................................13, 30

*Omnicare v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................................................22

*Pearlstein v. BlackBerry*,
  93 F. Supp. 3d 233 (S.D.N.Y. 2015)..................................................................................27

*In re Pfizer Sec. Litig.*,
  538 F. Supp. 2d 621 (S.D.N.Y. 2008).................................................................................3

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Resnik v. Swartz*,
303 F.3d 147 (2d Cir. 2002)......................................................................................23

*River Birch Cap., LLC v. Jack Cooper Holdings*,
2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ...........................................................18

*In re Rockwell Med. Sec. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .........................................................21

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................................12, 30

*Shields v. Citytrust Bancorp*,
25 F.3d 1124 (2d Cir. 1994)................................................................................19, 22

*Slayton v. Am. Express*,
604 F.3d 758 (2d Cir. 2010)..........................................................................13, 14, 15

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012).......................................................................22

*Tellabs v. Makor Issues & Rights*,
551 U.S. 308 (2007).................................................................................................1, 16

*Tung v. Bristol-Myers Squibb*,
412 F. Supp. 3d 453 (S.D.N.Y. 2019).......................................................................30

*In re Vivendi Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).....................................................................................24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) .......................................................................29

*Wielgos v. Commonwealth Edison*,
892 F.2d 509 (7th Cir. 1989) .......................................................................25, 26, 27

*Willard v. UP Fintech Holding*,
527 F. Supp. 3d 609 (S.D.N.Y. 2021)........................................................................28

*In re Willis Towers Watson plc Proxy Litig.*,
937 F.3d 297 (4th Cir. 2019) ...................................................................................24

*Zerman v. Ball*,
735 F.2d 15 (2d Cir. 1984)........................................................................................27

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Statutes and Rules**

15 U.S.C.
    § 78u-4 ..................................................................................................11, 16, 30
    § 78u-5 ..................................................................................................13, 14, 16
    § 78j(b)..........................................................................................................10
    § 78n(a) .........................................................................................................10

17 C.F.R. § 229.303(b)(2)(ii)..........................................................................................24

Fed. R. Civ. P. 9(b) ......................................................................................................11

**PRELIMINARY STATEMENT**

No one has a crystal ball. Markets are complex, and predicting financial results—particularly amid a global pandemic—is always uncertain. Companies know that. Investors know that. And Congress knew that when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Too "often," Congress found, plaintiffs' lawyers "file frivolous 'strike' suits" based on "a company's announcement of bad news, not evidence of fraud." S. Rep. No. 104-98, at 4 (1995). Congress thus enacted the PSLRA as "a check against abusive litigation," imposing "[e]xacting pleading requirements" and exempting most forward-looking statements from federal securities liability. *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007).

In June 2021, Katapult merged with FinServ, a special purpose acquisition company. Katapult then announced Q1 2021 financial results and reaffirmed its guidance for the rest of the year. Its guidance was optimistic, and for good reason: Katapult had seen nothing but exponential growth for years. In 2019, its revenue doubled. In 2020, its revenue almost tripled. And Q1 2021 saw not only Katapult nearly double its revenue year-over-year and close the quarter with one of its best months ever, but also Wayfair—the merchant partner representing over 70% of Katapult's business—report soaring revenue growth of close to 50% year-over-year. Naturally, Katapult also expected to see the traditional boost in consumer spending during the Q4 retailer holiday sales season (*e.g.*, Halloween, Black Friday, Christmas), an annual phenomenon which had enabled Katapult to generate most of its originations in the second halves of 2018, 2019, and 2020.

As the summer wore on, however, the economic clouds for e-commerce darkened. The Fourth of July weekend, an important holiday for retailers, was a dud. In late July, Amazon (an e-commerce bellwether) missed its quarterly sales estimate for the first time in three years and warned of falling retail demand. Most troublingly for Katapult, on August 5, 2021, Wayfair

reported that its Q2 U.S. revenue fell over 15% year-over-year, and that its Q3 revenue-to-date was down even more, sounding the alarm about "the most complex macro environment" in decades. Faced with these indicators, Katapult decided to pull its full-year guidance on August 10, 2021. Katapult's stock price then fell as investors, too, tempered their expectations.

From this case study in a company responsibly updating its outlook, Plaintiffs claim fraud. They insist Defendants must have had "actual knowledge" that Katapult's guidance would be "impossible to achieve." ¶¶ 15, 191.[1] Plaintiffs reach that conclusion despite citing documents confirming that Katapult reasonably believed it *would* meet its guidance. All Plaintiffs can muster is that the forecast did not pan out, which is a textbook example of alleging "fraud by hindsight"— the very thing Congress enacted the PSLRA to prevent. The law does not require clairvoyance. The best a company can do is provide a good-faith forecast and advise investors of the risks. That is exactly what Katapult did here.

The Second Amended Complaint ("SAC") asserts three causes of action under the Securities Exchange Act of 1934 (the "Exchange Act'"). And even after pirating Katapult's confidential information from a redacted filing in a parallel Delaware action,[2] Plaintiffs are just as far from stating a claim as they were before. The SAC's claims should all be dismissed.

Plaintiffs Do Not State A Section 10(b) Claim. Katapult's guidance and one Defendant's related statement are protected under a PSLRA safe harbor because they were identified as forward-looking and accompanied by meaningful cautionary language. The safe harbor also

---

[1] "¶" refers to paragraphs of the Second Amended Complaint ("SAC"). "Ex." refers to the exhibits attached to the Declaration of Brian M. French, filed concurrently herewith. Unless otherwise noted, all emphasis is added, and all internal citations, quotation marks, and alterations are omitted.

[2] As explained in Defendants' Motion to Strike, filed concurrently herewith, as an alternative to dismissing the SAC with prejudice, the Court should strike the SAC and order Plaintiffs to file a new pleading that removes any reliance on the confidential materials.

protects these forward-looking statements for the independent reason that Plaintiffs allege no particularized facts giving rise to a strong inference that the statements were made with actual knowledge that they were false or misleading.

Plaintiffs Do Not State A Section 14(a) Claim. Plaintiffs cannot pursue a "pure omission" theory without identifying a duty to disclose the omitted information, and they identify none. Item 303 did not create such a duty. And the allegedly omitted risk was, in fact, widely publicized.

Plaintiffs Do Not State A Section 20(a) Claim. Plaintiffs do not allege an underlying violation, or even that all Defendants exercised actual control over the challenged statements.

For these reasons—and others, below—the SAC should be dismissed with prejudice.

