**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GINA McINTOSH, Individually and On
Behalf of All Others Similarly Situated,

             Plaintiff,

    vs.

KATAPULT HOLDINGS, INC., LEE
EINBINDER, HOWARD KURZ, ORLANDO
ZAYAS, KARISSA CUPITO and DEREK
MEDLIN,

             Defendants.

---

Case No. 1:21-cv-07251-JPO

 

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
guiney@whafh.com

*Lead Counsel for Plaintiffs and the Class*

Dated:  March 6, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    A.   Background Concerning SPACS ......................................................................... 2

    B.   Formation and Purpose of the FinServ SPAC .................................................... 3

    C.   Katapult's History .............................................................................................. 3

    D.   Merger of FinServ and Katapult And Repeated Financial Projections ............. 3

    E.   The Truth Is Revealed ........................................................................................ 6

    F.   This Securities Class Action ............................................................................... 8

ARGUMENT ..................................................................................................................... 10

I.    THE COMPLAINT ADEQUATELY
ALLEGES A CLAIM UNDER SECTION 10(b) ................................................. 10

    A.   Legal Standards .................................................................................................. 10

    B.   The PSLRA Safe Harbor ................................................................................... 11

    C.   The Guidance Statements Are Not Protected Under The PSLRA Safe Harbor ........... 11

    D.   Even If The Statements Are Forward Looking, They Fail the Relevant Test ............... 13

        1.   The Statements Are Not Accompanied by Meaningful Cautionary Language ...... 13

        2.   The Complaint Adequately Alleges Actual Knowledge ......................................... 16

II.   THE COMPLAINT ADEQUATELY
ALLEGES A CLAIM UNDER SECTION 14(a) ................................................. 21

    A.   Elements and Pleading Standard ........................................................................ 21

    B.   The Complaint Adequately Alleges Failure
To Disclose Known Trends and Uncertainties .................................................. 22

        1.   The Structure of the Waterfall Arrangements were not Widely Publicized .......... 22

        2.   Prime Lenders Stealing Katapult's Clients Was A Known Trend ........................ 26

    C.   The Complaint Adequately Alleges A False
or Misleading Statement in the Prospectus ....................................................... 29

III.    THE COMPLAINT ADEQUATELY
        ALLEGES A CLAIM UNDER SECTION 20(a)............................................................. 29

CONCLUSION.......................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*In re AIG 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................10

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) ..................................................................16

*In re Bank of America Corp. Secs., Derivative,*
*& Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010) ..................................................................28

*Baum v. Harman Int'l Indus.*,
   408 F. Supp. 3d 70, 83 (D. Conn. 2019)..............................................................15

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010) ..................................................................19

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................11

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013) ..................................................................13

*City of Providence v. Aeropostale, Inc.*,
   No. 18-cv-01428, 2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. Mar. 25, 2013).......10, 16

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
   519 F. Supp. 3d 99 (E.D.N.Y. 2021) ....................................................................16

*Delman v. GigAcquisitions3, LLC*,
   No. 2021-0679-LWW, 2023 Del. Ch. LEXIS 1 (Del. Ch. Jan. 4, 2023)..................27

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................18

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
   No. 20-cv-9992 (PAC),
   2021 U.S. Dist. LEXIS 185730 (S.D.N.Y. Sept. 27, 2021)......................................21

*In re Fed Ex Corp. Sec. Litig.*,
   517 F. Supp. 3d 216 (S.D.N.Y. 2021) ..................................................................10

*Galestan v. Onemain Holdings, Inc.*,
　348 F. Supp. 3d 282 (S.D.N.Y. 2018) ....................................................................12, 15

*In re Gen. Elec. Co. Sec. Litig.*,
　857 F. Supp. 2d 367 (S.D.N.Y. 2012) ...........................................................................11

*Greco v. Qudian Inc.*,
　No. 1:20-cv-577-GHW, 2022 U.S. Dist. LEXIS 165369 (S.D.N.Y. Sept. 13, 2022) ................11

*Halperin v. eBanker USA.com*,
　295 F.3d 352 (2d Cir. 2002) ................................................................................13, 14

*In re Henry Schein Secs. Litig.*,
　No. 18-cv-01428, 2019 U.S. Dist. LEXIS 230571 (E.D.N.Y Sept. 27, 2019) ..........................10

*Jian Zhou v. Faraday Future Intelligent Elec. Inc.*,
　No. 2:21-cv-09914-CAS (JCx),
　2022 U.S. Dist. LEXIS 192565 (C.D. Cal. Oct. 20, 2022)..................................................28

*In re JP Morgan Chase Sec. Litig.*,
　363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................................21

*Kronfeld v. Trans World Airlines, Inc.*,
　832 F.2d 726 (2d Cir. 1987) ......................................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)...................................................................................................10

*Miller-Sethi v. City Univ. of N.Y.*,
　No. 21-CV-8591 (JPO), 2023 U.S. Dist. LEXIS 13756 (S.D.N.Y. Jan. 26, 2023)....................18

*In re Mindbody, Inc. Sec. Litig.*,
　489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...........................................................................27

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
　No. 21-2524, 2022 U.S. App. LEXIS 35103 (2d Cir. Dec. 20, 2022)....................................26

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
　709 F.3d 109 (2d Cir. 2013) ......................................................................................25

*New Orleans Emples. Ret. Sys. v. Celestica, Inc.*,
　455 F. App'x 10 (2d Cir. 2011)....................................................................................14

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
　603 F.3d 144 (2d Cir. 2010) ......................................................................................29

iv

*In re Prudential Securities Inc. Ltd. Partnerships Litigation,*
930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................................................1

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004) ................................................................................................14

*In re Romeo Power Inc. Sec. Litig.,*
No. 21 Civ. 3362 (LGS),
2022 U.S. Dist. LEXIS 154233 (S.D.N.Y. Aug. 25, 2022)...........................................15, 17

*In re Salix Pharms., Ltd.,*
No. 14-CV-8925 (KMW),
2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016)..............................................15, 16

*Salladay v. Lev,*
No. 2019-0048-SG, 2020 Del. Ch. LEXIS 78 (Del. Ch. Feb. 27, 2020)..............................26

*Sgalambo v. McKenzie,*
739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................................11

*In re Skechers USA, Inc. Sec. Litig.,*
444 F. Supp. 3d 498 (S.D.N.Y. 2020) .................................................................................16

