UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GINA MCINTOSH, *individually and on behalf of all others similarly situated*, *et al*.,<br>　　　　　　　　　　　Plaintiffs,<br><br>　　　　　　　-v-<br><br>KATAPULT HOLDINGS, INC., *et al*.,<br>　　　　　　　　　　　Defendants. | 21-CV-7251 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Defendant Katapult Holdings, Inc. ("Katapult") is in the business of providing point-of-sale lease-purchase options for consumers who are considered to be "non-prime," that is, holding credit scores higher than subprime borrowers but lower than prime borrowers. In 2021, Katapult became a public company through a merger with FinServ Acquisition Corp. ("FinServ"), a special purpose acquisition company formed for the purpose of effecting such a merger. Plaintiffs bring claims under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that Katapult misled shareholders about its business by failing to disclose known, adverse economic trends that would diminish its revenue and by misrepresenting certain risks tied to its business model. Pending before the Court are Defendants' motions to strike and to dismiss the Second Amended Complaint. For the reasons that follow, Defendants' motion to strike is denied, while the motion to dismiss is granted in part and denied in part.

## I.   Background

### A.   Factual Background

The following facts are taken from the operative complaint (ECF No. 59) and, for purposes of this motion to dismiss, are assumed to be true.

Defendant Katapult is a digital platform that provides point-of-sale lease-purchase options for non-prime customers who cannot access traditional financing products.  (ECF No. 59 ¶ 3.)  Defendant Orlando Zayas is the CEO of Katapult; Defendant Karissa (Long) Cupito[1] is its CFO; and Defendant Derek Medlin is its COO.  (*Id.* ¶¶ 30–32.)  Each served in their respective roles in pre-merger Katapult as well.  (*Id.*)  Defendant Lee Einbinder was CEO of FinServ and later became a Katapult Board Member, while Defendant Howard Kurz was CFO of FinServ.  (*Id.* ¶¶ 34–35.)

Katapult generates revenue by partnering with prime lenders in a "waterfall" process: When a consumer attempts to purchase a durable good on credit (for example, via a "buy now, pay later" option on a merchant's online checkout page), the prime lender makes an initial review of the consumer's credit file to determine whether it will extend them credit for the purchase.  (*Id.* ¶ 63.)  If the prime lender declines, then the consumer's data is transmitted to Katapult, which then has an opportunity to approve the customer.  (*Id.* ¶¶ 65–66.)

On December 18, 2020, FinServ, a special purpose acquisition company (SPAC) formed solely to effect a merger or other enumerated business combination with one or more other businesses, announced that it had entered into a definitive merger agreement with Katapult.  (*Id.* ¶ 7.)   On May 18, 2021, FinServ filed its Proxy Statement and Prospectus

---

[1] This Defendant is referred to as Karissa Cupito in the caption of the Second Amended Complaint and on the docket; certain exhibits refer to her as Karissa Long.  The Court refers to her as Cupito for the purposes of this Opinion and Order.

("Prospectus") soliciting stockholder approval of the merger.  (*Id.* ¶ 14.)  The Katapult-FinServ merger was completed by June 9, 2021.  (*Id.* ¶ 9.)

Prior to the merger, in January 2021, Katapult had issued a preliminary registration statement projecting that its originations for the 2021 fiscal year would be $402 million and its revenue $455 million.  (*Id.* ¶ 68.)  In April of that year, it reiterated that originations would be between $375 and $425 million, with revenue between $425 million and $475 million.  (*Id.* ¶¶ 68–70.)

On June 15, 2021 — the beginning of the putative Class Period — Katapult issued a press release[2] announcing its first quarter results and reiterating that its anticipated origination and revenue figures would be within the same ranges announced in April.  (*Id.* ¶ 82.)  Plaintiffs allege that the statements within the June 15, 2021 press release (the "June 15 Press Release") were materially misleading because (1) Katapult had been experiencing a decline in e-commerce retail sales and consumer spending since the spring of 2021; (2) Katapult knew by then that its pool of potential consumers was shrinking due to the changes in approval patterns among prime lenders; and (3) Katapult knew by then that it had reached only 27 to 31% of its projected gross originations for the year, 31 to 34% of projected revenue, and 30 to 36% of projected adjusted EBITDA, making it clear that it would not meet its stated projections for the year.  (*Id.* ¶¶ 123–24, 138.)  Plaintiffs allege that statements made by certain individual Defendants during the conference call (the "June 15 Conference Call") held to discuss the quarterly earnings report were materially misleading for the same reason.  (*Id.* ¶¶ 125–126.) Plaintiffs further allege that FinServ's Prospectus was materially misleading because it omitted

---

[2]  ECF No. 67-9 ("Katapult Announces First Quarter 2021 Financial Results").

information about the "zero sum" nature of the waterfall relationship between Katapult and the prime lenders.  (*E.g., id.* ¶¶ 14, 207, 220–21, 223, 229.)

