**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GINA McINTOSH, Individually and On
Behalf of All Others Similarly Situated,

         Plaintiff,

      vs.

KATAPULT HOLDINGS, INC., LEE
EINBINDER, HOWARD KURZ, ORLANDO
ZAYAS, KARISSA CUPITO and DEREK MEDLIN

         Defendants.

Case No. 1:21-cv-07251-KHP

**DECLARATION OF MATTHEW M. GUINEY IN SUPPORT OF (I) MOTION FOR FINAL
APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION AND CERTIFICATION OF
CLASS; AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT
OF EXPENSES, AND REIMBURSEMENT OF TIME TO LEAD PLAINTIFF**

I, Matthew M. Guiney, hereby declare as follows:

1.      I am a member of the New York Bar in good standing and am appearing in this case *pro hac vice*. I am a partner at Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"). My firm was appointed Lead Counsel in this Action for Lead Plaintiff Matis Nayman ("Lead Plaintiff"), additional plaintiff Felipe de Castro Luna (collectively, "Plaintiffs"), and the proposed class. I have personal knowledge of the matters stated herein and, if called as a witness, I could and would competently testify thereto.[1]

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meanings as set forth in the Stipulation of Settlement filed with the Court on July 22, 2024 ("Stipulation") (ECF No. 102-1, Ex. 1).

1

2.      I respectfully submit this Declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure in support of Plaintiffs': (1) Motion for Final Approval of Settlement, Plan of Allocation and Certification of the Class; and (2) Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement of Time to Lead Plaintiff.

## I.      INTRODUCTION

3.      The parties to this Settlement are Lead Plaintiff Matis Nayman and additional plaintiff Felipe de Castro Luna (collectively, "Plaintiffs") and Defendants Katapult Holdings Inc., ("Katapult," or the "Company") f/k/a FinServ Acquisition Corp. ("FinServ"), Orlando Zayas, Karissa (Long) Cupito, Derek Medlin, Lee Einbinder and Howard Kurz (collectively, "Defendants").

4.      Plaintiffs have entered into this Settlement on behalf of themselves and the other Members of the proposed Class with Defendants providing a recovery of $2.5 million in cash. Magistrate Judge Katharine H. Parker preliminarily approved the Settlement on July 24, 2024 (ECF No. 103).

5.      The Settlement is a very good result for the Class in a case that posed significant hurdles.  The $2.5 million Settlement constitutes a conservatively estimated 5.22% recovery for the Class.  *See* Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement, Plan of Allocation and Certification of Class ("Settlement Memorandum") at 1.  The Settlement is reasonable in light of the median settlement amount and percentage recovered as reported by Cornerstone Research, which tracks and aggregates court-approved securities class action settlements.  *See* Exhibit E attached hereto at 14 (Laarni T. Bulan and Laura E. Simons, *Securities Class Action Settlements – 2022 Review and Analysis*, Cornerstone Research).  Here, the $2,500,000 Settlement comprises approximately 5.22% of the approximately $41 million in maximum damages potentially available in this case.  Moreover, $41 million was Plaintiff's best-

2

case scenario for damages.  Thus, the Settlement is an excellent result.  For these reasons and those discussed below, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

6.      Lead Counsel diligently litigated the Action from August 2021 through the execution of the Stipulation.  Lead Counsel, *inter alia*, (i) conducted a comprehensive investigation into the allegedly wrongful acts, which included a review and analysis of Katapult's and Finserv's filings with the SEC, public reports and news articles concerning  Katapult and Finserv, transcripts of Katapult's and Finserv's investor calls; (ii) filed a motion for lead plaintiff on behalf of their client Matis Nayman; (iii) researched the law relevant to the claims asserted and Defendants' potential defenses thereto, and drafted the initial complaint and Amended Class Action Complaint (the "Amended Complaint") based on their extensive investigation, which included the use of a private investigator; (iv) opposed Defendants' motion to dismiss the Amended Complaint; (v) negotiated and drafted the Stipulation and exhibits thereto, as well as the motion for preliminary approval of the Settlement; and (vi) engaged and consulted with a damages consultant and prepared the proposed Plan of Allocation.

7.       At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Settling Parties' positions and the risks of continuing litigation.