**BACKGROUND**[3]

**A.    Katapult's Business And Rapid Growth**

Defendant Katapult Holdings, Inc. is a publicly traded, e-commerce focused financial technology company offering lease-purchase options to non-prime U.S. consumers. Ex. 1 at 104. Consumers with non-prime credit, who comprise an estimated 38% of all U.S. consumers, often lack sufficient cash or credit to obtain everyday durable goods, such as electronics, computers, home furnishings, and appliances. *Id.* at 105. Katapult helps these underserved consumers obtain the goods they need, while also helping merchants reach a previously inaccessible segment of the population. *Id.* at 104.

---

[3] On a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference," *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007), as well as "matters of which a Court may take judicial notice," *In re Pfizer Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008). The Court may take judicial notice of "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012); "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018); and "analyst reports," *In re Avon Prods. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009).

Katapult does most of its business through Wayfair, one of the world's largest online furniture and home goods stores. *Id.* at 126. In 2020, for example, "Wayfair represented approximately 72%" of Katapult's origination dollars. *Id.* at 50. For that reason, Katapult has always cautioned investors that its own performance may depend, in large part, on Wayfair's performance. *See, e.g.*, *id.* at 50 ("The concentration of a significant portion of our business and transaction volume with a limited number of merchants, or type of merchant or industry, exposes us disproportionately . . . to the economic performance of those merchants or industry.").

Katapult also generates business through "waterfall" arrangements with prime lenders, such as Affirm. ¶ 63. Online retailers often give customers the option to apply for credit at the checkout page (*i.e.*, "buy now, pay later"). If the prime lender—Affirm, say—denies the application, the customer will often cancel the transaction altogether. But through a waterfall arrangement, any application Affirm declines will automatically "fall" to Katapult, giving Katapult the opportunity to approve it. ¶ 63 ("[I]f Affirm declines that application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer."); *see* ¶¶ 65-66. Although Katapult has no control over which applications Affirm declines or how many, Katapult nonetheless benefits from the incremental business. ¶ 66 ("So we love the waterfall, because it captures us consumers that applied and got turned down for whatever reason.").[4]

Between 2018 and 2020, Katapult experienced tremendous, exponential growth. As the table below shows, Katapult's revenue doubled in 2019 and nearly tripled in 2020:

| *$ in millions*[5] | **2018** | **2019** | **2020** |
|---|---|---|---|
| **Revenue** <br> *YoY Growth* | $43.1 | $91.9 <br> *113%* | $247.2 <br> *169%* |

---

[4] Katapult also has similar waterfall arrangements with other prime lenders. ¶ 65.

[5] Ex. 3 at 2; Ex. 1 at 125.

**B.    The December 2020 Merger Announcement**

FinServ Acquisition Corp. ("FinServ") is a special purpose acquisition company ("SPAC") that went public on November 5, 2019. ¶ 52. FinServ focused its efforts on identifying businesses in the financial services industry, "with particular emphasis on businesses that are providing or changing technology for traditional financial services." ¶ 51. Like most SPACs, FinServ had 24 months from its IPO to complete an initial business combination. ¶ 56.

On December 18, 2020, FinServ and Katapult announced a proposed merger in a joint press release that attached a Katapult investor presentation. ¶ 60; Ex. 2. The presentation included Katapult's latest full-year 2021 forecasts—projecting $455 million in revenue, $402 million in originations, and $70 million in EBITDA. ¶ 61; Ex. 2 at 47. The presentation also cautioned investors that Katapult's forecasts were "subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions," "risks related to the concentration of Katapult's business among a relatively small number of merchants," and "the impact of the COVID-19 pandemic," such that "actual results could differ materially from the results implied by these forward-looking statements." Ex. 2 at 13.

Following the merger announcement, Katapult publicly discussed its waterfall arrangements on multiple occasions. Katapult reminded investors that it can approve waterfall applications only if prime lenders decline them first, meaning prime lenders ultimately control how many such applications "fall" to Katapult. *See, e.g.*, ¶ 63 ("*if* Affirm declines that application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer"); ¶ 65 ("*If* Affirm declines the application the data is electronically transmitted, and we have the opportunity to approve that consumer."). Katapult's CEO, Orlando Zayas, also explained that Katapult's waterfall application volume necessarily changes when prime lenders adjust their lending criteria in response to changing economic conditions: "We are in a waterfall situation

5

where, when the economy gets rough, the prime lenders tighten up. We're actually a beneficiary

of that because we see a better credit quality than we've seen in the past get turned down, and we

can still manage that risk." Ex. 4 at 3. Notably, around the same time, Affirm disclosed that it was

refining its risk model in response to "improved macroeconomic conditions." Ex. 5 at 2.

On April 21, 2021, Katapult updated its full-year guidance—this time projecting

$425-$475 million in revenue, $375-425 million in originations, and $50-$60 million in EBITDA.

¶ 70; Ex. 6 at 47. Katapult's guidance assumed a 2021 growth rate that was, if anything, modest

compared to its recent historical growth rate:

| $ in millions[6] | 2019 | 2020 | 2019 to 2020 Growth Rate | 2021 Forecast | Forecasted 2020 to 2021 Growth Rate (Low-High) |
|---|---|---|---|---|---|
| Revenue | $91.9 | $247.2 | 169.1% | $425 - $475 | 71.9% - 92.2% |
| Gross Originations | $102.5 | $236.4 | 130.5% | $375 - $425 | 58.7% - 79.8% |
| EBITDA/(Loss) | $(4.9) | $40.2 | N/A[7] | $50 - $60 | 24.5% - 49.3% |

Within weeks, Amazon (an e-commerce bellwether) and Wayfair posted stellar Q1 2021

results, signaling a robust online retail environment. On April 29, 2021, Amazon announced a

net-sales increase of 44% year-over-year ("YoY"). Ex. 7 at 5. And on May 6, 2021, Wayfair

reported that net revenue had increased almost 50% YoY. Ex. 8 at 5.

**C.    FinServ Issues The Proxy, And FinServ's Shareholders Approve The Merger**

On May 18, 2021, FinServ filed the final Rule 424(b)(3) prospectus and proxy statement

(the "Proxy"). ¶ 75; Ex. 1. Although the Proxy asked FinServ shareholders to approve the merger,

---

[6] Ex. 3 at 2-4; Ex. 6 at 47.

[7] No EBITDA growth rate is listed here due to the difficulty expressing, in percentage terms, Katapult's EBITDA growth from negative $4.9 million in 2019 to positive $40.2 million in 2020.

6

it did not mince words about the risks or the uncertainty around Katapult's projections. Across 35 pages of detailed "Risk Factors," the Proxy warned investors that Katapult's business could suffer from "changes in factors affecting discretionary spending for nonprime consumers," including "disposable consumer income," "availability of credit," and "COVID-19," that could "reduce demand for [its] products and services resulting in lower revenue"; that Wayfair represented 72% of Katapult's origination dollars in 2020, "expos[ing Katapult] disproportionately to . . . [Wayfair's] economic performance"; that "strategic actions" by other market participants could impact Katapult's stock price; that Katapult's "estimates of market opportunity and forecasts of market growth may prove to be inaccurate," making it "difficult to sustain" its previous "rapid growth"; and that Katapult's "revenue and operating results may fluctuate" and could "vary from quarter to quarter and by season." Ex. 1 at 47, 49-51, 68.