*Slayton v. Am. Express Co.,*
604 F.3d 758 (2d Cir. 2010) ...........................................................................13, 15, 17, 20

*Tongue v. Sanofi,*
816 F.3d 199 (2d Cir. 2016) ...............................................................................................20

*United Paperworkers Int'l Union v. Int'l Paper Co.,*
985 F.2d 1190 (2d Cir. 1993) .......................................................................................25, 26

*In re Vivendi, S.A. Sec. Litig.,*
838 F.3d 223 (2d Cir. 2016) ...............................................................................................11

*Yi Xiang v. Inovalon Holdings, Inc.,*
254 F. Supp. 3d 635 (S.D.N.Y. 2017) .................................................................................27

## STATUTES & RULES

Fed. R. Civ. P.
Rule 12(b)(6)........................................................................................................................18

v

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a), *et seq.* ("PSLRA") ............*passim*
    15 U.S.C. § 78u-5(c)(1) ..........................................................................................10, 16

Securities Exchange Act of 1934....................................................................................2
    Section 10(b), 15 U.S.C. § 78j(b) ............................................................................9
    Section 14, 15 U.S.C. § 78n....................................................................................9
    Section 14(a), 15 U.S.C. § 78n(a)......................................................................21, 28
    Section 20(a), 15 U.S.C. § 78t(a)...........................................................................29

SEC Rule 10b-5 ...............................................................................................................9

Lead Plaintiff Matis Nayman and additional plaintiff Felipe de Castro Luna (collectively, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint ("Complaint"). For the reasons stated herein, the motion to dismiss should be denied.

## PRELIMINARY STATEMENT

As Judge Milton Pollack presciently noted some years ago, in the context of the judicially-created "bespeaks caution" doctrine (analogous to and a predecessor of the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision): "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (quotation omitted).

In this case, Defendants argue that they did not have a "crystal ball" that could predict Katapult's future financial results. Def. Mem. at 1.[1] However, as set forth in the Complaint, Defendants had something far more relevant and useful: actual real-time financial results and internal projections that showed that continued blind adherence to financial projections that had been made more than six months earlier was no longer appropriate. Reaffirming financial guidance in the face of those documents was, as publicly stated by one of Katapult's major institutional shareholders, "at best incompetent or, worse, blatantly dishonest and misleading." And when Defendants revealed that the disappointing financial results were caused, in part, by a

---

[1] "Defendants" are the Company ("Katapult Holdings Inc." or "Katapult"), the Katapult Individual Defendants (consisting of Defendants (Long) Cupito, Medlin and Zayas), and the FinServ Defendants (consisting of Defendants Einbinder and Kurz). "Def. Mem." refers to Defendants' memorandum of law in support of the motion to dismiss.

1

known trend that Defendants omitted to disclose to shareholders, analysts were stunned. The revelation of the truth decimated Katapult's market capitalization, harming Katapult shareholders. Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

This is a federal securities class action brought individually and on behalf of all persons and entities other than Defendants who: (1) purchased or otherwise acquired Katapult securities between June 15, 2021 and August 9, 2021, both dates inclusive (the "Class Period"); and/or (2) beneficially owned and/or held FinServ Acquisition Corp. ("FinServ") common stock at the close of business on May 11, 2021 (the "Record Date") and were eligible to vote at FinServ's June 7, 2021 special meeting (collectively, the "Class"). Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934.

### A.    Background Concerning SPACS

This securities class action concerns FinServ, a so-called Special Purpose Acquisition Company, or "SPAC." SPACs are publicly traded blank-check companies "that raise money with the sole purpose of buying a company to take it public." ¶41.[2] SPACs have received a fair amount of criticism. The Office of Senator Elizabeth Warren recently issued a report entitled "The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders." The Report found that "SPACs are abusing loopholes and gaps in current securities law, and are using them to take advantage of retail investors and enrich themselves. Regulators and Congress should act quickly to close loopholes and protect investors and the market." ¶44.

---

[2] References to "¶ __" are to the operative Complaint.

**B.       Formation and Purpose of the FinServ SPAC**

FinServ was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.  On November 5, 2019, FinServ completed its initial public offering (the "IPO") of 25 million units generating gross proceeds to FinServ of $250 million.  FinServ's liquidation deadline was November 5, 2021.  As a consequence, FinServ had to complete an acquisition prior to that date or be liquidated.  ¶56.

**C.       Katapult's History**

Katapult claims to be a "next-generation platform for digital and mobile-first commerce focused on the non-prime consumer."  Katapult provides point-of-sale lease-purchase options for non-prime consumers who cannot access traditional financing products. Katapult purportedly "solves critical consumer pain points by transforming the way non-prime consumers shop for durable goods" and claims merchants benefit from "higher retail conversion and greater marketing spend efficiency by reaching this underserved segment."  ¶57.  In other words, when the first creditors at a point of sale reject a consumer's request for credit as too high risk, they can arrange to pass that application along to Katapult, enabling Katapult to extend the credit.  ¶5.

**D.       Merger of FinServ and Katapult And Repeated Financial Projections**

On December 18, 2020, FinServ issued a press release entitled "Katapult to Become a Publicly Traded Company through Merger with FinServ Acquisition Corp."  In short, Katapult and FinServ would merge and trade as Katapult on NASDAQ under the new symbol "KPLT."  At the time of the announcement, the transaction was expected to close during the first half of 2021, subject to approval by FinServ stockholders and other regulatory requirements.  ¶60.

On the same day, the Defendants issued an investor slideshow that presented estimated financial results of $402 million in originations, $455 million in revenue and $70 million in

3

EBITDA for fiscal year 2021. The projections for 2021 and beyond contained hockey-stick like projections illustrating massive and exponential growth in the coming years. ¶62. The $402 million in originations was to be made up of two components: (1) "existing merchants: 70% of this number comes from the annualized origination run rate of our existing merchants on the platform today" and (2) "our near-term pipeline, which makes up the remaining 30% of the $402 million and consists of merchants that are in advanced stages of our sales cycle." ¶64.

On April 21, 2021, Defendants reiterated that "our expectations for the financial performance of our business remain unchanged." More specifically, Defendants reiterated that originations would be between $375 and $425 million and revenue would be between $425 and $475 million. Notably, although the midpoint of these ranges was the same as the guidance first issued in December 2020, the April 2021 presentation presented ranges rather than specific midpoint figures. ¶71.