On August 10, 2021, Katapult issued a press release disclosing poor financial results for the second quarter and withdrawing its previously disseminated financial guidance.  (*Id.* ¶ 87.) Defendant Zayas, Katapult's CEO, attributed the change to a broad shift in consumer behavior beginning in June of that year and continuing through July 4, 2021.  (*Id.* ¶ 89.)  Zayas also stated that Katapult's business was negatively impacted by a change in the behavior of its prime lender partners — they began to approve more consumers whom they would have typically denied based on their credit files, reducing the number of consumer applications flowing to Katapult through the waterfall process.  (*Id.* ¶¶ 92–93.)

With respect to scienter, Plaintiffs allege that by March and April of 2021, Defendants Einbinder, Kurz, Zayas, and Cupito were aware that Katapult's business was slowing (*id.* ¶¶ 163–65) and that by June 19, 2021, Defendant Cupito informed the Katapult Board of Directors that if the company continued along its "steady state," revenue and originations for the fiscal year would fall short of its original predictions.  (*Id.* ¶ 168.)

By August 10, 2021 — after Katapult had announced the slow-down in its business — its share price fell by 56 percent.  (*Id.* ¶ 103.)

### B.    Procedural Background

On August 27, 2021, Plaintiff Gina McIntosh commenced this action.  (ECF No. 1.) On May 26, 2022, the Court appointed Plaintiff Matis Nayman as Lead Plaintiff.  (ECF No. 40.)  On July 29, 2022, Plaintiffs filed an Amended Complaint, which they followed with a Second Amended Complaint on November 10, 2022.

On January 9, 2023, Defendants filed under seal a motion to strike the Second Amended Complaint, arguing that it contains confidential information that Plaintiffs

impermissibly obtained from documents filed in a separate proceeding against Katapult in

Delaware state court.[3]  (ECF No. 74.)   According to a letter filed under seal, Plaintiffs'

counsel obtained the information from an article published on Law360's website and

disseminated through one of its newsletters, which linked to the publicly filed complaint in the

Delaware case.  Redaction failures in that document allowed Plaintiffs' counsel to view the

redacted content by hovering over it with their cursor and also by copy/pasting it into a new

document.  According to Defendants, that complaint contained confidential information that

the Delaware plaintiffs obtained after asking to inspect Katapult's books and records under

Section 220 of the Delaware General Corporations Law.  (ECF No. 74 at 2.)

The Court permitted Plaintiffs to file the Second Amended Complaint with the

contested information redacted on the public docket, pending the Court's decision on the

motion to strike.  (ECF No. 56.)

Pending before the Court are Defendants' motions to strike the Second Amended

Complaint and, in the alternative, to dismiss it for failure to meet the pleading requirements of

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995,

U.S.C. § 78u-4(b) and for failure to state a claim pursuant to Federal Rule of Civil Procedure

12(b).

## II.    Legal Standard

### A.    Motion to Strike

Under Federal Rule of Civil Procedure 12(f), the Court may "strike from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

---

[3] That case is captioned as *Saunders v. Lee Einbinder, et al.*, C.A. No. 2022-0755-PAF
(Del. Ch.) (ECF No. 74 at 3).

Civ. P. 12(f).  Courts in this District have held that Rule 12(f) motions are "highly disfavored." *Lee v. E*Trade Fin. Corp.*, No. 12 CIV. 6543, 2013 WL 4016220, at *7 (S.D.N.Y. Aug. 6, 2013) (citing 5 Charles A. Wright et al., *Federal Practice and Procedure* § 1382 (2d ed.1990)); *see also Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas Con Energia y Servicios Especializados*, *S.A. de C.V.*, No. 17 CIV. 9873, 2019 WL 1877344, at *3 (S.D.N.Y. Apr. 26, 2019) ("Motions to strike are not to be granted 'unless there is a strong reason for so doing.'").

### B.   Motion to Dismiss

#### 1.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual allegations," but it must offer something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  In resolving a motion to dismiss, the court "must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Doe v. Indyke*, 457 F. Supp. 3d 278, 282 (S.D.N.Y. 2020) (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014)).

On a 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d

564, 570 (S.D.N.Y. 2013) [hereinafter, *Bank of Am. AIG*], *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (citation omitted).

### 2.   Rule 9(b) and the PSLRA

Beyond the standards imposed by Rule 12(b)(6), a complaint alleging securities fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 353–54 (S.D.N.Y. 2015).

"Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent."  *Id.* (citing *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012)).   Under the PSLRA, if a plaintiff alleges that a defendant has made an untrue statement of a material fact, the plaintiff must satisfy the following heightened pleading standard:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  In addition, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

## III.   Discussion

### A.   Motion to Strike

Defendants have not put forth a valid basis to strike the second amended complaint.  First, Defendants have not shown that the information that Plaintiffs' counsel copied and pasted from the papers filed in the Delaware action were "redundant, immaterial, impertinent,

or scandalous" as contemplated by Rule 12(f).  *See* 5 Charles A. Wright et al., *Federal Practice and Procedure* § 1382 (2d ed.1990) (defining each term and providing examples).

Second, Defendants' reliance on the PSLRA is unavailing.  It is true that the PSLRA imposes a stay of discovery while a motion to dismiss is pending in a securities action.  *See* 15 U.S.C. § 78u–4.  However, the information in question was not exchanged through discovery between the parties.  Nor was it unearthed because Plaintiffs filed a lawsuit attempting to gain discovery by other means.  *See, e.g.*, *Beiser v. PMC-Sierra*, 2009 WL 483321, at *1 (Del. Ch. Feb. 26, 2009) (dismissing the plaintiffs' Section 220 books and records lawsuit because it sought to circumvent the PSLRA discovery stay).  To be sure, Congress intended the PSLRA "to reduce the litigation burden for defendants[ by imposing] more stringent pleading requirements and mandatory discovery stays for securities fraud class actions filed in federal court."  *In re Bisys Sec. Litig.*, 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007).  But Defendants have not shown that a situation like this one — where Plaintiffs obtained information because it was accidentally disseminated to the general public, without imposing any discovery burden on the opposing party — falls within the intended scope of the PSLRA discovery stay rule.

Third, Defendants' reliance on New York Rule of Professional Conduct 4.4(b) is not persuasive.  The Rule provides that "[a] lawyer who receives a document, electronically stored information, or other writing relating to the representation of the lawyer's client and knows or reasonably should know that it was inadvertently sent shall promptly notify the sender."  N.Y. R. Prof. Cond. 4.4(b).  The circumstances contemplated by that rule are plainly not present here.[4]  And, in any event, Plaintiffs' counsel reports that it promptly notified Defendants'

---

[4] *See* N.Y. R. Prof. Cond. 4.4(b) cmt. 2 ("A document, electronically stored information, or other writing is 'inadvertently sent' within the meaning of paragraph (b) when

counsel about the inadvertent disclosure on the part of the law firm representing the Delaware plaintiff.

The motion to strike is therefore denied.  The Court proceeds to the merits of Defendants' motion to dismiss.

### B.     Pleading Standard

The threshold issue is whether the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA for securities fraud claims apply to Plaintiffs' allegations under both Section 10(b) and Section 14(a) of the Exchange Act. Defendants argue that those standards apply to both sets of claims.  Plaintiffs disagree, arguing that the 14(a) claims are not subject to those heightened pleading standards because they arise solely on a negligence theory, rather than a fraud theory.  Plaintiffs have also expressly disclaimed that any of their 14(a) allegations are based on fraud.  (ECF No. 59 ¶¶ 201, 217.) Defendants counter that the Rule 9(b) and PSLRA pleading standards must apply where a plaintiff has asserted allegations sounding in fraud, even if they have disclaimed such a theory.

Defendants have the better of the argument.  "[I]f a plaintiff's factual assertions in a Section 14(a) claim are premised on fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-CV-9992, 2021 WL 4443258, at *8 (S.D.N.Y. Sept. 27, 2021) (citation and internal quotation marks omitted).  On their 14(a) claims, Plaintiffs allege that the Prospectus contained "false and misleading" information and that members of the class "were misled by Defendants' false and misleading statements and

---

it is accidentally transmitted, such as when an email or letter is misaddressed or a document or other writing is accidentally included with information that was intentionally transmitted.").

omissions."  (ECF Nos. 59 ¶¶ 219, 225–26).  This is indistinguishable from language that the Second Circuit has found to be "classically associated with fraud."  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (concluding that the phrases "materially false and misleading;" "inaccurate and misleading;" and "untrue statements of material facts" sounded in fraud, despite plaintiffs' allegations relying on a negligence theory).  Even more to the point, Plaintiffs devote several paragraphs of the Second Amended Complaint to the idea that "SPACs like FinServ have become magnets for fraud," noting that "the SEC has criticized SPACs because of their apparent tendency to encourage fraud."  (ECF No. 59 ¶ 11; *see also id.* ¶ 49).