8.      In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with establishing liability, as well as the duration and complexity of the legal proceedings that remained ahead.  As demonstrated by the Settling Parties' court filings, the Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, raised (and continued to raise) arguments concerning, among

other things, whether the alleged misstatements were material or false, whether there was sufficient evidence of Defendants' scienter, and whether Lead Plaintiff could establish loss causation and damages (and if so, how much). They also took into account risks relating to the potential appeal of their Rule 10b-5 claim and related claims that had been dismissed by the Court as well as the risk that Defendant would appeal from any future successful decision that Plaintiffs might obtain.

9.    The Plan of Allocation for distribution of the Settlement proceeds is fair and reasonable.  The Plan of Allocation allocates settlement monies depending on when investors bought and sold Katapult common stock or warrants during the Class Period and/or whether they held FinServ shares that made them eligible to vote at FinServ's June 7, 2021 special meeting and subsequently exchanged these shares for Katapult common stock.  Lead Counsel requests that the Court approve the Plan of Allocation.

10.    Lead Counsel also respectfully requests that the Court approve the proposed award of attorneys' fees in the amount of 33 1/3% of the Settlement, or $83,3333.00, plus litigation expenses of $44,131.99.  Lead Counsel litigated this case to date on a wholly contingent-fee basis. Lead Counsel believes the fee and expense request is reasonable in light of their extensive efforts in creating this tangible and immediate benefit for the Class, and as recognition for the risks faced and overcome.

11.    Lead Counsel also believes that the fee application of 33 1/3% of the total recovery is fair, reasonable and warrants Court approval.  As set forth fully in the accompanying Memorandum of Law In Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement of Time for Plaintiffs (the "Fee Brief"), the fee request is well within the range of fees typically awarded in actions of this type, was approved by Plaintiffs in its

retainer, and is fair in light of the benefits obtained, the substantial risks undertaken, and the quality, nature and extent of the services rendered.

12.    Lead Counsel also requests that the Court approve a reimbursement of $8,000 to Court-appointed Lead Plaintiff Matis Nayman, who spent 100 hours representing the Class and achieving the proposed Settlement. *See generally* Declaration of Matis Nayman, attached as Exhibit C hereto. Per the Declaration, Mr. Nayman's hourly rate is $1,800. Lead Counsel respectfully requests that the Court approve an $8,000 reimbursement to Matis Nayman for the time spent on this case and service in achieving the Settlement for the Class.

13.    Lead Counsel also requests that the Court approve a reimbursement of $2,000 to Court-appointed Plaintiff Felipe de Castro Luna. Felipe de Castro Luna spent 10 hours representing the Class and achieving the proposed Settlement. *See generally* Declaration of de Castro Luna, attached as Exhibit B hereto. Per the Declaration, Mr. de Castro Luna's hourly rate is $200. Lead Counsel respectfully requests that the Court approve a $2000 reimbursement to Felipe de Castro Luna for the time spent on this case and service in achieving the Settlement for the Class.

14.    Pursuant to the July 24, 2024 Preliminary Approval Order (ECF No. 103), 12,733 copies of the Individual Notice were mailed or disseminated to potential Class Members and nominees. *See* Exhibit A attached hereto (the Declaration of Luiggy Segura Concerning: (A) Mailing of the Notice; (B) Publication of the Summary Notice; and (C) Report On Requests For Exclusion and Objections, dated November 4, 2024).

15.    The notices apprised Class Members of their right to object to the Settlement, the Plan of Allocation, Lead Counsel's application for attorneys' fees of up to 33 1/3% of the

Settlement Fund, plus expenses of up to $60,000, as well as the proposed $10,000 reimbursement to Plaintiffs.

16.     The time to object to the fee and expense request expires on November 22, 2024. To date, not a single objection to the fee and expense amounts set forth in the Notice or exclusions has been received.

## II.    SUMMARY OF THE ALLEGATIONS

17.     Plaintiffs asserted claims on behalf of a putative class of investors pursuant to §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rules 10b-5 and 14a-9 promulgated thereunder against Defendants Katapult Holdings Inc., ("Katapult," or the "Company") f/k/a FinServ Acquisition Corp. ("FinServ"), Orlando Zayas, Karissa (Long) Cupito, Derek Medlin, Lee Einbinder and Howard Kurz (collectively, "Defendants").