Informed of the risks, FinServ's shareholders voted to approve the merger on June 7, 2021. ¶ 79. The merger closed on June 9, 2021. *Id.*

### D. Katapult Announces Strong Q1 2021 Results And Reaffirms Its April 2021 Guidance

On June 15, 2021, Katapult announced Q1 2021 results. Consistent with its full-year projections, YoY Katapult's revenue climbed 88%, its gross originations 71%, and its EBITDA 122%. Ex. 9 at 4. Katapult also added 26 new merchants in the first quarter. Ex. 10 at 6.

In addition, Katapult reaffirmed its full-year guidance from April 2021. ¶ 82; Ex. 9 at 5. "[G]iven the data we have today," Katapult's then-CFO, Karissa Cupito, said, "we continue to believe that this guidance is reasonable and appropriate." ¶ 84. Cupito explained that Katapult "anticipate[d] the majority [its] growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021." ¶ 90; Ex. 10 at 9. This, she noted, was due to "traditional retailer seasonality," *i.e.*, increased consumer spending during the Q4 retailer holiday sales season (*e.g.*,

Halloween, Black Friday, Christmas). Ex. 10 at 7, 11. In 2019, for example, Katapult generated

65% of its full-year originations in the second half of the year (and only 13% in Q1). Ex. 6 at 46.

Thus, Katapult not only saw impressive growth in the first half of the year, but also expected to

grow even more in the second half.

As always, Katapult reminded investors that its forecasts were inherently uncertain, might

not pan out, and were subject to the detailed risk factors identified in its SEC filings and the Proxy.

Ex. 9 at 6; Ex. 10 at 4.

> **E.      E-Commerce Retail Sales Decline Precipitously, And Katapult Pulls Guidance**

Unfortunately, as the summer wore on, the economic environment for e-commerce took a

turn for the worse. COVID-19 restrictions eased, tilting consumer spending toward travel and

entertainment and away from retail goods. Ex. 14 at 14, 17-18. Consumer spending fell over the

Fourth of July weekend, an important holiday for American retailers. ¶ 89. On July 29, 2021,

Amazon missed its quarterly sales estimate for the first time in three years and warned of falling

retail demand for the remainder of the year. Ex. 11. Most troublingly for Katapult, on August 5,

2021, Wayfair announced that its Q2 U.S. revenue had nosedived over 15% YoY, Ex. 12 at 4, and

that its Q3 revenue-to-date was "down in the high-teens," Ex. 13 at 9, sounding the alarm about

an unprecedented macroeconomic environment:

> [W]e need to acknowledge that this is probably the murkiest moment in 2021.
> Frankly, it's the most complex macro environment to read that I've seen in my
> entire career. Every public company is having to base its comments on only a few
> weeks of data, all while the macro and public health picture is rapidly changing.
> We believe we'll get to a better view of consumer behavior as people settle into
> their normal routines post summer.

Ex. 13 at 10; *see id.* at 4 (discussing "bottlenecks at nearly every point in the supply chain").

Faced with these indicators, Katapult decided to pull its guidance on August 10, 2021. ¶ 87.

On an investor call, Cupito echoed Wayfair's comments from a few days earlier:

> We are in a very complex macroeconomic environment, to say the least. Since our last call, we observed meaningful changes in both e-commerce and retail sales forecast[s] and consumer spending behavior, and in the past few weeks, the onset of new policies from the COVID-19 variants. Beginning with the data that became available after our earnings call we then[,] validated as many online retailers released earnings over the past few weeks. The consensus in the market suggests e-commerce sales will likely slow for the balance of the year. Coupled with developments, consumer spending in July appear[s] to be shifting away from durable good categories in favor of travel, clothing and entertainment.

Ex. 14 at 17-18. Zayas made similar observations, stating:

> On the macro front, it is a rapidly changing and complex environment that we have not previously faced in our business, which makes forecasting difficult. Since our Q1 earnings call and continuing today, many new developments emerge[d] that have impact on our business. Starting in late June and noticeably picking up during the July 4th weekend, we began seeing macro headwinds consistent [with] what you've heard from several retailers. First, we observed our consumers shift their focus towards new spending categories and away from durable goods as summer activities increased and restrictions abated. Coupled with this consumer category expenditure, external data has become available suggesting e-commerce sales will likely slow for the balance of the year.

*Id.* at 14. Zayas also noted that prime lenders had begun loosening their standards in response to changing economic conditions, "stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume." ¶ 92.

For all that, Katapult still achieved year-to-date ("YTD") revenue of $158.1 million, representing an increase of 53% YoY. Ex. 14 at 14. Katapult also added 31 new merchants in the second quarter, bringing the total number of new merchants for the first half of the year to 57. Ex. 14 at 15. But Katapult's stock price declined. ¶ 103. And on August 27, 2021, this litigation began.

### F.     This Lawsuit

On July 29, 2022, Plaintiffs filed an Amended Complaint ("AC"), asserting claims under Sections 10(b), 14(a), and 20(a) of the Exchange Act. ECF No. 46. Defendants moved to dismiss the AC on September 23, 2022. ECF. No. 53. Less than two weeks later, Plaintiffs announced that

they intended to file an SAC, incorporating confidential material they had pirated from a redacted filing in a parallel Delaware proceeding, *Saunders v. Einbinder, et al.*, C.A. No. 2022-0755-PAF (Del. Ch.). On October 13, 2022, the Court ordered Plaintiffs to file the SAC in redacted form and invited Defendants to challenge Plaintiffs' use of the information in a separate motion addressing "whether the use of such information implicates the PSLRA stay of discovery." ECF No. 56.

On November 10, 2022, Plaintiffs filed their SAC. ECF No. 59. In the SAC, Plaintiffs copy nearly verbatim 18 paragraphs from the Delaware complaint, ¶¶ 62, 64, 68, 102, 157-170, copy-and-paste screenshots from documents without any surrounding context, ¶¶ 62, 68, 159-162, 165-166, 168-169, abandon their scheme-liability claim, and add a number of irrelevant facts that post-date the putative class period by over a year, ¶¶ 119-121. Plaintiffs allege that Katapult, Zayas, Cupito, and Katapult COO Derek Medlin violated Section 10(b) of the Exchange Act when Katapult issued its full-year guidance on June 15, 2021, and when Cupito called the guidance "reasonable and appropriate" later that day. ¶¶ 122, 125, 186. Plaintiffs also allege that Katapult, Zayas, FinServ CEO Lee Einbinder, and FinServ CFO Howard Kurz violated Section 14(a) of the Exchange Act when FinServ filed the Proxy on May 18, 2021. ¶¶ 220-221, 223, 229. Lastly, Plaintiffs allege that the Individual Defendants are liable as control persons under Section 20(a) of the Exchange Act—Zayas, Cupito, and Medlin in connection with the Section 10(b) claim, and Zayas, Einbinder, and Kurz in connection with the Section 14(a) claim. ¶¶ 197, 234.