On May 5, 2021, Defendants filed the final amendment to the Form S-4 registration statement in connection with new FinServ shares to be issued in connection with the FinServ and Katapult merger. Attached to the Registration Statement was the preliminary proxy statement/prospectus that provided FinServ shareholders with information about the proposed merger. Two weeks later, FinServ filed its final Prospectus on Form 424b3 soliciting stockholder approval of the merger. (The documents are collectively referred to as the "Prospectus"). The Prospectus detailed various, but not all, risk factors that Katapult faced as a business going forward, and disclosed information about the Company, its business model and other information concerning the proposed merger. ¶76.

Unfortunately for Katapult shareholders, the Prospectus failed to adequately disclose the nature of Katapult's waterfall relationship with other lenders, whereby Katapult *only* had the

4

opportunity to serve a customer when the lender above Katapult had already declined to lend to a customer. In this way, Katapult's bottom line was *completely* tied to the business decisions of lenders above Katapult in the waterfall arrangement. In other words, Katapult only has the opportunity to lend to a customer after that customer has already been passed over by the lender up the waterfall. And as a consequence of its self-identified *unique* position in the waterfall, Katapult was exposed to the risk (known to Defendants) that prime lenders could simply expand lending to additional customers. But because the waterfall is a zero sum game, each additional customer served by the prime lender "up the waterfall" meant one less customer flowing "down the waterfall" to Katapult. ¶¶108-09.

On June 9, 2021, the Company announced the completion of the merger. The next day, Katapult shares began publicly trading. Just five days later, on June 15, 2021, the Company issued a press release entitled "Katapult Announces First Quarter 2021 Financial Results." This was Katapult's first quarterly earnings report as a public company. In short, the Defendants reiterated that, as of June 15, 2021, they anticipated that fiscal year gross originations would fall in the range of $375-$425 million and revenue in the range of $425-$475 million. These ranges were the *very same* as those first announced in December of 2020 (midpoint ranges) and reiterated again in April of 2021. During the conference call concerning the quarterly earnings report, Defendant Cupito explained as follows: "given the data *we have today*, we continue to believe that this guidance is reasonable and appropriate." (Emphasis added). ¶¶83-84.

Unfortunately for Katapult shareholders, the data that the Defendants had that day did *not* support Defendants' continued blind adherence to the financial guidance. In reality: (1) Katapult was experiencing declining e-commerce retail sales and consumer spending that began, at the latest, *in the spring of 2021*; (2) prime lenders were reaching down the credit spectrum or

5

"waterfall" to cannibalize Katapult's best customers; (3) as of June 15, 2021 (which represented 45% of the fiscal year completed), Katapult had achieved only 27-31% of the projected gross originations for the year, 31-34% of the projected revenue, and 30-36% of the projected adjusted EBITDA and, consequently, there was no way that Katapult could possibly achieve the annual guidance that it had repeatedly presented to investors. ¶86.



In fact, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████. ¶161. ████████

████████████████████████████████████████████████████████

████████████████████████████████████ Indeed, just 10 days after the closing of the transaction, on June 19, 2021, the Katapult Board of Directors received an update

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ¶168.

Of equal significance is the fact that ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ "starting in late June and noticeably picking up during the July 4th weekend" as Defendant Zayas had stated, ████████████████████

████████████████████ *Compare* ¶89 with ¶169.

## E.    The Truth Is Revealed

On August 10, 2021, Katapult issued a press release disclosing poor financial results for the second quarter of 2021, eliminated its prior financial guidance, and disclosed that it lacked visibility into its consumers' buying behaviors. The market was shocked. Defendants blamed the announcement on a purported turn of events "starting in late June and noticeably picking up during

6

the July 4th weekend." ¶89. But, as set forth above, Katapult's financial results had been trending in the wrong way for months prior to the July 4th weekend. ¶169. This revelation also flew in the face of the comments that were made on June 15, 2021 – just two weeks before the end of the quarter – when the Defendants "anticipated the majority of our growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021." ¶90.

Analysts were also stunned at the revelation that "prime providers [were] stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume." In other words, under the Company's "waterfall" arrangement with its partners, fewer customers were being denied credit by the initial lending entity because those entities were expanding the pool of customers they would lend to. But for every additional marginal customer that the initial lending entity decided to do business with, Katapult was left with one fewer customer in the waterfall paradigm. These trends – whereby higher credit score customers were being cannibalized by Katapult's competitors – apparently started "*in the spring*" but were not disclosed until August 2021. ¶¶93, 98. Indeed, Defendants belatedly explained that Katapult was unique because "we're in a waterfall environment *where we are receiving declines from prime providers* and that allows us additional insight as we can see trending and detail analytics as to what's happening in our base through application flow all the way through conversion." Defendants also belatedly conceded that Katapult's unique position as relying solely and completely upon the entity above Katapult in the waterfall deciding how to tighten and loosen its lending standards would affect Katapult "is *something that we've seen before often on throughout the years*. I think this is *fairly common*, but in our position in the waterfall, we have more visibility into it." ¶101.

7

The reaction to these shocking disclosures was universal and damning. One analyst questioned the veracity of Defendants' remarks as follows: "we have a difficult time sugarcoating Katapult Holdings' [] disappointing 2Q 2021 results. In addition, *we found several of management's explanations for the slowdown inconsistent with what we have heard from other industry players* (including Aaron's, PROG Holdings, and Rent-A-Center)." ¶102. On August 13, 2021, a *Seeking Alpha* article characterized the announcement as "shocking" and called into question the "credibility of management." ¶104. In the same vein, one of Katapult's major shareholders, Infinitum Partners, L.P., delivered an open letter to the Katapult board of directors criticizing management for "essentially reaffirming" guidance in June of 2021. But just two months later, "Katapult abruptly withdrew guidance and missed expectations that it had only recently re-affirmed." The conclusion was blunt: "In our view, the company must have known what Q2 2021 would look like at the time of the Q1 2021 earnings call, which was held on June 15th, two weeks before the end of Q1 2021. Affirming guidance at that time was, in our view, *at best incompetent or, worse, blatantly dishonest and misleading*." ¶114. (Emphasis added). Katapult's Vice President of Finance and Payments, Gregory S. Wildeman, who "oversaw all financial strategic decision-making" and who reported directly to the CEO, also resigned his position in August 2021. ¶144.