Plaintiffs point out, correctly, that the PSLRA's heightened pleading standard for a defendant's state of mind, 15 U.S.C. § 78u-4(b)(2), does not apply to suits brought under Section 14(a).  *See Enzo Biochem*, 2021 WL 4443258, at *8; *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012).  But that is beside the point, given that the contested issue is whether Plaintiffs adhered to the requirements set out at 15 U.S.C. § 78u-4(b)(1), a provision which does not deal with state of mind and, instead, governs the particularity of the pleadings required to satisfy the heightened Rule 9(b) standard when pleading the distinct element of "misleading statements and omissions."  *Id.*

The Court's analysis, therefore, proceeds on the premise that the heightened pleading requirements apply to the 14(a) claims.  But first, the Court considers Plaintiffs' 10(b) claims.

### C.      Section 10(b) of the Exchange Act

Plaintiffs bring their 10(b) claims against Katapult, Zayas, and Cupito,[5] alleging that two sets of statements attributable to the Defendants violated Section 10(b) of the Exchange Act.  The first is from the Press Release:  "As of June 15, 2021, Katapult anticipates FY 2021 Gross Originations, Revenue, and EBITDA to be $375-$425 million [and] $425-$475 million."  The second was a remark by Defendant Cupito during the earnings June 15 Conference Call held on the same day:  "[G]iven the data we have today, we continue to believe that this guidance is reasonable and appropriate."  The Court concludes that Plaintiffs have failed to plausibly allege that these two Guidance Statements state a claim under Section 10(b).

Section 10(b) prohibits "any person from using or employing 'any manipulative or deceptive device or contrivance in contravention' of SEC rules."  *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 548 (S.D.N.Y. 2018) (quoting 15 U.S.C. § 78j(b)).  To state a claim under Section 10(b), "a plaintiff must establish '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or a sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008)).

The PSLRA narrowed the reach of Section 10(b).  "The PSLRA established a statutory safe-harbor for forward-looking statements."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010).  Where a "private action . . . is based on an untrue statement of a material fact or

---

[5] Plaintiffs have withdrawn their claims against Defendant Medlin.  (ECF No. 78 at 21 n.11.)  The claims against him are therefore dismissed.

omission of a material fact necessary to make the statement not misleading a defendant shall

not be liable with respect to any forward-looking statement . . ." if:

> (1) it is identified as a forward-looking statement and it is "accompanied by
> meaningful cautionary statements identifying important factors that could cause
> actual results to differ materially from those in the forward-looking statement"; or
> (2) it is immaterial; or
> (3) "the plaintiff fails to prove that it was made with actual knowledge that it was false
> or misleading."

*Id.* at 765–66. (citing 15 U.S.C. § 78u–5(c)).  "A statement may contain some elements that

look forward and others that do not and forward-looking elements may be severable from non-

forward-looking elements."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016)

(citation and internal quotation marks omitted).

"As of June 15, 2021, Katapult anticipates FY 2021 Gross Originations, Revenue, and

EBITDA to be $375-$425 million [and] $425-$475 million" is a forward-looking statement

under the PSLRA.  The PSLRA contains several definitions of a forward-looking statement,

including: "a statement containing a projection of revenues, income (including income loss),

earnings (including earnings loss) per share, capital expenditures, dividends, capital structure,

or other financial items."  15 U.S.C § 78u–5(i)(1)(a).  The challenged statement precisely

meets this definition.  Plaintiffs counter that because the statement began with the phrase "as of

June 15, 2021," it actually reflected Defendants' *present* understanding and cannot, therefore,

qualify as forward-looking.  This argument is unpersuasive.  *See Gissin v. Endres*, 739 F. Supp.

2d 488, 505–06 (S.D.N.Y. 2010) (concluding that a statement referencing the defendant's

"current expectation of cash flows" was forward-looking because it did "not justify the

financial projections in terms of any particular aspect of the company's *current* situation" but

instead "[said] only that, whatever that situation is, it makes the future projection attainable.")

(citation omitted) (emphasis added).  In other words, "as of June 15, 2021" did not, in itself,

provide specific information about Katapult's current circumstances, making it "too vague to be actionable apart from the future projection[s]." *In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (citation omitted).

Defendant Cupito's statement that "given the data we have today, we continue to believe that this guidance is reasonable and appropriate" is also a forward-looking statement under the PSLRA. "Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020) (gathering cases), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). This rule is especially appropriate here, given the full context of Cupito's statement:

> Given the data we have today, we continue to believe that this guidance is reasonable and appropriate, and we plan to provide a more detailed update on our Q2 earnings release. To reiterate, the guidance is to achieve originations of $375 million to $425 million, revenue of $425 million to $475 million and adjusted EBITDA of $50 million to $60 million. And as we have said previously, we anticipate the majority of our growth to be concentrated in the second half of the year with a heavy weighting to Q4 2021.

(ECF No. 67-10 ("Ex. 10") at 10.) Taken as a whole, the challenged portion of Cupito's statement is reasonably interpreted as an expression of her belief in a future outlook, premised on a prediction about the company's growth in the six months following the June 15 Conference Call.