18.     Defendant Katapult is the product of the merger of an earlier Katapult entity ("legacy Katapult") and Finserv.  Finserv was a Special Purpose Acquisition Company ("SPAC"), created with the sole purpose of buying a company to take it public.  Legacy Katapult was – and Katapult is – a provider of financing for consumers with sub-optimal credit.  Plaintiffs alleged that during the period leading up to the merger, Defendants falsely offered and reiterated their belief in representations about Katapult's business model and expected performance.

19.     Katapult's access to customers was through a "waterfall" arrangement with prime lenders, where if a prime lender rejected a borrower as too high a risk, that borrower would automatically be passed on to Katapult, who had the opportunity to offer the customer a loan on which Katapult would make profit.  Plaintiffs alleged that: 1) the Proxy Statement Prospectus that Defendants filed on May 18, 2021 in connection with the business combination between FinServ and Katapult (the "Prospectus") failed to disclose critical information about the waterfall,

including that prime lenders could decide to extend credit to customers with lower credit ratings that Katapult had projected would be in its customer pool restricting the flow of customers to Katapult.

20.    As to Plaintiffs' Section 10(b) and 10b-5 claims, Plaintiffs alleged that between June 15, 2021 and August 9, 2021, both dates inclusive (the "Class Period"), Defendants made false and misleading statements about Katapult's then current beliefs about its near-term financial prospects, including statements that were misleading because of what Defendants knew was then happening with respect to Katapult's waterfall partnerships.

## III.    PROCEDURAL HISTORY

21.    This Action began on August 21, 2021, when Plaintiffs filed the initial complaint. ECF No. 1.  On May 26, 2022, the Court appointed Matis Nayman as Lead Plaintiff, and approved his selection of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as Lead Counsel.  ECF No. 40.

22.    Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things: (1) reviewing and analyzing (a) FinServ and Katapult's filings with the U.S. Securities and Exchange Commission ("SEC"), (b) public reports, press releases, blog posts, and news articles concerning FinServ and Katapult, (c) FinServ and Katapult investor call transcripts; and (2) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, contacting former Katapult employees and other sources of relevant information.

23.    Lead Counsel also consulted with a damages and loss causation expert.

24.    On November 10, 2022, Plaintiffs filed and served the 71-page operative Second Amended Complaint.  ECF No. 59.

25.     On January 9, 2023, Defendants filed motions to strike, or alternatively, dismiss, Plaintiffs' Second Amended Complaint.  ECF Nos. 65, 68.  Plaintiffs filed their oppositions to each of those motions on March 6, 2023 (ECF Nos. 77, 78) and on April 11, 2023, Defendants filed their replies.  ECF Nos. 79 and 80.

26.     On August 8, 2023, United States District Judge J. Paul Oetken of the United States District Court for the Southern District of New York denied Defendants' motion to strike and granted in part and denied in part Defendants' motion to dismiss, including dismissal of Plaintiffs 10(b) and 10b-5 claim, as well as the 20(a) claim based thereon, and defendants Cupito and Medlin against whom only dismissed claims were brought.

27.     On September 6, 2023, Defendants Lee Einbinder, Katapult Holdings, Inc., Howard Kurz, and Orlando Zayas filed their answer and affirmative defenses to the Amended Complaint, ECF No. 88.  Thereafter, discovery commenced.

28.     On September 25, 2023, the Parties held their Rule 26(f) conference, and on September 26, 2023, the parties' Civil Case Management Plan and Scheduling Order was entered by the Court.  ECF No. 90.  Lead Plaintiffs served interrogatories and multiple document requests on Defendants and received responses and objections from Defendants. Defendants also served multiple document requests on Plaintiffs and received responses and objections from Plaintiffs

## IV.     NEGOTIATION OF THE SETTLEMENT AND ITS TERMS

29.     On December 18, 2023, Lead Counsel and Defendants' Counsel participated in a full-day mediation session with Ms. Yoshida.  In advance of that session, the Parties exchanged, and provided to Ms. Yoshida, detailed mediation statements and exhibits, which addressed the issues of both liability and damages.

30.     The mediation was conducted on the same day as, and in coordination with, the mediation of a case in a related action, *In re FinServ Acquisition Corp. SPAC Litigation*, No. 2022-

0755-PAF ("Delaware Action"), pending in Delaware Chancery Court. The session ended without any final agreement being reached.