## LEGAL STANDARDS

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Plaintiffs must plead (i) a material misrepresentation or omission, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) reliance, (v) loss causation, and (vi) damages. *Maloney v. Ollie's Bargain Outlet Holdings*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021) (Oetken, J.). To state a claim under Section 14(a), 15 U.S.C. § 78n(a), Plaintiffs must plead (i) a material misrepresentation or

10

omission, (ii) negligence, (iii) that the proxy solicitation itself, rather than the alleged defect in the solicitation materials, was an "essential link" in accomplishing the transaction, and (iv) loss causation. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).

Both claims are subject to the PSLRA's heightened pleading requirements. *See Maloney*, 518 F. Supp. 3d at 777; *In re Bemis Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021). Under the PSLRA, the SAC must not only identify each statement and omission alleged to have been misleading, but also specify "the reason or reasons why" each is misleading. 15 U.S.C. § 78u-4(b)(1)(B). For all allegations "made on information and belief"—here, all nonpublic information in the SAC—the SAC "shall state with particularity all facts on which that belief is formed." *Id.* And, for the Section 10(b) claim, the SAC must "state with particularity facts giving rise to a strong inference that [Defendants] acted with [scienter]." *Id.* § 78u-4(b)(2)(A).

Both claims are also subject to Rule 9(b), which requires the SAC to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "While there is no requirement . . . that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a), when plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." *In re Columbia Pipeline*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (cleaned up); *see also Enzo Biochem v. Harbert Discovery Fund*, 2021 WL 4443258, at *8 (S.D.N.Y. Sept. 27, 2021) ("[W]hether Rule 9(b)'s heightened pleading standard applies to a particular case turns on the nature of the plaintiff's allegations, not the elements of the legal cause of action."). Here, the SAC squarely contends that Section 14(a) Defendants Einbinder and Kurz "had an incentive to take liberties," "to overlook problems," and "to present [Katapult] in [a] misleadingly favorable light to ensure the acquisition." ¶ 150; *see* ¶¶ 16-18 (alleging, in a string of paragraphs about the Proxy,

that "Defendants were aware of the serious and significant risk" posed by Katapult's waterfall arrangements). The SAC also features a multipage, fraud-focused diatribe against SPACs and their sponsors, ¶¶ 41-49 (accusing SPACs like FinServ of being "magnets for fraud," "encourag[ing] fraud," and "creat[ing] perverse incentives for their key employees"), which could only be addressed to Einbinder and Kurz, as FinServ's officers. The SAC even characterizes the Proxy's omissions as "misleading" and "untrue," *e.g.*, ¶¶ 219, 225-228, terms "classically associated with fraud," *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) ("Plaintiffs assert that their Section 11 claims do not sound in fraud, but the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." (cleaned up) (emphases in original)).

## ARGUMENT

Under any pleading standard, the result is the same: Plaintiffs do not state an Exchange Act claim because they do not plead an actionable misstatement or omission, scienter, negligence, or that every Defendant "made" a statement under *Janus Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011).

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(B)

Plaintiffs challenge two statements under Section 10(b). Both were made on June 15, 2021. The first is Katapult's full-year 2021 guidance. ¶ 122; Ex. 9 at 5. The second is Cupito's remark on a related investor call that, "given the data we have today, we continue to believe that this guidance is reasonable and appropriate." ¶ 125; Ex. 10 at 9. According to Plaintiffs, these two statements—*i.e.*, the "Guidance Statements"—were materially false and misleading because it was "impossible" for Katapult to meet those year-end forecasts. ¶¶ 15, 20, 124, 126. Plaintiffs assert their Section 10(b) claim against Katapult, Zayas, Cupito, and Medlin. ¶ 186.

12

Plaintiffs' challenge fails for two reasons. *First*, the Guidance Statements are protected under the PSLRA safe harbor for forward-looking statements. *Second*, Medlin did not "make" either Guidance Statement.

### A.    The Guidance Statements Are Protected Under The PSLRA Safe Harbor For Forward-Looking Statements

In the PSLRA, Congress created a "safe harbor for forward-looking statements." 15 U.S.C. § 78u-5. The safe harbor provides that a defendant "shall not be liable" for any forward-looking statement that is either (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," (ii) "immaterial," or (iii) not "made with actual knowledge by [the speaker] that the statement was false or misleading." *Id.* § 78u-5(c). "Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy *any one* of these three categories." *Okla. Firefighters Pension & Ret. Sys. v. Xerox*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox*, 771 F. App'x 51 (2d Cir. 2019); *see also Slayton v. Am. Express*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive.").

The Guidance Statements are protected under two, independent prongs of the safe harbor. Both were identified as forward-looking and accompanied by meaningful cautionary language, and neither was made with actual knowledge it was false or misleading. *See Gray v. Wesco Aircraft Holdings*, 454 F. Supp. 3d 366, 395 (S.D.N.Y. 2020) ("Either cautionary language or an absence of knowledge is alone sufficient to trigger the safe harbor."), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

### 1.    The Guidance Statements Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language

The Guidance Statements were unmistakably forward-looking and identified as such. They fit squarely within the PSLRA's definition of forward-looking statements, as both addressed "a

projection of revenues" and "other financial items," "future economic performance," and related "assumptions." 15 U.S.C. § 78u-5(i)(1). Both were expressly identified as forward-looking. *See* Ex. 9 at 6 (cautioning that the press release contains forward-looking statements, including "statements regarding estimates and forecasts of financial and performance metrics"); Ex. 10 at 4 ("[T]his call will contain forward-looking statements regarding future events and financial performance."). And "linguistic cues" confirm the same. *Compare Slayton*, 604 F.3d at 769 ("facts," "circumstances," and "linguistic cues" can identify a forward-looking statement, including "cues like 'we expect' or 'we believe'"), *with* ¶ 122 ("Katapult *anticipates* FY 2021 Gross Originations, Revenue and Adjusted EBIDTA to be in the following ranges"), *and* ¶ 125 ("we continue to *believe* that this guidance is reasonable and appropriate"). All this applies equally to Cupito's comment because an expression of "confidence" in projections is "forward-looking within the meaning of the PSLRA safe harbor." *Gray*, 454 F. Supp. 3d at 387, 390 ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement.").