F.     **This Securities Class Action**

On the shocking news that Katapult would pull its guidance and the revelation about the known trends, the Company's share price fell $5.47, or *more than 56%*, to close at $4.26 per share on August 10, 2021, on unusually heavy trading volume. ¶13. Plaintiffs filed the operative Complaint on November 4, 2022. The Complaint seeks recovery on behalf of shareholders under two separate theories.

First, in reaffirming annual guidance on June 15, 2021, just *two weeks* prior to the close of the financial quarter, Defendants misled investors. In fact, Defendants reaffirmed annual guidance despite having achieved *only approximately 30%* of the midpoint estimate for gross originations of the yearly financial targets by June 15 (as set forth more fully below). The statements in the June press release and conference call were materially false and misleading because: (1) Katapult was experiencing declining e-commerce retail sales and consumer spending that began in the Spring of 2021; (2) prime lenders were reaching down the credit spectrum or "waterfall" to cannibalize Katapult's best customers; (3) according to a June 2021 financial presentation,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ ¶168. Plaintiffs allege these failures constitute a violation of Section 10(b) the Securities Exchange Act of 1934.

Second, the Prospectus disclosed *nothing*, whatsoever, about the following: (1) Katapult's "waterfall" system of payments whereby Katapult only gets access to customers who have been passed over by lenders above Katapult in the credit lending chain; (2) how prime lenders could open up their lending spectrum and directly cannibalize Katapult's target client; (3) that the cyclical nature of the business cycle would directly affect Katapult's bottom line; and (4) how lending and credit would have a dynamic effect on Katapult's business model. Plaintiffs allege that these failures violate Section 14 of the Securities Exchange Act of 1934.

9

## ARGUMENT

**I.    THE COMPLAINT ADEQUATELY
ALLEGES A CLAIM UNDER SECTION 10(b)**

### A.    Legal Standards

A claim for a primary violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 must allege: "(1) a material misrepresentation or omission … [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance …; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotations omitted). To survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotations omitted). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *In re Henry Schein Secs. Litig.*, 18-cv-01428, 2019 U.S. Dist. LEXIS 230571, at **21-22 (E.D.N.Y Sept. 27, 2019) (quoting *Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir. 2011)); *cf. City of Providence v. Aeropostale, Inc.*, No. 18-cv-01428, 2013 U.S. Dist. LEXIS 44948, at *42 (S.D.N.Y. Mar. 25, 2013) ("The inference need not, however, be 'irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the most plausible of competing inferences.'") (quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007)).

Defendants do not argue that the Complaint fails to adequately allege *any* of the six enumerated requirements. Rather, Defendants *only* argue that the allegedly false and misleading statements are protected under the PSLRA's "safe harbor" for forward-looking statements. Def. Mem. at 13-21. As set forth below, the argument is without merit and should be rejected.

**B.      The PSLRA Safe Harbor**

Pursuant to the PSLRA's safe harbor, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and "accompanied by meaningful cautionary statements," or (2) the forward-looking statement is "immaterial," or (3) the plaintiff "fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021). Defendants argue that the financial projections at issue here are protected under the first and third prongs of the test. "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016) (internal quotation omitted).

**C.      The Guidance Statements Are Not Protected Under The PSLRA Safe Harbor**

Defendants baldly argue that challenged statements made in June 2021 were "unmistakably forward-looking and identified as such." Def. Mem. at 13-15. In fact, the statements were not forward looking at all, but rather, statements of present fact.

To determine whether the statements are protected under the PSLRA's safe-harbor provision, the Court must conduct a statement-by-statement analysis. *Greco v. Qudian Inc.*, No. 1:20-cv-577-GHW, 2022 U.S. Dist. LEXIS 165369, at *28-30 (S.D.N.Y. Sept. 13, 2022). A threshold issue in determining the applicability of the PSLRA's safe harbor is a determination of whether the challenged statements are forward-looking in nature. *Id.* "As a general rule, statements whose truth cannot be ascertained until sometime after they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (citation omitted). In contrast, "the safe harbor . . . do[es] not apply to statements of present or historical facts." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367,

11

385 (S.D.N.Y. 2012); *see also Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (concluding that PSLRA safe harbor was inapplicable because statements at issue "state[d] a present or historical fact alone or incorporate[d] forward-looking aspects into statements of present or historical fact").

Here, the challenged statements present then-existing facts and are stated in the present tense: "given the data *we have today*, we continue to believe that this guidance is reasonable and appropriate." ¶84 (emphasis added).[3] *"As of June 15, 2021*, Katapult anticipates FY 2021 Gross Originations, Revenue and Adjusted EBITDA to be $375-$425 million [and] $425-$475 million." ¶82 (emphasis added). There is nothing forward looking about these statements in any fashion whatsoever. Rather, the veracity of these statements can be ascertained *as of the date they were made* because they are explicitly based on information existing as of the date the statements were made. Contrast these statements with those made in December of 2020: those statements were forward looking because the truth of those statements could not be ascertained until the end of 2021. ¶61-62. But the statements at issue here are explicitly based on data available *at the time the statements were made*.

Statements like these – where the speaker explicitly notes that the statements are based on present facts and circumstances – are regularly held to fall outside of the safe harbor and forward looking categories. For example, in *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018), the Court held that the following earnings guidance was not protected by the safe harbor provision because the statements concerned *present facts*: "we remain comfortable with our previously stated EPS guidance for 2017 of $5.60 to $6.10 per share, with an average

---

[3] Defendants' motion to dismiss omits the key introductory phrases "as of June 15, 2021" and "given the data we have today" when addressing the relevant statements. *See* Def. Mem. at 14.

receivables of $16 billion." For this independent reason, the Court should deny Defendants' motion to dismiss Count I of the Complaint.

### D.     Even If The Statements Are Forward Looking, They Fail the Relevant Test

Even if the statements are forward-looking (and Plaintiffs contend that they are not), the statements are nevertheless not protected under the PSLRA safe harbor because they are not accompanied by meaningful cautionary language and the Complaint adequately alleges actual knowledge that the statements were false or misleading.

#### 1.     The Statements Are Not Accompanied by Meaningful Cautionary Language

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton* v. *Am. Express Co.,* 604 F.3d 758, 772 (2d Cir. 2010). "[G]eneric and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that 'forward-looking statements are subject to certain risks and uncertainties'—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these statements." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.,* 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) (quoting *Ill. State Bd. of Inv. v. Authentidate Holding Corp.,* 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order)). In fact, "[c]autionary language in securities offerings is just about universal[,]" and so "the key question [ . . .] when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have [shown that] the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin v. eBanker USA.com,* 295 F.3d 352, 359 (2d Cir. 2002).