Defendants have also demonstrated that these two forward-looking statements were accompanied by the requisite cautionary language. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772 (citation omitted). In particular, the cautionary language must reflect

"company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Id.* (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).  Additionally, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful." *Gray*, 454 F. Supp. 3d at 392 (citing *Slayton*, 604 F.3d at 768–69).

The Press Release contained a separate section labeled "Forward-Looking Statements," which cautioned that the anticipatory statements within the document were subject to change based on several company-specific risk factors, including "risks related to the concentration of Katapult's business among a relatively small number of merchants"; "failure to realize the anticipated benefits of the transaction with FinServ"; "the effects of competition on Katapult's future business"; and "the impact of the COVID-19 pandemic on Katapult's business," among others.  (ECF No. 67-9 at 7.)  And at the beginning of the June 15 Conference Call, Bill Wright, Vice President of Investor Relations at Katapult, stated:

> Before we begin, I would like to remind everyone that this call will contain forward-looking statements regarding future events and financial performance and should be considered in conjunction with cautionary statements contained in our earnings release and the company's most recent periodic SEC reports. These statements reflect management's current beliefs, assumptions and expectations and are subject to a number of factors that may cause actual results to differ materially from those statements.

(ECF No. 67-10 at 5.)  Wright therefore referenced the cautionary language contained in the June 15 Press Release, which was released in conjunction with and on the same day as the June 15 Conference Call.  The Court concludes that this reference to the cautionary language in the text of the Press Release — which was the sole subject of the Conference Call — was sufficient.

Plaintiffs counter that Defendants should have identified *different* risk factors.  The crux of their argument is that the Defendants had actual knowledge that Katapult would miss the stated revenue and origination goals for the fiscal year because they knew that originations had declined from March through June.[6]  But, as Judge Liman thoughtfully explained in *Gray*, "This argument conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA."  454 F. Supp. 3d at 394.  And "[i]f the Court were to accept it, an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of safe harbor even if there were meaningful cautionary language otherwise."  *Id.* This result is not permissible because it "would be contrary to the disjunctive nature of the safe harbor elements."  *Id.* (citing *Slayton*, 604 F.3d at 766).

Because the Guidance Statements were forward-looking statements accompanied by the mandated cautionary language, Plaintiffs' Section 10(b) claim fails.

### D.    Section 14(a) of the Exchange Act

Plaintiffs bring their Section 14(a) claims on behalf of all former FinServ shareholders who held shares of FinServ common stock as of the Record Date of the merger (May 11, 2021) and were entitled to vote on the merger at FinServ's Special Meeting on June 7, 2021.  (ECF No. 59 ¶ 201.)  The Section 14(a) claims are brought against Katapult, Zayas, Einbinder, and Kurz.

---

[6] Plaintiffs also cite a presentation dated June 19, 2021 — *after* the date of the Press Release and Conference Call — estimating that Katapult's origination and revenue figures in a "steady state," *e.g.* with no additional initiatives or strategies to boost the business — would be lower than the Guidance figures.  (*See* ECF No. 59 ¶ 168.)  Because this information post-dates the forward-looking statements in question, the Court does not consider it as part of its analysis.

Plaintiffs allege that the Prospectus and other proxy solicitation materials disseminated to FinServ shareholders were false and misleading because they failed to disclose information in two primary categories.  The first category relates to the nature of the waterfall structure, including the fact that "Katapult *only* had the opportunity to serve a customer when the lender above Katapult declined to lend to a customer," creating a "zero sum game" in which Katapult was "reliant on the entity above it in the waterfall declining the initial application."  (ECF No. 59 ¶ 207.)  The second category relates to how prime lenders began to change their approval practices, which Plaintiffs argue allowed them to "cannibalize Katapult's entire customer base."  (*Id.*)  Plaintiffs also allege that Defendants failed to disclose "how high savings rates and low delinquency rates would cut against . . . Katapult's entire business model."  (*Id.*)

To state a claim under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, a plaintiff must demonstrate that: "(1) the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004).  The plaintiff "must also allege that defendants acted at least with negligence in making the misrepresentation or omission."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).

Here, the parties' arguments center on the first prong of the Section 14(a) test: whether Defendants made a material misstatement or omission.  The omission of information from a proxy statement violates Section 14(a) and Rule 14a-9 "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading."  *Resnik v.*

*Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).  Plaintiffs' arguments implicate both prongs of this standard.  First, they argue that Defendants failed to disclose information in the Prospectus specifically required by SEC regulations.[7]  (ECF No. 59 ¶¶ 212–14.)  Second, Plaintiffs argue that certain omissions in the Prospectus made other material in it materially false or misleading.