31.     Thereafter, Ms. Yoshida conducted further discussions with the Parties, which culminated in Ms. Yoshida making a mediator's recommendation to resolve the Action for total settlement consideration in this Action of $2,500,000 in total value (the "Settlement Consideration"), comprised of: (i) a cash component of $1,775,000 (the "Cash Component"); and (ii) an additional component worth $725,000 comprised of Katapult common stock (the "Settlement Shares") and/or cash (the "Additional Component").

32.     The Parties subsequently accepted Ms. Yoshida's recommendation. The agreement in principle to settle the Action that was memorialized in a term sheet (the "Term Sheet"), which was fully executed in May, 2024, following significant additional negotiations. The Term Sheet sets forth, *inter alia*, Plaintiffs' in this case's agreement to settle and release all claims asserted against Defendants in return for $1,775,000 of the Cash Component and $725,000 of the Additional Component, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement. Following extensive negotiations, on July 3, 2024, the Parties executed the Stipulation.

## V.     PRELIMINARY APPROVAL OF THE SETTLEMENT AND MAILING AND PUBLICATION OF NOTICE OF THE SETTLEMENT

33.     On July 3, 2024, Plaintiffs filed the Unopposed Motion for an Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement, along with Plaintiffs' supporting memorandum of law, and proposed notices to the Class Members. ECF No. 99.

34.     Plaintiffs requested that the Court approve the forms of notice, which, among other things, described the terms of the Settlement, advised Class Members of their rights in connection

9

with the Settlement, set forth the Plan of Allocation, informed Class Members of the amount of attorneys' fees and expenses that Lead Counsel and Plaintiffs would request, and explained the procedure and deadline for filing a Proof of Claim and Release form (the "Proof of Claim Form") in order to be eligible to receive a payment from the Net Settlement Fund.  In addition, Plaintiffs requested that the Court certify the Class for settlement purposes.

35.    By Order dated July 24, 2024, Magistrate Judge Parker preliminarily approved the Settlement and approved the forms of notice to the Class.  ECF No. 103.  The Court also appointed JND Legal Administration ("JND") as Claims Administrator and instructed JND to disseminate notice to the Class.  *See id*.  Based upon the trading information provided by claimants, JND is determining each claimant's eligibility to participate in the Settlement and calculating each claimant's respective "Recognized Claim" based on the Plan of Allocation.

36.    The Declaration of Luiggy Segura represents that the Claims Administrator has provided Notice to the Class in compliance with the Preliminary Approval Order.  Exhibit A attached hereto.

37.    As stated in the Segura Declaration, in addition to mailing a total of 12,733 Notice Packets to potential Settlement Class Members and nominees, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over *PR Newswire*.  *Id*. ¶¶ 9-10.

38.    JND also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.Katapult-FinServSecuritiesLitigation.com, to provide Class Members with information about the Action, as well as downloadable copies of the Notice, Claim Form and Stipulation.  *Id*. ¶ 11.

39.    Pursuant to the Preliminary Approval Order, the deadline for Class Members to submit objections to the Settlement, or the fee, expense and lead plaintiff reimbursement

application is November 22, 2024, and the deadline to request exclusion from the Class is also November 22, 2024, 21 days prior to the Settlement Hearing.  To date, Lead Counsel and JND have received no objections to the Settlement, fee and expense, or requested reimbursement of time to Plaintiffs, and no exclusions from the Class.  *Id*. ¶¶ 13-14.  Should any objections or additional requests for exclusion be received, Lead Counsel will address such in the reply papers.

## VI.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.    The Settlement Was Negotiated at Arm's-Length

40.    As set forth above, the terms of the Settlement were negotiated by the parties at arm's-length through adversarial good-faith negotiations.  Even after a settlement in principle was reached, the Settling Parties took several months to negotiate and agree to the terms of the Settlement.

41.    The settlement was also reached with the help of a well-known mediator, Michelle Yoshida, and was the product of a mediator's recommendation after many months of hard fought negotiations.

42.    Lead Counsel is experienced in prosecuting securities class actions and has successfully prosecuted hundreds of similar class actions in courts throughout the country.  *See* Ex. D attached hereto (Wolf Haldenstein firm resumes).  Lead Counsel leveraged its experience and resources to assess the merits and value of the case and negotiate the Settlement.