The Guidance Statements also were accompanied by extensive, meaningful cautionary language. Katapult cautioned that actual results were "difficult or impossible to predict and *will differ* from assumptions," including due to "risks and uncertainties" from changes in "business, market, financial, political and legal conditions," the "uncertainty of the projected financial information," "the concentration of Katapult's business among a relatively small number of merchants," "the effects of competition on Katapult's future business," and "the impact of the COVID-19 pandemic." Ex. 9 at 6; *see* Ex. 10 at 4. Katapult also reminded investors to carefully consider the detailed risk factors identified in its SEC filings and the Proxy. Ex. 9 at 6; Ex. 10 at 4. The Proxy included *35 pages* of highly specific "Risk Factors," warning, for example, that:

14

- Katapult's business could suffer from "changes in factors affecting discretionary spending for nonprime consumers," including "disposable consumer income," "availability of credit," and "COVID-19";

- Wayfair represented 72% of Katapult's origination dollars in 2020, "expos[ing Katapult] disproportionately to . . . [Wayfair's] economic performance";

- "[S]trategic actions" by other market participants could impact Katapult's stock price; and

- Katapult's "estimates of market opportunity and forecasts of market growth may prove to be inaccurate," making it "difficult to sustain" its previous "rapid growth."

Ex. 1 at 47, 49-51, 68. Katapult even highlighted its guidance as a specific estimate it may fail to achieve. *Id.* at 68.

All of this cautionary language easily satisfies the standard for the PSLRA safe harbor. *See, e.g.*, *Slayton*, 604 F.3d at 771, 773 (cautionary language must "convey[] substantive information" but "need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor"); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk."), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *In re Curaleaf Holdings Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) ("There is no requirement that a Company disclose its risk in any magic words preferred by plaintiffs.").

The PSLRA safe harbor alone compels dismissal of Plaintiffs' Section 10(b) claim.

### 2. Plaintiffs Fail To Allege Particularized Facts Giving Rise To A Strong Inference That Any Defendant Made The Guidance Statements With Actual Knowledge They Were False Or Misleading

That the Guidance Statements were identified as forward-looking and accompanied by meaningful cautionary language should end the matter. But the Guidance Statements are inactionable for another, independent reason: Plaintiffs do not allege they were made with actual knowledge they were false or misleading.

15

The PSLRA requires Plaintiffs to plead particularized facts creating a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Under the safe harbor's "actual knowledge" prong, "the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Gray*, 454 F. Supp. 3d at 381 (quoting *Slayton*, 604 F.3d at 773) (holding that forward-looking statements were protected under the PSLRA safe harbor because plaintiff failed to plead actual knowledge); *see* 15 U.S.C. § 78u-5(c)(1)(B).

To meet this exacting standard, Plaintiffs allege that Zayas, Cupito, and Medlin had (i) a motive to defraud investors, and (ii) actual knowledge, based on internal documents cited in the SAC, that Katapult could not meet its projections. ¶¶ 150-170. Neither allegation has merit.

### a.    Plaintiffs Fail To Allege A Valid Motive

To plead a valid motive, Plaintiffs must show that Zayas, Cupito, and Medlin "benefitted in some concrete and personal way from the purported fraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009). This standard "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.* By contrast, motives "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*; *see In re Axis Cap. Holdings Sec. Litig.*, 456 F. Supp. 2d 576, 593-94 (S.D.N.Y. 2006) ("The law is clear that the desire of individual defendants to keep their jobs or increase their compensation by artificially inflating stock price is not sufficient to establish motive." (cleaned up)).

16

Here, Plaintiffs' scattershot allegations fall far short. They begin with irrelevant observations about SPAC employees' incentives, ¶ 150, perhaps forgetting that Zayas, Cupito, and Medlin were not FinServ employees. Next, Plaintiffs suggest that "Lock-Up Agreements" and "earn out shares" made Zayas, Cupito, and Medlin desire to keep the stock price high, ¶¶ 151, 156, but that is exactly the motive "common to most corporate officers" that the Second Circuit has long rejected, *ECA*, 553 F.3d at 198; in fact, most shareholders received the same earn-out shares, Ex. 1 at 164, 179, meaning they were not a "personal benefit" to any Defendant, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (rejecting "generalized" motive that benefitted "shareholders, not just the director defendants specifically"). Plaintiffs also note that certain restricted shares vested "upon a Liquidation Event" (*i.e.*, the merger) ¶ 155, ignoring that the Guidance Statements were made six days *after* the merger closed. And Plaintiffs do not and cannot explain how the Company's pre-close agreement to "pay certain expenses" relating to share registration had anything to do with the Guidance Statements, let alone motivated them. ¶ 153.

Most fundamentally, Plaintiffs do not allege that Zayas, Cupito, or Medlin sold any stock during the putative class period. This dispenses with Plaintiffs' entire motive theory and decreases any inference of scienter. *E.g.*, *Acito v. IMCERA Grp.*, 47 F.3d 47, 54 (2d Cir. 1995) (lack of stock sales "undermines plaintiffs' claim that defendants" acted with scienter); *In re eSpeed Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) (lack of stock sales undermined motive allegations); *In re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders . . . is inconsistent with an intent to defraud shareholders.").

      **b.**      **The SAC's Cited Documents Do Not Show Actual Knowledge That The Guidance Statements Were False Or Misleading**

Absent a motive, Plaintiffs' other scienter allegations must be "correspondingly greater." *ECA*, 553 F.3d at 199; *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 531

17

(S.D.N.Y. 2020) ("Having failed to demonstrate a remotely plausible, personalized motive, Plaintiffs must make an even stronger showing of intent using other facts."). Plaintiffs try to make up the difference by copy-and-pasting quotes and screenshots of confidential documents they pirated from a redacted complaint in Delaware. Those documents, Plaintiffs insist, show that Zayas, Cupito, and Medlin knew that Katapult's Q2 2021 originations were declining so severely as to make its full-year 2021 projections "impossible to achieve." ¶ 15; *see* ¶ 20. But the documents do not support that conclusion; they preclude it.

*First*, Plaintiffs claim that early March 2021 emails show that ▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮ *Cf.* ¶ 62 (December 18, 2020 presentation projected annual originations growth of 100% in 2021). These emails, therefore, decidedly undermine any inference of actual knowledge.

*Second*, the SAC points to another update email on April 9, 2021, ¶ 165, but it conspicuously omits any explanation of how the email supports Plaintiffs' theory. As it turns out, the April update confirmed that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

---

[8] *See also River Birch Cap., LLC v. Jack Cooper Holdings*, 2019 WL 1099943, at *8 (S.D.N.Y. Mar. 8, 2019) ("The Court need not accept as true Plaintiff's characterization of an incorporated document's content because that content contradicts such characterization." (cleaned up)).

███████████████████████████████████████████████████████

████████████████████████████████████████████. Thus, the April update further undermines any inference of actual knowledge.