Here, Defendants cite only to the boilerplate and generic warnings associated with the press release and conference call. Def. Mem. at 14. But Defendants said nothing, whatsoever, about

13

the fact that  the June 2021 press release and conference call and disclosed nothing about that fact that ████████████████████ "starting in late June and noticeably picking up during the July 4th weekend" as Defendant Zayas had stated.[4]  The Defendants also said nothing, whatsoever, about the contemporaneous internal update that ████████ ████████████████████████████████████████████████████ ¶168.

In light of these facts, the statements simply did not offer any meaningful cautionary language whatsoever.  These risks were not hypothetical, but rather, had already materialized *at the time of* the challenged statements.  This critical fact bars Defendants from now claiming protection under the safe-harbor provision. *See, e.g., New Orleans Emples. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) (cautionary language not meaningful when "defendants did more than just offer rosy predictions; they allegedly stated that present inventory was under control . . . despite recklessly disregarding that the opposite was true."); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")  In fact, cautionary language that accompanies a statement is considered meaningful when "it cannot be said that any reasonable investor could consider [the

---

[4] Defendants' brief picks up on this theme, arguing that "economic clouds for e-commerce darkened" only "as the summer wore on." Def. Mem. at 1.  In reality, ████████████████████████ ████████████████████████████ and Katapult's ████████ as of mid-June.  ¶168.  Analysts also rejected the story that the landscape only changed after Katapult's June conference call: "we found several of management's explanations for the slowdown inconsistent with what we have heard from other industry players (including Aaron's, PROG Holdings, and Rent-A-Center)." ¶102.

statement] important in light of the adequate cautionary language." *Halperin,* 295 F.3d at 357. Here, the cautionary language was clearly not meaningful, as market professionals were stunned when the truth came to light — thus supporting the argument that Defendants' cautionary language was anything but cautionary.

A mountain of case law supports the point. In *Galestan,* 348 F. Supp. 3d at 304, the Court held that the purportedly cautionary language "likely [did] not rise to the level of 'meaningful' cautionary language" because it was boilerplate and did not provide context or insight. *See also In re Romeo Power Inc. Sec. Litig.,* No. 21 Civ. 3362 (LGS), 2022 U.S. Dist. LEXIS 154233, at *6-9 (S.D.N.Y. Aug. 25, 2022) (statements about revenue targets with timelines that could not be met were not protected by the safe harbor because "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again.") (Citation omitted).

Moreover, courts in the Second Circuit have consistently held that "the [PSLRA] safe harbor [provision] . . . does not protect material omissions." *Baum v. Harman Int'l Indus.,* 408 F. Supp. 3d 70, 83 (D. Conn. 2019). In *In re Salix Pharms., Ltd.,* No. 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202, at *37-38 (S.D.N.Y. Apr. 22, 2016), the Court held that the defendant's failure to update cautionary language over time to reflect new information and new risks supports the conclusion that such statements were merely boilerplate (citing *Slayton,* 604 F.3d at 772-73 ("Our conclusion is bolstered by the fact that the defendants' cautionary language remained the same even while the problem changed.")) Here, Defendants' financial guidance for fiscal year 2021 never deviated at any time between December 2020 and June of 2021 despite changed circumstances on the ground and despite internal ███████████████████████

███████████████████████████████████████████████████████

15

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████ ¶168. "Defendants' failure to update these statements from quarter to quarter and from year to year renders them meaningless in light of the changing circumstances and risks." *In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *37-38. *See also In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 514-15 (S.D.N.Y. 2020) (warning language insufficient because it did not address the specific risk that plaintiffs cite in this action, and only warned in general terms that did not provide sufficiently meaningful information about the relevant factors); *City of Providence*, 2013 U.S. Dist. LEXIS 44948, at *38-40 (warnings must be specific and show the magnitude of the risk); "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531-32 (S.D.N.Y. 2010) (citation and internal quotation omitted).[5]

## 2.    The Complaint Adequately Alleges Actual Knowledge

Defendants also argue that the Complaint does not adequately allege actual knowledge that the challenged statements were false or misleading. Def. Mem. at 17-21. But the allegations in this unique case, where the Complaint cites contemporaneous internal financial projections, are sufficient to state a claim at this stage of the litigation.

---

[5] Defendants' cited authority is easily distinguishable. Def. Mem. at 15. For example, in *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013), "the disclosure that the plaintiffs demand was not required because that information was not materially different from the information that was already publicly disclosed." *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) stands for the same proposition: "the information that plaintiffs contend was not disclosed was clearly disclosed from the Company's inception." But that is decidedly not the case here.

16

As Defendants correctly argue, the PSLRA safe harbor requires plaintiffs to show that forward-looking statements were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii). "[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.'" *Slayton,* 604 F.3d at 773 (citation omitted).[6]

The Complaint easily meets this standard. Specifically, the Complaint alleges that when the Defendants stated that "***as of June 15, 2021***, Katapult anticipates FY 2021 Gross Originations, Revenue and Adjusted EBITDA to be $375-$425 million [and] $425-$475 million" (¶82 (emphasis added)) and stated that "given the data *we have today*, we continue to believe that this guidance is reasonable and appropriate," those statements were made with actual knowledge that they were false or misleading. That is because a contemporaneous internal presentation *explicitly* showed that ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ ¶168. The Complaint adequately alleges that Defendants had actual knowledge that the statements were misleading because ████████████████████████████████████ ████████████████████.

---

[6] Defendants incorrectly argue, however, that "absent a motive, Plaintiffs' other scienter allegations must be "correspondingly greater." Def. Mem. at 17-18. That standard is associated with scienter *outside* of the context of the PSLRA's safe harbor context. Here, Plaintiffs must meet the "actual knowledge" standard, but need not meet any "correspondingly greater" test. Defendants' cited cases have nothing to do with the safe harbor for forward looking statements: the cases do not even cite those words.