### 1.    Required Disclosure of Omitted Information

Plaintiffs contend that Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required Defendants to disclose the information about the waterfall, changes in prime lender behavior, and changes in savings and interest rates in the Prospectus.  Under Item 303, registrants are required to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

More specifically, "the Regulation imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quotation marks omitted).  To be liable, the registrant must have had actual knowledge of the relevant trend or uncertainty.  *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).  "To demonstrate knowledge, a plaintiff must allege facts that raise a 'plausible

---

[7] Defendants do not argue that Plaintiffs failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA with regard to this claim.

inference' that the company's management was aware of a trend that would 'materially impact' the company's financial condition." *In re Coty Inc. Sec. Litig.*, No. 14-CV-919, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) (quoting *Panther Partners*, 681 F.3d at 121–22).

Plaintiffs have failed to plausibly allege that the information regarding the nature of the waterfall structure was a material misstatement or omission for the purposes of Item 303.  First, Plaintiffs have not convincingly shown that the *existence* of the waterfall structure as the key component of Katapult's business was a "trend, demand, commitment, event or uncertainty" as enumerated by Regulation S-K.  As such, there is no plausible violation of the Item 303 disclosure requirement.

As to the change in behavior of the prime lenders, Plaintiffs have not plausibly alleged that Defendants had actual knowledge of that trend or uncertainty when the Prospectus was issued.  Plaintiffs attempt to show actual knowledge based on two remarks that Defendant Zayas made during an August 10, 2021 conference call — three months *after* the Prospectus was issued.   In the first instance, Zayas stated the following in discussing the changes in prime lender behavior:

> And really simply and there have been various outside stimulus, the trends in supply and demand have changed as they needed . . . the character of what those above us are approving.  And just like last year when we saw a tightening during uncertainty, but for stimulus, we have seen that loosening occur.  And this is something that we've seen before often on throughout the years.  I think this is fairly common, but in our position in the waterfall, we have more visibility into it.

(ECF No. 59 ¶ 100.)  In the second instance, Zayas stated that prime lenders began to extend credit to a wider pool of consumers, cutting into Katapult's business, starting in the Spring of 2021.  (*Id.* ¶ 138.)  These post-hoc comments analyzing the impact of the change in prime lender behavior do not establish Defendants' actual knowledge of that trend at the time the Prospectus was issued.  *See Holbrook v. Trivago N.V.*, No. 17 CIV. 8348, 2019

WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019) ("[Defendant's] post hoc description of the extent of the ultimate impact of the [alleged trend or uncertainty] . . . does not speak to what the Company knew or should have known at the time of the offering."), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).

Finally, Plaintiffs allege that Defendants were required to disclose "how high savings rates and low delinquency rates would cut against . . . Katapult's entire business model." During the August 2021 conference call, Defendants stated that "with historically high savings rate and low delinquency rates [and] . . . customers buoyed by stimulus and a recovering jobs market, we are observing prime providers stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume." (ECF No. 59 ¶ 12.; *see also id.* ¶ 105 (similar remarks during November 9, 2021 earnings call.)) Again, Plaintiffs have not plausibly alleged that any Defendant had actual knowledge of this trend when the Prospectus was issued. Further, Plaintiffs fail to identify when the shifts in savings and delinquency rates began, an omission that undermines their attempt to establish Defendants' actual knowledge. *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) (rejecting Item 303 claim where plaintiffs "conspicuously fail[ed] to allege the existence of any causal event or moment in time that the [trend] allegedly began.").

Plaintiffs have therefore not plausibly alleged that Defendants failed to make a disclosure required by SEC regulations.

### 2.   Omission of Information Making Prospectus Materially Misleading

Alternatively, Plaintiffs argue that the following description of the waterfall from the Prospectus was false or misleading:

> **Waterfall partnerships**: A waterfall is where the application will flow from the prime lender to other financing and lease-purchase options automatically; this gives the consumer the best option for their situation. Katapult's technology supports a sophisticated integration with these partners and ensures a smooth and efficient customer transaction experience during application and checkout.

(ECF No. 59 ¶ 215.)  The Court construes this as an argument that omissions in this statement made other statements in the Prospectus materially false or misleading.  This Section 14(a) claim is subject to a negligence standard.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 636.

### a.      Pleading Standard

Here, the parties contest whether this allegation, taken on its own, satisfies the heightened pleading standards of Rule 9(b) and the PSLRA, as outlined in section III(B).  Because the Section 14(a) claim at issue here sounds in fraud, under the PSLRA, Plaintiffs are obligated to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Enzo Biochem.*, 2021 WL 4443258, at *7 (quoting 15 U.S.C. § 78u-4(b)(1)).  Under Rule 9(b), they are obligated to identify: "(1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent."  *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d at 353 (citing *Anschutz Corp.*, 690 F.3d at 108).