43.    Defendants are represented by experienced practitioners from the law firm of Cooley LLP, a capable and prominent law firm that is experienced in complex securities class action litigation.  Notwithstanding this opposition, Lead Counsel was able to develop a case that was sufficiently strong to persuade Defendants to settle it on terms that are favorable to the Class.

44. The Settlement avoids the hurdles Plaintiffs would have to clear in proving liability and damages if the Action continued, and avoids the significant costs and risks associated with further litigation and the very real risk of no recovery at all.

45. As a result of Lead Counsel's litigation efforts and the discussions during the Settling Parties' settlement negotiations, Lead Counsel was able to identify issues that were critical to the outcome of this case. Lead Counsel has considered the risks of continued litigation, the likelihood of obtaining class certification, the likelihood of defeating *Daubert* and summary judgment motions after completion of fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the Action through trial and the inevitable subsequent appeals, including the likelihood of Defendants prevailing if Plaintiffs appealed from those parts of the motion to dismiss that were decided against them.

**B.      Defendants Raised Arguments that Posed Risk to the Action**

46. At the time the Settlement was reached, Defendants' motion to dismiss the Amended Complaint had been denied. Although Plaintiffs believe that the claims asserted in the Amended Complaint are meritorious, they had lost their Rule 10b-5 claims and related claims on the motion to dismiss and proceeding with the litigation posed additional risks.

47. Defendants argued, and would continue to argue, that their challenged statements were not materially false and misleading when made because, *inter alia*: (i) evidence concerning the risks associated with Katapult's waterfall arrangement with other lenders was a matter of public record; and (ii) many of Defendants' alleged misstatements were forward-looking and, thus, protected by the PSLRA's safe harbor.

48. Defendants also argued and would continue to argue that even if Plaintiffs could establish a material misstatement or omission, there was no evidence upon which Plaintiffs could prove the requisite mental state of scienter – i.e., that Defendants misled investors intentionally or

with extreme recklessness.  Lead Counsel believe they could have prevailed on all these issues, but every motion in litigation is uncertain, and the risks to Plaintiffs were real.

49.    Defendants' arguments at class certification and summary judgment would have been just as hard-fought and extensive as their motion to dismiss was.  Plaintiffs had no guarantee of success.

50.    The risks of establishing liability and damages at trial were also significant. Plaintiffs could not predict what evidence would be gleaned through discovery and would face the unpredictability of a lengthy and complex trial, the risk that the jury would react to evidence in unforeseen ways, and the risk that the jury would find that the challenged statements were not materially false or misleading and that no damages were caused by Defendants' actions. Accordingly, Plaintiffs faced the risk that the Defendants' arguments would find favor with a jury and result in the Class losing at trial and receiving no recovery.

**C.    The Judgement of the Parties and Reaction of the Class Provide Additional Support for Approval of the Settlement**

51.    As set forth above, the Settlement is the product of substantial arm's-length negotiations between opposing counsel with significant experience in securities class action litigation and with significant assistance from a well-known mediator.  In sum, Lead Counsel believes that the Settlement represents a favorable resolution for the Class under the circumstances.

52.    As noted, 12,733 Individual Notices have been mailed to potential Class Members and nominees.  *See* Exhibit A (Segura Decl.) ¶ 9.  As of the date of this Declaration, Lead Counsel and JND have received no objections to the Settlement, the Plan of Allocation, or the fee, expense and lead plaintiff reimbursement requests.  There have also been no exclusions.  *See id.*

D.      **The Settlement is an Excellent Result Considering the Risks of Continued Litigation**

53.      The Settlement is a fair and reasonable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through class certification, summary judgment, to trial, and through likely post-trial motions and appeals.

54.      Plaintiffs' maximum estimated damages here are $41 million.  However, this optimistic figure does not account for the numerous arguments Defendants made and likely would have continued to make to reduce damages, including, but not limited to, that (1) there was no fraud here and thus no damages; (2) the market was aware of the truth about the waterfall arrangements; and (3) that the alleged misstatements and omissions caused recoverable damages.

55.      Lead Counsel does not agree with any of these arguments.  Nevertheless, if Defendants were successful in making any one of them, damages could be reduced to $0 in the worst-case scenario or, based on expert analysis, be reduced well below $41 million.  The $2.5 million Settlement comprises 5.22% of the $41 million figure.  The 5.22% percentage recovery here is above the percentage of damages recovered in many other securities class action settlements, including in courts in this District and Circuit.