*Third*, Plaintiffs assert that a June 19, 2021 presentation ████████████████████████

████████████████████████████ ¶ 168. That manages to be both irrelevant and wrong.

Irrelevant, because the presentation post-dates the Guidance Statements. ¶¶ 81, 168. This is classic "fraud by hindsight"—an approach "[t]he Second Circuit has firmly rejected." *Greco v. Qudian*, 2022 WL 4226022, at *9 (S.D.N.Y. Sept. 13, 2022); *see, e.g.*, *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").

And wrong, because the presentation directly contradicts Plaintiffs' conclusion. ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[9] *See also Ginx v. Soho All.*, 720 F. Supp. 2d 342, 345 (S.D.N.Y. 2010) ("To the extent that the complaint refers to or relies on a particular document, it is of course proper for the Court to consider the entire text of that document in deciding any motion to dismiss.").

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

Thus, like the March and April updates, the June presentation is not merely unhelpful to Plaintiffs' theory; it refutes it. And Plaintiffs would know that if they had legally obtained the full document, rather than relying on pirated fragments without any clue as to the surrounding context.

*Fourth*, and more broadly, Plaintiffs do not adequately allege that Katapult's originations were declining so severely—at any point before June 15, 2021—as to make its full-year projections "impossible to achieve." ¶ 15.

To begin with, Plaintiffs' hindsight theory ignores Katapult's historical track record. Katapult's revenue doubled in 2019 and almost tripled in 2020. Ex. 3 at 2; Ex. 1 at 125. Its Q1 2021 results were strong—March one of its best months ever. ¶ 165. The March and April updates indicate that ██████████████████████████████. ¶¶ 161, 165. And for all the SAC's rhetoric about Katapult's April and May originations, ████████████████████████ ████████████████████. ¶ 169. Moreover, if, as Plaintiffs speculate, Katapult had achieved $145.3 million in revenue as of June 15, 2021, then it would have needed $304.7 million in additional revenue to hit the mid-point of its guidance. ¶ 128. That additional revenue would have represented 98% growth YoY from the same period in 2020—substantially *lower* growth than Katapult achieved in *both* 2019 and 2020. *See supra* at 4 (revenue growth of 113% in 2019 and 169% in 2020); Ex. 3 at 2-4; Ex. 9 at 5; Ex. 14 at 4.

Plaintiffs also ignore that Katapult expected to benefit from traditional retailer seasonality, *i.e.*, increased consumer spending during the Q4 retailer holiday sales season (*e.g.*, Halloween, Black Friday, Christmas). When Katapult issued guidance on June 15, 2021, Cupito explained that

20

Katapult "anticipate[d] the majority of [its] growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021." ¶ 90. And that made perfect sense: Katapult generated most of its originations in the second half of each of the preceding three years. For example, in 2019, Katapult generated only 35% of its originations in the first half of the year (13% in Q1, 22% in Q2), with the other 65% coming in the second half of the year. Ex. 6 at 46. Katapult generated 39% of its annual originations *in Q4 alone* in both 2018 and 2019. *Id.* Thus, when Plaintiffs declare that achieving ~33% of its full-year projections on June 15 made those projections "impossible to achieve," they ignore Katapult's (and the wider industry's) well-established historical trends. *See* ¶¶ 128-130.

Predicting that historical trends would continue in Q3 and Q4 2021 might have been optimistic. But it was certainly not impossible. *See Greco*, 2022 WL 4226022, at *9 ("It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, or not borne out by subsequent events." (cleaned up)). And it would take far more than the SAC's conclusory allegations here to demonstrate otherwise. *See, e.g.*, ¶ 20 (merely declaring that "achieving the stated performance was impossible").

*   *   *

In sum, the SAC does not give rise to *any* inference of scienter, let alone a "strong" one.[10] The far more compelling inference is that Defendants provided a good-faith forecast based on Katapult's historical track record, and simply did not anticipate the economic headwinds they

---

[10] Plaintiffs cannot cure this problem with a boilerplate "core operations" allegation, *see* ¶ 141; even if the doctrine survived the PSLRA, it "cannot establish scienter on its own," much less "actual knowledge." *Maloney*, 518 F. Supp. 3d at 781; *see also Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (rejecting core operations allegation as "plainly insufficient to raise a strong inference" of scienter); *In re Rockwell Med. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (same).

21

ultimately encountered. *See In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) ("[E]ven if the defendants turned out to be wrong about predicted financial performance, 'misguided optimism is not a cause of action, and does not support an inference of fraud.'" (quoting *Shields*, 25 F.3d at 1129)). Plaintiffs therefore fail "to surmount the high bar of actual knowledge," and their Section 10(b) claim should be dismissed. *Gray*, 454 F. Supp. 3d at 395.[11]

### B.    Medlin Did Not "Make" The Guidance Statements Under Janus

Defendants previously argued that Medlin cannot be liable for the Guidance Statements because he did not make them. ECF No. 54 at 21; *Janus*, 564 U.S. at 142 ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). The AC did not allege that Medlin had *any* authority over either Guidance Statement, let alone "ultimate" authority. ECF No. 46.

The SAC fares no better. It barely mentions Medlin's name. And the only mention seemingly addressed to whether he "made" a statement is this throwaway line: "Each of defendants Medlin, Zayas and Cupito spoke at length during the June 15, 2021 conference call." ¶ 127. But the law is clear that a corporate officer cannot be liable merely for participating in an investor call. *See Ho v. Duoyuan Glob. Water*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (*Janus* precludes making one party liable for failing to correct another's statement on an investor call); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808-09 (S.D.N.Y. 2018) ("[S]tatements on earnings calls could not be attributed to any non-speaking Defendants."). Nor did Medlin sign, approve, or ratify the press release or related Form 8-K. Ex. 9; *see In re Smith Barney Transfer Agent Litig.*, 884 F. Supp.

---

[11] For the same reasons, the Guidance Statements are also inactionable statements of opinion under *Omnicare v. Laborers District Counsel Construction Industry Pension Fund*, 575 U.S. 175 (2015). *See id.* at 186 (holding that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong"); *Gray*, 454 F. Supp. 3d at 400 ("Plaintiff also has failed to allege facts supporting the strong inference that either Wesco's management or board did not hold the beliefs they professed.").