Analogous case law supports the point. In *In re Romeo Power Inc. Sec. Litig.*, 2022 U.S. Dist. LEXIS 154233, at *9 (S.D.N.Y. Aug. 25, 2022), the Court held that the statements at issue adequately satisfied the relevant test because they "set out precise revenue conversion targets with precise timelines, and the Complaint raises a strong inference that Defendants actually knew they could not approach those projections." The motion to dismiss was denied because, just like the facts here, "the Complaint raises a cogent inference, at least as compelling as any opposing inference, that Defendants actually knew that they had no reasonable basis for predicting a significant ramp-up in revenue as quickly as they did, or were aware of undisclosed facts tending to seriously undermine the accuracy of those projections." *Id.*[7]

Defendants argue that the "presentation directly contradicts Plaintiffs' conclusion." Def. Mem. at 19 (citing Def. Mem. Exhibit 17). But Defendants are incorrect as a matter of both law and fact. As to the law, Defendants' reading of the presentation is irrelevant at this stage of the litigation because in evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all facts alleged in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. *Miller-Sethi v. City Univ. of N.Y.*, No. 21-CV-8591 (JPO), 2023 U.S. Dist. LEXIS 13756, at *8 (S.D.N.Y. Jan. 26, 2023). Indeed, Defendants' reading of the presentation would draw all inferences concerning the presentation in *Defendants'* favor. But Defendants' multi-page editorial about what the presentation actually says should be rejected as a matter of law. Def. Mem. at 18-21.[8]

---

[7] Defendants also argue that Plaintiffs "fail to allege a valid motive." Def. Mem. at 16. But that is simply not a requirement under the PSLRA's safe-harbor test. Indeed, Defendants' cited authority concerning motive has nothing to do with the safe harbor exception at all. *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

[8] Defendants also argue that "Katapult's historical track record" supported the continued blind adherence to the financial projections first presented in December 2020. Def. Mem. at 20-21. Relying on past growth metrics simply ignores changed circumstances on the ground.

As to the facts, the presentation – which Defendants have submitted in whole in connection with the motion to dismiss – simply makes pellucid that it was knowingly misleading for Defendants to reaffirm Katapult's 2021 financial guidance that had first been issued in December 2020 in the face of the real facts on the ground at the time those statements were made. For example, the top line conclusion of the presentation warns that "████████████████████ ███." Def. Mem. Ex. 17 at 1. The presentation also warns of "████████████████ ███████████," which directly contradicts Defendants' later statements that the Company only saw headwinds "starting in late June and noticeably picking up during the July 4th weekend." ¶142. The presentation also illustrates ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████.) Def. Mem. Ex. 17 at 2.[9]

The internal presentation purported to show a list of ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████. Def. Mem. Ex. 17 at 6 ("████████████"), at 7 ("████████████"). In fact, none of these ████████ were initially part of Katapult's 2021 forecasted guidance in December

---

[9] Defendants' one sentence throwaway argument that the "presentation post-dates the Guidance Statements" is without merit. Def. Mem. at 19. The challenged statements were based on information available to Defendants as of June 15, 2021 and there is no indication that the financial information and purported initiatives summarized in the June 19, 2021 presentation were not available to Defendants as of the time of the challenged statements. At worst, the Defendants were completely ignorant of all of the information in the June 19, 2021 presentation, but that scenario would also certainly satisfy the relevant standard of knowingly making a false or misleading statement and Defendants do not argue otherwise. Even in that case, Defendants would have had a duty to update the challenged statements as facts on the ground changed. *See In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (defendant had "continuing duty to update or correct past statements when they became known to be misleading.")

of 2020. Rather, ████████████████████████████████████████

████████████████████████████. Indeed, in December of 2020, Katapult explained that the $402

million in originations was to be:

> "made up of two components. First, existing merchants: 70% of this number comes from the annualized origination run rate of our *existing merchants* on the platform today. The second component is our near-term pipeline, which makes up the remaining 30% of the $402 million and consists of merchants that are in *advanced stages of our sales cycle*."

¶64 (emphasis added). ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ Def. Mem. Ex 17 at 10. In short, the data available to the Defendants showed that

continued adherence to previous guidance was not appropriate.[10] Or, as one of Katapult's main

institutional shareholders surmised, continued adherence to the guidance in the face of facts on the

---

[10] Defendants move the goalposts and argue that so long as the financial projections provided to the public were not "impossible" to achieve, the Complaint should be dismissed. Def. Mem. at 21. But the standard is not whether the stated results were impossible to achieve but rather, whether Defendants knew that the statements were false or misleading. *Slayton*, 604 F.3d at 766. The Complaint alleges that it was, at the very least, misleading for the Defendants to reaffirm the expected guidance in the face of ████████████ ████████████████████████████████████████████████████ ¶168. In the same vein, the statements are not statements of pure opinion under *Omnicare*. Def. Mem. at 22 n.11. Even if the challenged statements are considered opinion statements, they are not protected if (1) "the speaker did not hold the belief she professed," (2) "the supporting facts she supplied were untrue," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-94, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015)).

ground was "blatantly dishonest and misleading." ¶114. The Complaint adequately alleges that Defendants knew that the fiscal year 2021 guidance was not "reasonable and appropriate" in light of the internal documents cited above. Consequently, Defendants knew the statements were false and misleading and the Complaint satisfies the third prong of the PSLRA's safe-harbor test.[11]

## II.    THE COMPLAINT ADEQUATELY ALLEGES A CLAIM UNDER SECTION 14(a)

Defendants argue that Plaintiffs' Section 14(a) claim (Count III) fails because a there was no duty to disclose the waterfall arrangements (Def. Mem. at 23-29) and because there is no misleading statement in the Prospectus. Def. Mem. at 29. Both arguments fail.

### A.    Elements and Pleading Standard

Defendants correctly summarize that to state a claim under Section 14(a), 15 U.S.C. § 78n(a), Plaintiffs must plead (1) a material misrepresentation or omission, (2) negligence, (3) that the proxy solicitation itself, rather than the alleged defect in the solicitation materials, was an "essential link" in accomplishing the transaction, and (4) loss causation. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005). But the PSLRA's requirements for state of mind, 15 U.S.C. § 78u-4(b)(2), does not apply to Section 14(a) lawsuits. *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-cv-9992 (PAC), 2021 U.S. Dist. LEXIS 185730, at *18 (S.D.N.Y. Sept. 27, 2021). Furthermore, the Complaint explicitly alleges as follows as to Count III: "This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence." ¶217.