Though the allegation at paragraph 215 of the Second Amended Complaint does nothing more than identify the allegedly fraudulent statement and where and when it was made, taking the complaint as a whole, the Court determines that Plaintiffs have satisfied the requirements of the PSLRA and Rule 9(b) with regard to this allegation.  The Second

Amended Complaint specifies the statement they allege was misleading, the reason why it was misleading, and the facts on which that belief was formed.  Plaintiffs have also identified a basis for their belief that the statement was "false and misleading" (or fraudulent), as discussed above.

Defendants counter that the waterfall description was unactionable puffery.  That argument is not availing.  "Puffery is defined as an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *Enzo Biochem.*, 2021 WL 4443258, at *12 (citations and quotation marks omitted).  The description of the waterfall, taken in its entirety, does not meet this definition because it is not so vague and broad that no reasonable investor in the company would have relied on it.

The Court now considers the merits of this claim.

### b.     Merits

A proxy solicitation is materially misleading under Section 14(a) when there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  In other words, a misstatement is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citations and internal quotation marks omitted).  "The point of a proxy statement . . . should be to inform, not to challenge the reader's critical wits." *Virginia Bankshare*s, *Inc. v. Sandberg* 501 U.S. 1083, 1097 (1991).  But at the same time, "nit-picking should not become the name of the game," and "[f]air

accuracy, not perfection, is the appropriate standard." *Bank of Am. Corp. Sec.*, *Derivatives, & Emp. Ret. Inc. Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 290 (S.D.N.Y. 2010) [hereinafter "*Bank of Am. ERISA Litig.*"] (quoting *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978)).

Given that materiality is a mixed question of law and fact, on a Rule 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

According to Plaintiffs, the Prospectus's description of the waterfall was impermissibly generic, making the other statements within the Prospectus materially false and misleading because it "failed to provide any warning about the risks associated with the flow of applications to Katapult." (ECF No. 78 at 36.) Defendants counter that even if the language in the Prospectus was not specific about the conditional nature of Katapult's ability to receive customers through the waterfall, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information." (ECF No. 72 at 33 (quoting *Bank of Am. AIG*, 980 F. Supp. 2d at 576).)

The Second Amended Complaint references two instances where the 'zero sum' nature of the waterfall structure was disclosed to the public. First, Defendant Zayas described the

waterfall "during a conference call held in connection with the merger announcement" in

December 2020[8] as follows:

> Our best and leading industry integrations come from our prime lending
> waterfall with select prime lenders, like Affirm.  Affirm chose to integrate
> with us, creating a waterfall, where the application is input once, and with the
> consumer's consent, if Affirm declines that application, the data is
> electronically transmitted to Katapult and we have the opportunity to approve
> this consumer.

(ECF No. 59 ¶ 63.)

> Second, Zayas made similar remarks during a January 2021 investor conference:

> Our first partner, Affirm realized that having a solution for their declines was
> important to their retailers. They noted as many e-commerce retailers have, that
> consumers declined for credit will disappear. Affirm liked that we had an
> application flow identical to theirs, and we were already in several merchant
> side by side and our consumers were treated with the same transparency and
> respect. They chose to integrate with us creating a waterfall where the
> application is only input once. If Affirm declines the application the data is
> electronically transmitted, and we have the opportunity to approve that
> consumer.

(*Id.* ¶ 65.)

FinServ filed a copy of the transcript from that conference with the SEC as part of its

Form 425 disclosures in January 2021.  (ECF No. 82 at 12.)

Additionally, Defendants identify two other instances of public disclosure regarding the

waterfall:  In November 2019, Affirm published a post on its website about its partnership with

Katapult that stated:  "If customers are denied financing with Affirm, they automatically get

considered by Katapult."  (ECF No. 67-15 at 2.)  And in an article published by Business

Insider on March 1, 2021, Defendant Zayas gave a similar explanation of Katapult's structure.

---

[8] The Second Amended Complaint does not indicate when this call took place, but
Plaintiffs have not contested Defendants' assertion that it took place in December 2020.  (ECF
No. 72 at 25.)

(ECF No. 67-4.)  FinServ filed a copy of that interview with the SEC as part of its Form 425 disclosures.  (*See id.* at 1, 7.)  These statements were therefore filed with the SEC and available on the public record before Defendants issued the May 18, 2021 Prospectus.[9]  (ECF No. 67-1 at 2.)

Under Second Circuit precedent, Plaintiffs have plausibly alleged that more specific disclosures about (1) the nature of the waterfall structure and (2) the fact that the waterfall was Katapult's sole means of customer acquisition had a substantial likelihood of altering the total mix of information available to investors.  In *United Paperworkers International Union v. International Paper Company*, the Second Circuit held that "the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading, and such reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials."  985 F.2d 1190, 1199 (2d Cir. 1993).  While shareholders may be deemed to have constructive notice of facts "widely reported in readily available media," *id.*, the circumstances here support a conclusion that the disclosures were sporadic, rather than widely disseminated.  A single news article and a single website post, dated two years before the merger, cannot reasonably be interpreted to constitute widespread reporting.