56.      The amount and percentages of the Settlement are reasonable in light of the median settlement amount and percentage recovered as reported by Cornerstone reported that the median settlement in a securities class action from 2018 to 2022 had a 4.7 % recovery rate damages in cases analogous to this one, *i.e.*, where a motion to dismiss has been decided, but a class certification motion has not yet been filed.  *See* Exhibit E attached hereto at 14 (Laarni T. Bulan and Laura E. Simons, *Securities Class Action Settlements – 2022 Review and Analysis*, Cornerstone Research).  Here, the $2,500,000 Settlement comprises approximately 5.22% of the approximately $41 million in maximum damages potentially available in this case.  Moreover, $41

million was Plaintiff's best-case scenario for damages. Thus, the Settlement is an excellent result. For these reasons and those discussed below, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

57.     Accordingly, the Settlement is a favorable and good result for the Class.

## VII.    THE PLAN OF ALLOCATION

58.     Pursuant to the Notice Order and as set forth in the Individual Notice, Summary Notice, and Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a timely and proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, and attorneys' fees and expenses (as well as reimbursement of Plaintiffs' time), the remainder of the Settlement Fund (the "Net Settlement Fund") shall be distributed among Class Members who submit valid Proof of Claim forms according to the Plan of Allocation.

59.     If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed. The proposed Plan of Allocation provides that, to qualify for payment, a claimant must be, among other things, an eligible Member of the Class and must submit a valid Proof of Claim form that provides all of the requested information. The Settlement Fund will be distributed on a *pro rata* basis depending on the Class Member's recognized losses. The Plan of Allocation is set forth in the Notice.

60.     The proposed Plan of Allocation was formulated after consultation with Lead Counsel's damages consultant in order to calculate an equitable method to divide the Net Settlement Fund for distribution among Class Members who submit valid claims. The proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Class.

61.     For 10(b) damages, the Plan of Allocation recognizes differences in damages incurred by those who bought and, if applicable, sold their shares at different prices and times during the Class Period, reflecting the different damages due to the purchase and sale prices that they paid and the amount of alleged artificial inflation in Katapult at the time of their purchases. For 14(a) damages, the Plan of Allocation turns on whether Class members held FinServ shares that made them eligible to vote at FinServ's June 7, 2021 special meeting and subsequently exchanged these shares for Katapult common stock.  The Settlement Fund will be distributed on a *pro rata* basis depending on the Class Member's recognized losses.

## VIII.  LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES IS FAIR AND REASONABLE

62.     Lead Counsel have not received any payment for their services in prosecuting this litigation to date, nor have they been paid for expenses incurred in the prosecution of this Action. The Notice provides that Lead Counsel may apply for an award of attorneys' fees not to exceed 33 1/3% of the Settlement Fund, plus expenses of up to $60,000.

63.     As set forth in the Fee Brief, Lead Counsel is requesting attorneys' fees of 33 1/3% of the Settlement Fund, plus expenses.  The requested fee was approved by Plaintiffs in their retainers.  *See* Nayman Decl. (attached as Exhibit C hereto); Castro de Luna (attached as Exhibit B hereto).  The requested fee is also well within the range of fees awarded by courts in this Circuit and courts throughout the country in cases of this size and at this procedural stage.

64.     Lead Counsel achieved this Settlement at significant risk and expense.  Lead Counsel undertook this litigation on a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute a risky action with no guarantee of compensation for the substantial investment of time and money the case would require, or even the recovery of expenses.  The

16

requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the Class.

65.     The requested fee is also warranted in light of the result obtained for the Class and the obstacles that existed to obtaining any recovery.  Defendants have maintained throughout the litigation that they had no liability.  If the case survived Defendants' motion to dismiss, of which there was no guarantee, it would have proceeded to discovery, class certification, *Daubert* motions, summary judgment and possibly trial, each posing further risks and protracted litigation.

**A.     The Fee Request is Justified Under the Percentage of Recovery Method**

66.     For Lead Counsel's efforts on behalf of the Class, it is applying for compensation from the Settlement Fund on a percentage basis.  The percentage method is an appropriate method of compensating counsel because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  In addition, the percentage method is particularly appropriate here, given the favorable result that Lead Counsel achieved.