22

2d 152, 165 (S.D.N.Y. 2012) ("Because he did not sign those filings, he did not 'make' the statements they contained."); *Noto v. 22nd Century Grp.*, 35 F.4th 95, 103 (2d Cir. 2022) ("[C]onclusory statements that defendants furnished information and language for, prepared, reviewed, approved, and/or ratified the articles" do "not adequately allege that defendants had ultimate control over the articles."). For this independent reason, the Section 10(b) claim against Medlin should be dismissed.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(A)

Under Section 14(a), Plaintiffs contend that the entire May 18, 2021 Proxy was false and misleading—and violated Item 303 of Regulation S-K—because it omitted that, under Katapult's waterfall arrangements, (i) Katapult received only those applications rejected by prime lenders, (ii) there was a risk that, under certain economic conditions (*e.g.*, higher savings rates, lower delinquency rates), prime lenders would loosen lending standards, meaning fewer applications would fall to Katapult, and (iii) that risk had materialized, as prime lenders were already loosening lending standards. ¶¶ 207, 214. "In the alternative," Plaintiffs claim that one generic description of a waterfall arrangement in the Proxy was false or misleading. ¶ 215. Plaintiffs assert this claim against Einbinder, Kurz, Zayas, and Katapult. ¶¶ 220-221, 223, 229.

Plaintiffs' challenge fails for two reasons. *First*, a "pure omission" is inactionable absent a duty to disclose, and Item 303 did not create one here. *Second*, Plaintiffs do not adequately allege that the Proxy's generic description of a waterfall arrangement was false or misleading.

### A.    Plaintiffs Fail To State A "Pure Omission" Claim

An omission can violate Section 14(a) only "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002); *see also Gray*, 454 F. Supp. 3d at 401 ("The plain language of Rule 14a-9

23

requires a plaintiff to show both materiality *and* a false or misleading statement as a result of the omission.").[12] A "pure omission"—*i.e.*, one that does not make any affirmative statement false or misleading—"is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Vivendi Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).

In search of a duty to disclose, Plaintiffs have turned to Item 303 of Regulation S-K. Item 303 requires issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). To violate Item 303, Defendants must have "actual knowledge" of both (i) "the relevant trend of uncertainty," and (ii) "a fairly substantial probability that the known risk at issue will materialize and have a material impact—if not a more-likely-than-not standard, then something not too much below that." *Holbrook v. Trivago*, 2019 WL 948809, at *12 (S.D.N.Y. Feb. 26, 2019); *see Gutman v. Lizhi*, 2022 WL 4646471, at *5 (E.D.N.Y. Oct. 1, 2022) ("Item 303 requires 'actual knowledge' of an existing trend *and* its future material impact on the company."); *In re Coty Sec. Litig.*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) ("To demonstrate knowledge, a plaintiff must allege facts that raise a plausible inference that the company's management was aware of a trend that would materially impact the company's financial condition.").

---

[12] *Cf. Heinze v. Tesco*, 971 F.3d 475, 483 (5th Cir. 2020) ("Heinze is left with only a pure-omission theory that is untethered to any specific false or misleading representation in the proxy statement. Such pure-omission claims are not cognizable. The texts of Section 14(a) and SEC Rule 14a-9 do not provide a freestanding cause of action to challenge any and all material omissions from proxy statements. Instead, they allow an omission-based claim only if the proxy statement 'omits to state any material fact necessary in order to make the *statements therein* not false or misleading.'" (emphasis in original) (quoting 17 C.F.R. § 240.14a-9(a))); *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 306 (4th Cir. 2019) (rejecting argument "that the omission of a material fact is actionable [under Section 14] even if it doesn't make an affirmative statement false or misleading").

But Item 303 did not create a duty to disclose here. The structure and risks of Katapult's waterfall arrangements were widely publicized. And Plaintiffs do not adequately allege that prime lenders' loosening of lending standards qualified as a known, material trend under Item 303.

### 1.     The Structure And Risks Of Katapult's Waterfall Arrangements Were Widely Publicized

"Where allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information." *Bank of Am.*, 980 F. Supp. 2d at 576; *see, e.g.*, *Lau v. Opera*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) ("[T]here is no duty to disclose information to one who reasonably should be aware of it."); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("It is pointless and costly to compel firms to reprint information already in the public domain." (quoting *Wielgos v. Commonwealth Edison*, 892 F.2d 509, 517 (7th Cir. 1989) (Easterbrook, J.))). And here, the market understood exactly how Katapult's waterfall arrangements worked.

Katapult made crystal clear that it gets the opportunity to approve waterfall applications only if prime lenders decline them first. During an investor call in December 2020, Zayas explained that, under Katapult's arrangement with Affirm, "*if* Affirm declines [an] application, the data is electronically transmitted to Katapult and we have the opportunity to approve this consumer." ¶ 63. He said the same at an investor conference in January 2021: "*If* Affirm declines [an] application the data is electronically transmitted, and we have the opportunity to approve that consumer." ¶ 65. And the list goes on. *See, e.g.*, Ex. 15 at 2 (November 2019: "*If* customers are denied financing with Affirm, they automatically get considered by Katapult."); Ex. 4 at 3 (March 2021: "*If* Affirm declines a purchase, they send the data to [Katapult].").

There is simply no other way to interpret these disclosures. They are basic conditional statements: *If* Affirm declines an application, Katapult can approve it. Zayas never said Katapult

25

gets to decide whether Affirm approves an application. Nor did he suggest Affirm had limitations on which applications it could approve or how many. Indeed, when Plaintiffs try to muster an example of Defendants' revealing "the truth," they point to a post-class period statement that is almost identical to what Zayas disclosed *before* the class period: "*If* the prime lender declines the application, the data is electronically transmitted to us and we have the opportunity to approve this customer." ¶¶ 107-109. It was thus abundantly clear to the market that Katapult occupied a "secondary" position in the waterfall. ¶ 108.

The market was equally clear on the risks associated with Katapult's position in the waterfall. The market knew that online retailers see a finite number of financing applications, meaning Affirm's lending decisions necessarily affect the number of applications that "fall" to Katapult. Investors also knew that Affirm—a free, self-interested economic actor—could modify its lending standards at any time, to any degree, and for any reason; as Affirm told investors in February 2021, it was "continuously mak[ing] refinements to [its] risk model" in response to changing economic conditions, including "delinquency rates," to maximize profits. Ex. 5 at 2, 4. It was thus "apparent to all serious observers and most casual ones" that Affirm might, at any point, (i) tighten its lending standards and leave more applications for Katapult, or (ii) loosen its lending standards and leave fewer applications for Katapult. *Wielgos*, 892 F.2d at 515; *see* Ex. 16 at 12 (analyst acknowledging that Affirm could loosen its lending standards at any time and "enter[] the non-prime space"). Not to mention, that was precisely the dynamic Zayas discussed in his March 2021 interview: "We are in a waterfall situation where, when the economy gets rough, the prime lenders tighten up. We're actually a beneficiary of that because we see a better credit quality than we've seen in the past get turned down, and we can still manage that risk." Ex. 4 at 3.