---

[11] Plaintiffs withdraw the claims alleged against Defendant Medlin in response to Defendants' arguments at Def. Mem. 22-23.

21

**B.    The Complaint Adequately Alleges Failure To Disclose Known Trends and Uncertainties**

As to the first argument, Defendants argue that the structure and risks of the waterfall arrangements were widely known, and that prime lenders cannibalizing Katapult's business does not qualify as a known trend under Item 303. Both arguments fail.

**1.    The Structure of the Waterfall Arrangements were not Widely Publicized**

Defendants argue that the risks associated with Katapult's waterfall arrangement were widely publicized and, consequently, Defendants cannot be held liable for failing to disclose the information. Def. Mem. at 25-27. As a threshold issue, Defendants tacitly concede that adequate and meaningful information about the dynamics associated with the waterfall arrangement with Katapult's competitors is *not* included in the Prospectus itself. In fact, Defendants do not cite to any part of the Prospectus whatsoever for disclosure about the structure of the waterfall arrangements. For good reason. The Prospectus used the term "waterfall" only three times, only two times in relevant context, as follows:

> "Waterfall partnerships:    A waterfall is where the application will flow from the prime lender to other financing and lease-purchase options automatically; this gives the consumer the best option for their situation. Katapult's technology supports a sophisticated integration with these partners and ensures a smooth and efficient customer transaction experience during application and checkout."

¶215. That is the entire disclosure about the most important dynamic affecting Katapult's business model. Defendants themselves categorize this discussion of the waterfall arrangement as a mere "generic description." Def. Mem. at 29. In short, the Prospectus *itself* did not adequately or completely disclose the waterfall arrangement.

Rather than rely on the Prospectus itself, Defendants are forced to rely on snippets of statements made outside of the Prospectus documents. But those snippets do not come close to

satisfying the relevant standard. Specifically, Defendants rely on a December 2020 investor call, a January 2021 investor conference, a November 2019 statement (not referenced in the Complaint) and a March 2021 newspaper article for the proposition that the waterfall dynamic was widely reported and understood. But each of those statements merely presents a vapid "if/then" statement that provides no insight whatsoever into the very real risks associated with the waterfall arrangements. Each of the snippets merely recounts the simple idea that "*If* customers are denied financing with Affirm, they automatically get considered by Katapult." Full stop. There is no additional disclosure or information whatsoever. Absent from any of these snippets is disclosure about the far more complex dynamic and risks (subsequently revealed in August of 2021) concerning: (1) the nature of Katapult's waterfall relationship with other lenders, whereby Katapult *only* had the opportunity to serve a customer when the lender above Katapult declined to lend to a customer; (2) the fact that prime lenders could and would simply "reach down" the credit spectrum and cannibalize Katapult's entire customer base; (3) the fact that these risks were known and knowable to Katapult at the time the Prospectus was issued; (4) how high savings rates and low delinquency rates would cut against (rather than in favor of) Katapult's entire business model; (5) the fact that Katapult's particular position within the waterfall renders Katapult *completely* reliant on the entity above it in the waterfall declining the initial application; (6) the fact that Katapult occupied a subsequently self-identified *unique* position in the waterfall, which exposed the Company to the known risk that prime lenders could simply expand the pool of customers to extend credit to; (7) the fact that the waterfall is a zero sum game, and the consequence was that each additional customer served by the prime lender "up the waterfall" meant one less customer flowing "down the waterfall" to Katapult. ¶207. In short, the Prospectus failed to disclose that prime lenders above Katapult could simply turn off the "waterfall" tap all together at any time, and that

23

this was a known trend at the time the Prospectus was issued. ¶101. *None* of that information was in the public domain when Defendants disseminated the Prospectus. Indeed, contrary to the idea that Katapult's business might suffer based on changed economic circumstances, Defendant Einbinder touted the opposite dynamic: "we think the business model is resilient. This is a company that will do well, whether it's a good economy or bad economy." ¶67.

To further illustrate the point, the Complaint alleges that analysts were shocked when Defendants belatedly revealed that Katapult's competitors simply "opened up to try to get more volume" which completely undercut the prior representations that Katapult's business would do well under all economic circumstances. ¶95. Indeed, *every* question posed by analysts inquired about the newly revealed dynamic. For example, the very first question posed at the earnings conference call was as follows:

> "I wanted to ask about the competitive environment. And I guess, specifically about the -- your comments about prime providers sort of moving down market into the original -- and your traditional kind of lower prime base. What is your view about the degree to which is a more sort of permanent shift? I guess, in other words, has the competitive environment become more challenging on a lasting basis?"

¶96. The second analyst followed up on the first question: "I just wanted to follow up on Ramsey's question on kind of -- on the prime kind of stretching a bit deep. Would you say that's kind of traditional providers or more of like the new entrants into the prime financing market that you're seeing stretched?" In response, Defendant Zayas revealed that Katapult's partners were reaching down the credit spectrum to, quite simply, cannibalize Katapult's business. ¶97-98.

The next analyst *also* inquired about the newly disclosed dynamic as follows: "Not to beat a dead horse with this issue of prime lenders sort of dropping down. But I cover Aaron's and Progressive and Rent-A-Center. And they haven't said *anything* about that phenomenon. So I

guess I'm trying to understand why is that *unique* to Katapult when Aaron's, Progressive and Rent-A- Center are seeing no such phenomenon?" (Emphasis added). In response, Defendant Zayas belatedly described the waterfall partnership, Katapult's *unique* position in the waterfall, and revealed that its dynamic could shift immediately based on economic factors. ¶99-100. In this way, the market was certainly not "equally clear on the risks associated with Katapult's position in the waterfall." Def. Mem. at 26.

Even if the snippets of information cited by Defendants adequately alleged the complete waterfall dynamic set forth above – and Plaintiffs submit that they do not – relevant case law illustrates the insufficiency of those snippets in any event. In *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993), the Court explained that "the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading, and such reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials." In *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 125-28 (2d Cir. 2013), the court explained that "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." (quoting *Litwin v. Blackstone Group*, 634 F.3d 706, 718 (2d Cir. 2011)). Indeed, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a . . . prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987). Thus, in the context of allegedly false or incomplete proxy solicitations, "sporadic news reports . . . should not be considered part of the total mix of information that would clarify or place

in proper context . . . representations" that were contained in materials that the company provided "directly." *United Paperworkers,* 985 F.2d at 1199. In short, "proxies should be lucid, and not a game of Clue." *Salladay v. Lev*, No. 2019-0048-SG, 2020 Del. Ch. LEXIS 78, at *30-31 (Del. Ch. Feb. 27, 2020). Defendants failed to adequately disclose the actual structure and risks associated with Katapult's waterfall arrangements until August of 2021. Defendants' arguments should be rejected.