---

[9] Though courts must typically resolve 12(b)(6) motions without looking outside the pleadings, it is permissible to take judicial notice of press coverage establishing what information was in the public domain during periods relevant to the plaintiff's claims.  *Bank of America AIG*, 980 F.Supp.2d at 570 (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  Courts may also take judicial notice of "public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'"  *Bank of America AIG*, 980 F.Supp.2d at 570 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991)).

Likewise, Zayas' December 2020 and January 2021 remarks are not properly considered as part of the total mix of information available to shareholders because these disclosures were not made "in the context" of the shareholder vote tied to the Prospectus. *See id.* (concluding that news articles were not part of the total mix of information because they were not published in the context of the proxy contest, with the latest article having appeared "more than two months before [the defendant's] Proxy Statement was even issued"). Defendants' latest-dated disclosure — Zayas's comments to Business Insider on March 1, 2021— was issued more than two months before the May 18, 2021 Prospectus.

While the January 2021 remarks and a copy of the Business Insider article were filed with the SEC prior to the dissemination of the Prospectus, those items were "filed with the SEC, not distributed to shareholders." *Id.* A reasonable shareholder reading the Prospectus alone would not have been apprised of the information contained in those disclosures. As the Second Circuit explained in *United Paperworkers*:

> The mere fact that a company has filed with a regulatory agency documents containing factual information material to a proposal as to which proxies are sought plainly does not mean that the company has made adequate disclosure to shareholders under Rule 14a–9. Corporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders.

*Id*. Defendants' argument that the description of the waterfall in the Prospectus did not contain a material misstatement or omission must therefore fail. This outcome is especially appropriate given the Supreme Court's guidance that "[i]n view of the prophylactic purpose of [Rule 14a-9] and the fact that the content of the proxy statement is within management's control, doubts as to the materiality of misstated or omitted information are to be resolved in favor of those the statute is designed to protect." *TSC Indus*., 426 U.S. at 448.

Next, the parties contest individual liability on the Section 14(a) claim.  Defendants

argue that Zayas cannot be liable for a Section 14(a) violation arising from the Prospectus

because Plaintiffs do not allege that he was involved FinServ's proxy solicitation.  "The basis

for Section 14(a) liability is not the nature of the duty between the defendant and a shareholder,

but whether that defendant has solicited or permitted his or her name to be used in the allegedly

unlawful proxy." *Bank of Am. ERISA Litig.*, 757 F. Supp. 2d 260, 288 (S.D.N.Y. 2010).

Because the Second Amended Complaint contains an allegation that Zayas permitted his name

to be used in the Prospectus (ECF No. 59 ¶ 221), Plaintiffs have plausibly pleaded Zayas's

liability.  Defendants do not contest that Einbinder and Kurz permitted use of their names in

the Prospectus.

Finally, Defendants argue that Plaintiffs have failed to plead negligence on their

Section 14(a) claim.  The Second Amended Complaint alleges facts sufficient to support an

inference that Katapult, Zayas, Einbinder, and Kurz acted with negligence in failing to disclose

more specific information about the risks of the waterfall structure in the Prospectus.

Supporting an inference of negligence are the allegations regarding the decline in volume in

March and April of 2021 "following recent market trends," ECF No. 59 ¶ 169, and the

allegations regarding Defendants' failure to include more precise information about how the

waterfall structure worked in the Prospectus itself, even as they disclosed that information in

other contexts.

### E.    Section 20(a) of the Exchange Act

Plaintiffs allege control person liability under Section 20(a) against Zayas and Cupito

on the Section 10(b) claim and Zayas, Einbinder, and Kurz on the Section 14(a) claim.  "In

order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show: (1)

a primary violation by a controlled person; (2) control of the primary violator by the defendant;

and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal citation omitted).

Plaintiffs have plausibly alleged a primary violation only as to their Section 14(a) claim. Because Defendants' arguments for dismissing this count are based entirely on the lack of a primary violation (*see* ECF Nos. 72 at 38, 80 at 20), the motion to dismiss is denied to the extent that this claim is premised on a primary violation of Section 14(a).

## IV. Conclusion

For the foregoing reasons, Defendants' motion dismiss is granted in part and denied in part, and its motion to strike is denied.

The Clerk of Court is directed to close the motions at ECF Nos. 53, 65, and 68.

The Clerk of Court is further directed to terminate Defendants Cupito and Medlin from this action.

SO ORDERED.

Dated: August 8, 2023
        New York, New York

_____
                  J. PAUL OETKEN
                  United States District Judge