67.     A lodestar crosscheck confirms the reasonableness of Lead Counsel's fee request, Lead Counsel is applying for attorneys' fees on behalf of all Plaintiffs' Counsel.  Plaintiffs' Counsel's compensation for the services rendered was wholly contingent on success.  Lead Counsel staffed the matter efficiently and avoided any unnecessary duplication of effort.

68.     Plaintiffs' Counsel dedicated nearly 1100 hours to prosecuting this Action resulting in a lodestar of $814,237.50 as follows:

**McIntosh v. Katapult Holdings, Inc. et. al**
Case No. 1:21-cv-07251-KHP (S.D.N.Y.)

**Attorney Time**

| Name | Hours | Rate | Lodestar |
|------|-------|------|----------|

17

| Name | Hours | Rate | Lodestar |
|------|-------|------|----------|
| Matthew M. Guiney | 737.5 | $850.00 | $626,875.00 |
| Patrick Donovan | 18.3 | $510.00 | $9,333.00 |
| Kate M. McGuire | 227.1 | $615.00 | $139,666.50 |
| Lillian R. Grinnell | 6.7 | $395.00 | $2,646.50 |
| Rourke C. Donahue | 30.0 | $350.00 | $10,500.00 |
| **Attorney Total** | **1019.6** | | **$789,021.00** |

**Paraprofessional Time**

| Name | Hours | Rate | Lodestar |
|------|-------|------|----------|
| Jim Cirigliano | 50.7 | $375.00 | $19,012.50 |
| Solina Tahiri | 0.3 | $215.00 | $64.50 |
| Judah Weinerman | 0.7 | $210.00 | $147.00 |
| Patrick Horan | 25.5 | $235.00 | $5,992.50 |
| **Paraprofessional Total** | **77.2** | | **$25,216.50** |

| | | | |
|------|-------|------|----------|
| **GRAND TOTAL TIME** | **1096.8** | | **$814,237.50** |

69.    Lead Counsel's 33 1/3% fee request represents a nearly perfect 1.02 multiplier of the total lodestar, well within – and in fact at the lower end – of the range of multipliers awarded by courts in this District and in courts throughout the country.  The lodestar does not include any additional time that Lead Counsel will devote to finalizing the Settlement over the coming months.

70.    Lead Counsel's expenses incurred in prosecuting this Action are set forth below. Lead Counsel's expenses are reflected in the books and records maintained by the firm, and are an accurate recordation of the expenses incurred.  In total, Lead Counsel incurred expenses in the amount of $44,131.99 to successfully prosecute the Action.

71.    Lead Counsel incurred expenses on, among other things, an investigator to identify and interview witnesses in connection with drafting the Amended Complaint, electronic legal research fees relating to Plaintiffs' detailed opposition to Defendants' motion to dismiss, a

18

damages consultant to calculate damages and develop the Plan of Allocation, mediation fees, and filing fees, all of which are properly recoverable.

**Expenses**

| | |
|---|---|
| Online Research | $4,964.16 |
| Reproduction/ Duplication | $189.40 |
| Overnight Delivery/Messenger | $137.52 |
| Travel | $41.71 |
| Prof. Services - OnPoint Investigations | $15,803.20 |
| Prof. Services - Bernstein Litowitz - ADR med. | $5,625.00 |
| Prof. Services - Stanford Conslting | $10,221.00 |
| Prof. Services -Strategic Claims | $7,150.00 |
| **TOTAL EXPENSES** | **$44,131.99** |

72.     There have been no objections to Lead Counsel's expense request – which is well below the $60,000 limit provided in the notice.

73.     Lead Counsel respectfully submits that its fees and expenses are reasonable and should be approved by the Court.

**B.     Standing and Expertise of Counsel**

74.     The expertise and experience of Lead Counsel is described in Exhibit D attached hereto.  Lead Counsel are experienced securities class action litigators and have years of experience litigating these types of cases, having served as lead or co-lead in some of the largest securities litigations in recent history and recovering billions of dollars for shareholders.

75.     Defendants are represented by very experienced counsel – the law firm of Cooley LLP – who spared no effort in the defense of their clients.  Defendants' counsel vigorously defended their clients, insisted they had no liability, and gave every indication that they were prepared to proceed with the litigation to trial, if necessary, if a settlement was not reached.  In the

face of this opposition, Lead Counsel developed its case so as to persuade Defendants to settle the case on a basis favorable to the Class under the circumstances.