As for the risk that economic conditions (*e.g.*, savings rates, delinquency rates) could affect market participants and their behavior, ¶ 207, that is "so basic that any investor could be expected to know it." *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984); *see, e.g.*, *Merrill Lynch*, 272 F. Supp. 2d at 250 ("Federal securities laws do not require a company to state the obvious."); *Wielgos*, 892 F.2d at 515 ("Issuers need not 'disclose' Murphy's Law or the Peter Principle, even though these have substantial effects on business."). But it was amply disclosed in any event. *See, e.g.*, Ex. 1 at 47, 56, 68 (warning that Katapult's performance was subject to numerous economic risks, including changing "economic conditions," "customer demand," "consumer spending," "disposable consumer income," "consumer debt and availability of credit," and "strategic actions" by other market participants); *cf. Bank of Am.*, 980 F. Supp. 2d at 579 ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

Therefore, Defendants did not conceal a "known risk" under Item 303.

### 2. Prime Lenders' Loosening Of Lending Standards Was Not A Known, Material Trend Under Item 303

Plaintiff also argue that prime lenders' loosening of lending standards qualified as a material trend on May 18, 2021, and that Einbinder, Kurz, and Zayas knew it. ¶¶ 212-214. That argument is wrong on multiple levels.[13]

*First*, to qualify as a trend under Item 303, a pattern must persist for more than just a few months. *E.g.*, *Nguyen v. MaxPoint Interactive*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("[E]vents occurring within a two month period of time do not establish a 'trend' for purposes of the disclos[ures] required by Item 303."); *Pearlstein v. BlackBerry*, 93 F. Supp. 3d 233, 245

---

[13] The argument is also irreconcilable with Plaintiffs' statement that their Counts Three and Four "are not based on any *knowing* or reckless conduct." ¶ 201.

27

(S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend."); *Blackmoss Invs. v. ACA Cap. Holdings*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."). Here, Plaintiffs never quite specify when prime lenders began loosening lending standards. *See Willard v. UP Fintech Holding*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) (rejecting Item 303 theory where plaintiffs "conspicuously fail to allege the . . . moment in time that the declines allegedly began"). But they suggest it "first showed up in the spring of 2021," ¶ 138, then point to a modest decline in monthly volume in April 2021, ¶ 169. At most, that is six weeks before the Proxy—too little time to establish a trend under Item 303.

*Second*, and more basically, Plaintiffs do not adequately allege that Einbinder, Kurz, or Zayas actually knew prime lenders were loosening lending standards as of May 18, 2021, much less knew it would have a "material impact" on Katapult. The SAC offers only one fact on this point: In August 2021, Zayas said that when Katapult looks back at its spring data, "we're seeing that the higher score bands are minimized a little bit." ¶ 98. This August statement does not establish actual knowledge of anything in May—not of loosening, not of material impact, and not on the part of any individual Defendant. *See Holbrook*, 2019 WL 948809, at *13 ("[Defendant's] post hoc description of the extent of the ultimate impact of the relevance assessment does not speak to what the Company knew or should have known at the time."); *Coty*, 2016 WL 1271065, at *7 (rejecting Item 303 claim that "fail[ed] to raise a plausible inference that any particular member of Coty management had knowledge"). Meanwhile, Einbinder and Kurz are not even mentioned.

*Third*, Einbinder and Kurz cannot be liable under Item 303 for failing to disclose information about Katapult (*i.e.*, a separate company from FinServ) pre-merger: "Item 303 requires

disclosure of trends that could impact 'net sales or revenues or income from continuing operations.' . . . Nothing about this language suggests that the disclosure requirement could apply to the operations of a potential acquisition target; if anything, the reference to 'continuing operations' appears to suggest the opposite." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands*, 495 F. Supp. 3d 622, 647 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands*, 2022 WL 1449184 (7th Cir. May 9, 2022).

*Fourth*, Plaintiffs never allege that Zayas was involved with FinServ's Proxy. To be sure, the SAC contains a boilerplate allegation that "Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the [Proxy]." ¶ 221. But absent a modicum of factual support for that conclusion, Plaintiffs' Section 14(a) claim against Zayas must be dismissed. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 294-95 (S.D.N.Y. 2010) (dismissing Section 14(a) claim against defendant who was not alleged to have had "a substantial and plausible connection to the solicitation process sufficient to subject [him] to liability under Section 14(a)"); *Kelley v. Rambus*, 2008 WL 5170598, at *5 (N.D. Cal. Dec. 9, 2008) (rejecting Section 14(a) claim when plaintiffs fail to allege that defendant "affirmatively permitted the use of its name in a manner sufficient to associate it with the proxy statements"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).

In short, Plaintiffs have identified no SEC regulation or other source creating a duty to disclose the allegedly omitted information, and there is none. *See Furlong Fund v. VBI Vaccines*, 2016 WL 1181710, at *6 (S.D.N.Y. Mar. 25, 2016) (dismissing § 14(a) omission claim where plaintiff "neglected to identify any SEC regulation imposing a duty on defendants to disclose").

### B.      Plaintiffs Fail To Allege A False Or Misleading Statement In The Proxy

Plaintiffs wrap up their Section 14(a) allegations with a curious, "[i]n the alternative" challenge to a generic description of Katapult's waterfall arrangements. ¶ 215. Fatally for this

makeshift challenge, however, Plaintiffs never explain why the statement was false or misleading. *See, e.g.*, 15 U.S.C. § 78u-4(b)(1) (Plaintiffs must "specify . . . the reason or reasons why the statement is misleading"); *Rombach*, 355 F.3d at 174 ("[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."). Nor could they—it is pure puffery. *Compare* ¶ 215 ("the best option"; "sophisticated integration"; "smooth and efficient"), *with Xerox*, 300 F. Supp. 3d at 570 (referring to "successful implementation" is puffery), *and Livingston v. Cablevision Sys.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (statement that company "can continue to provide superior products" is puffery).

### III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(A)

Absent a primary violation under Sections 10(b) or 14(a), Plaintiffs' Section 20(a) claims necessarily fail. *Tung v. Bristol-Myers Squibb*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019). Plaintiffs also fail to allege that Medlin—whose name is practically absent from the SAC— exercised "*actual* control over" any statement. *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs.*, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30, 2018) (emphasis in original).

**CONCLUSION**

For all these reasons, the SAC should be dismissed with prejudice.

30

Dated:   January 9, 2023

Respectfully submitted,

COOLEY LLP

By___ */s/ Aric H. Wu*___
        Aric H. Wu

Aric H. Wu
Brian M. French
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
ahwu@cooley.com
bfrench@cooley.com

Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA  92121-1117
Tel: (858) 550-6000
Fax: (858) 550-6420
kfukumura@cooley.com

*Attorneys for Defendants Katapult Holdings,
Inc., Lee Einbinder, Howard Kurz, Orlando
Zayas, Karissa Cupito, and Derek Medlin*

31