### 2.    Prime Lenders Stealing Katapult's Clients Was A Known Trend

Defendants also argue that prime lenders loosening their lending standards to cannibalize Katapult's business does not qualify as a known trend under Item 303 because the Complaint does not specify when the trend began or whether it extended prior to April 2021. Def. Mem. at 28. But Defendants completely ignore the fact that Defendant Zayas himself conceded that the loosening trend was something that had existed for years and was known and common, even touting Katapult's unique insight into the trend: this "is ***something that we've seen before often on throughout the years***. I think this is ***fairly common***, but in our position in the waterfall, we have more visibility into it." ¶101. In fact, Item 303 requires more than simply disclosure of a known trend, but also disclosure where a "demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 U.S. App. LEXIS 35103, at *5-7 (2d Cir. Dec. 20, 2022) (citing SEC's Interpretive Release, 1989 SEC LEXIS 1011 at *19). Indeed, if a disclosing party cannot determine that an uncertainty is not reasonably likely to occur, disclosure is generally required unless a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur. *Id.* Here, Defendant Zayas himself concedes the "specific facts from which [the court] could draw the 'plausible inference' that defendants had actual knowledge of the

26

trends or uncertainties at the time the registration statement was issued." *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 643-44 (S.D.N.Y. 2017) (citation omitted).

Defendants also argue that the Complaint fails to allege scienter as to Defendants Einbinder, Kurz and Zayas. Def. Mem. at 28. But Courts in this circuit have diverged on the pleading requirements for the requisite mental state in Section 14(a) claims, namely whether plaintiffs are subject to the scienter requirement [. . . .]" *In In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217-218 (S.D.N.Y. 2020). Furthermore, as set forth above, the Complaint alleges that Defendant Zayas **conceded** that the risk that prime lenders could and would loosen standards to cannibalize Katapult's business was admittedly known for years prior to the merger. ¶101. These allegations are sufficient as a consequence.

Defendants' argument that "Einbinder and Kurz cannot be liable under Item 303" for failing to disclose information about Katapult prior to the merger fares no better. Def. Mem. at 28-29. As an initial matter, the Prospectus was provided to FinServ shareholders to provide information about Katapult to allow them to make an informed vote on the transaction. Taken to its logical conclusion, the argument would render the Prospectus meaningless. Furthermore, "a SPAC's fiduciaries must [. . .] disclos[e] 'fully and fairly all material information' that is reasonably available about the merger and target to inform the redemption decision." *Delman v. GigAcquisitions3, LLC*, No. 2021-0679-LWW, 2023 Del. Ch. LEXIS 1, at *24-25 (Del. Ch. Jan. 4, 2023). Those who solicit proxies via statements containing misleading statements or omissions are "squarely within the ambit of Section 14(a)." *In re Mindbody*, 489 F. Supp. 3d at 218. In short, "anyone who knowingly participates in the distribution [of] a proxy solicitation should therefore expect to be held liable for false statements to all affected shareholders." *In re Bank of*

*America Corp. Secs., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 288 (S.D.N.Y. 2010) (citation omitted; emphasis in original).

Finally, Defendants argue that the Complaint fails to allege that Defendant Zayas was "involved with FinServ's Proxy." Def. Mem. at 29. But the Complaint alleges that Zayas did permit the use of his name in the Prospectus. ¶221. And for good reason: Zayas' name appears more than 100 times in the Prospectus. See Exhibit 1 attached to Def. Mem. In fact, Zayas is explicitly identified as one of the parties to the merger "in his capacity as the representative of all Pre-Closing Holders (as defined in the merger agreement)." Def. Mem. Ex. 1 at 1. And Defendant Zayas explicitly consented to serve as a director of FinServ "and to be named as a nominee or potential nominee for director of FSRV in any registration statement filed by FSRV under the Securities Act of 1933, as amended, including all amendments and post-effective amendments or supplements thereto and any prospectus and/or proxy statement contained therein."[12] In this way, Zayas "knowingly participate[d] in the distribution [of] a proxy solicitation [and] should therefore expect to be held liable for false statements to all affected shareholders." *In re Bank of America Corp. Secs., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d at 288.

Defendants' argument that Plaintiffs cannot allege a "pure omissions" claim under Section 14(a) is, consequently, without merit. See *Jian Zhou v. Faraday Future Intelligent Elec. Inc.*, No. 2:21-cv-09914-CAS (JCx), 2022 U.S. Dist. LEXIS 192565, at *45-46 (C.D. Cal. Oct. 20, 2022) (sustaining pure omissions Section 14(a) claim in connection with SPAC transaction).

---

[12] https://www.sec.gov/Archives/edgar/data/1785424/000121390021005366/fs42021ex99-3_finservacq.htm

28

C.    **The Complaint Adequately Alleges A False or Misleading Statement in the Prospectus**

Defendants' final argument categorizes the Prospectus's entire discussion of Katapult's waterfall arrangement as mere "puffery" thus rendering the statement inactionable. Def. Mem. at 29-30. But Defendants focus on the wrong part of the disclosure. In fact, as set forth above, the self-described "generic description" of the waterfall arrangement was false and misleading because the waterfall tap could simply be turned off all together by prime lenders above Katapult at any time. The generic statement that "a waterfall is where the application *will flow* from the prime lender to other financing and lease-purchase options automatically; this gives the consumer the best option for their situation" (emphasis added) was misleading because it failed to provide any warning about the risks associated with the flow of applications to Katapult.

III.    **THE COMPLAINT ADEQUATELY ALLEGES A CLAIM UNDER SECTION 20(a)**

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). Because the Complaint adequately alleges violations under Section 10(b) and 14(a) of the Exchange Act, Plaintiffs' claims under Section 20(a) (Counts II and IV) should also be sustained.

29

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss the Complaint should be denied.

Dated: March 6, 2023                    Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

/s/ Matthew M. Guiney
Matthew M. Guiney
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
guiney@whafh.com

*Lead Counsel for Plaintiffs and the Class*

Brian Schall (Pro Hac Vice forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel*

30