     **C.**     **The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases**

76.     This litigation was undertaken by Lead Counsel on a wholly contingent basis.  From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking this responsibility, Lead Counsel was obligated to ensure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of this Action and that funds were available to compensate staff and the considerable costs which a case such as this requires.

77.     Because of the nature of a securities litigation contingent practice, where cases are predominantly large and last several years, contingent litigation firms have to pay regular overhead, in addition to advancing the expenses of the litigation, all while no recovery is assured. This Action is no different.  From the outset, this Action presented a number of risks and challenges that could have prevented the Class from obtaining any recovery at all.  Further, law firms handling complex contingent litigation do not always win. Tens of thousands of hours have been expended on losing efforts.

78.     Lead Counsel has not been compensated for any time or expenses since it started litigating the case.  Lead Counsel would have received no compensation or payment of its expenses had Lead Counsel not resolved the case successfully.  Nevertheless, Lead Counsel ensured from the outset that sufficient resources were dedicated to the Action and that funds were available to compensate staff and cover any necessary expenses.  With an average time of several years for a case like this to conclude, the financial burden on Lead Counsel was greater than on defense firms

that are paid on an ongoing basis.  In addition to advancing all costs and litigation expenses, Lead Counsel faced the possibility that they would receive no attorneys' fees at all.  In light of the difficulty of undertaking such a lawsuit, Lead Counsel should be reimbursed for its time and expenses.  Indeed, Defendants mounted a strong defense and there were many significant obstacles to obtaining a larger recovery than the $2.5 million Settlement if Plaintiffs kept litigating.

**IX.  LEAD PLAINTIFF'S REQUEST FOR REIMBURSEMENT FOR THE TIME IT SPENT LITIGATING THIS CASE AND ACHIEVING THE SETTLEMENT SHOULD BE APPROVED**

79.     Pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4), Plaintiffs are seeking reimbursement related directly to their representation of the Class, including time reviewing pleadings and court filings, communicating with Lead Counsel, and participating in settlement discussions.  Such payments are expressly authorized by the PSLRA.

80.     As set forth in the accompanying Declaration of Matis Nayman (Exhibit C attached hereto), Lead Plaintiff Nayman seeks a modest reimbursement of $8,000 for the time he dedicated to the Action.  This request is reasonable and justified, and similar reimbursements are routinely made to lead plaintiffs in these types of cases.

81.     As set forth in the accompanying Declaration of Felipe de Castro Luna (Exhibit B attached hereto), Plaintiff De Castro Luna seeks a modest reimbursement of $2,000 for the time he dedicated to the Action.  This request is reasonable and justified, and similar reimbursements are routinely made to lead plaintiffs in these types of cases.

82.     The Individual Notice, Summary Notice and Notice each informed potential Class Members that Lead Counsel would be seeking payment of expenses in an amount not to exceed $60,000, and reimbursement to the Plaintiffs directly related to representation of the Class in an amount not to exceed $10,000, as authorized by the PSLRA.  The aggregate amounts requested are at or below the estimates given to the Class in the notices.

83.     As of the date of this Declaration, there have been no objections to either the requested attorney fees, the requested reimbursement of expenses, or the requested reimbursement to Plaintiffs.

## X.    CONCLUSION

84.     In view of the recovery to the Class, the substantial risks of this litigation, the substantial efforts of Lead Counsel, the quality of the work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, Plaintiffs and Lead Counsel respectfully submits that: (a) the Settlement is fair, reasonable and adequate, and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should be approved; (c) the application for attorneys' fees of 33 1/3% of the Settlement Fund, plus interest, and litigation expenses in the amount of $44,131.99 should be approved; (d) the Class should be finally approved for purposes of the Settlement; and (e) Plaintiffs should be awarded $10,000, pursuant to the PSLRA.

## XI.    TABLE OF EXHIBITS

85.     The following documents are true and correct copies:

| Exhibits to Guiney Decl. | Title |
|---|---|
| A | Mailing affidavit of JND |
| B | Castro Luna Client Declaration |
| C | Nayman Client Declaration |
| D | Wolf Haldenstein Adler Freeman & Herz LLP Firm Resume |
| E | Securities Class Action Settlements – 2022 Review and Analysis, Cornerstone Research |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2024.

By: */s/ Matthew M. Guiney*

MATTHEW M. GUINEY