UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

GINA MCINTOSH, *individually and on behalf of all
others similarly situated*,

                                        Plaintiff,

                    -against-

KATAPULT HOLDINGS, INC., LEE EINBINDER,
HOWARD KURZ, ORLANDO ZAYAS, KARISSA
CUPITO, AND DEREK MEDLIN,

                                        Defendants.
---------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:  12/17/2024 |

**21-CV-07251 (AS) (KHP)**

<u>**OPINION APPROVING
SETTLEMENT, PLAN OF
ALLOCATION, CLASS
CERTIFICATION, AND
ATTORNEYS' FEES AND COSTS**</u>

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

        This is a pending class action seeking relief under Sections 10(b), 14(a), and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities, other

than Defendants, that: (1) purchased or otherwise acquired Katapult Holdings, Inc. ("Katapult")

securities between June 15, 2021 and August 9, 2021, both dates inclusive, and/or (2)

beneficially owned and/or held FinServ Acquisition Corp. ("FinServ") common stock as of

FinServ's stockholders of record at the close of business on May 11, 2021 and were eligible to

vote at FinServ's June 7, 2021 special meeting.  (*See* SAC, ECF No. 59)  On July 24, 2024, the

undersigned granted Lead Plaintiff's, Matis Nayman's, unopposed motion for preliminary

approval of the proposed settlement.  (*See* Order, ECF No. 103)  On November 8, 2024, Lead

Plaintiff and an additional Plaintiff, Felipe de Castro Luna, filed the instant motion for final

approval of the proposed class action settlement, plan of allocation, and certification of a

settlement class.  (*See* Mot. for Final Settlement Approval ("Final Approval"), ECF No. 106)  On

November 8, 2024, Lead Plaintiff and the additional Plaintiff also filed the instant motion for an award of attorneys' fees, reimbursement of litigation expenses, and awards to Plaintiffs. (ECF No. 108) For the reasons stated below, the Motions for Final Settlement Approval, Attorneys' Fees, and related relief are GRANTED.

## BACKGROUND

Lead Plaintiff brought this class action on behalf of all persons or entities, other than Defendants, that: (1) purchased or otherwise acquired Katapult securities between June 15, 2021 and August 9, 2021, both dates inclusive, (the "Class Period") and/or (2) beneficially owned and/or held FinServ common stock as of FinServ's stockholders of record at the close of business on May 11, 2021 (the "Record Date") and were eligible to vote at FinServ's June 7, 2021 special meeting (collectively, the "Class"), against Katapult, as well as Defendants Lee Einbinder ("Einbinder"), Howard Kurz ("Kurz"), Orlando Zayas ("Zayas"), Karissa Cupito ("Cupito"), and Derek Medlin ("Medlin") (collectively, "Individual Defendants") for alleged violations of the Exchange Act. (*See* SAC, ECF No. 59)

Katapult is the product of the merger of an earlier Katapult entity ("legacy Katapult") and FinServ. (*Id.* at ¶¶ 60-80) The Individual Defendants were senior executive officers of Katapult or FinServ during the Class Period. (*Id.* at ¶¶ 30-36) Einbinder was the Chief Executive Officer ("CEO") of FinServ prior to the merger, and a member of Katapult's board of directors after the merger. (*Id.* at ¶ 34) Kurz was the Chief Financial Officer ("CFO") of FinServ prior to the merger. (*Id.* at ¶ 35) Zayas was the CEO of legacy Katapult prior to the merger, and the CEO of Katapult after the merger. (*Id.* at ¶ 30) Cupito was the CFO of legacy Katapult prior to

2

the merger, and the CFO of Katapult after the merger.  (*Id.* at ¶ 31)  Medlin was the Chief

Operating Officer ("COO") of legacy Katapult and the COO of Katapult after the merger.  (*Id.* at

¶ 32)  The Individual Defendants are alleged to have possessed the power and authority to

control the contents of Katapult's SEC filings, press releases, and other market communications,

some of which Plaintiffs claim contained material misrepresentations in violation of federal

securities law that form the basis for this action.  (*Id.* at ¶ 38)

   I.   Factual Background

     Katapult provides point-of-sale lease-purchase options for non-prime consumers (*i.e.*,

consumers with credit scores that are higher than those of subprime borrowers, but lower than

those of prime borrowers) who cannot access traditional financing products.  (*Id.* at ¶ 3)

FinServ was a blank check/special purpose acquisition company formed for the purpose of

effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or

similar business combination with one or more businesses.  (*Id.* at ¶ 6)

     On December 18, 2020, FinServ announced that it had entered into a merger agreement

with legacy Katapult whereby the combined company would operate as Katapult and its shares

would trade on NASDAQ under the new symbol "KPLT."  (*Id.* at ¶ 7)  On May 18, 2021, FinServ

filed its Proxy Statement and Prospectus soliciting approval for the merger.  (*Id.* at ¶ 14)  On

June 9, 2021, Katapult announced that it had completed the merger.  (*Id.* at ¶ 9)  On June 10,

2021, Katapult announced that its shares and warrants would begin trading on the NASDAQ

under the symbols "KPLT" and "KPLTW," respectively.  (*Id.*)

Prior to the merger, Katapult issued a preliminary registration statement projecting originations for 2021 fiscal year would be $402 million and revenue would be $455 million. (*Id.* at ¶ 61) It reiterated similar projections in April. (*Id.* at ¶ 69) On June 15, 2021, just two weeks before the second quarter of 2021 ended, Defendants issued a press release announcing its first quarter results and stating that its anticipated 2021 originations would fall in the range of $375-$425 million and revenue in the range of $425-$475 million—the same ranges announced in April. (*Id.* at ¶ 10)

On August 10, 2021, Katapult issued a press release announcing financial results for the second quarter of 2021, including a net loss of $8.1 million, compared to $5.1 million in net income for the second quarter of 2020. (*Id.* at ¶ 11) Katapult further disclosed that it "observed meaningful [negative] changes in both e-commerce retail sales forecasts and consumer spending behavior" and retracted its full year 2021 guidance, claiming it could not "accurately predict our consumer's buying behaviors for the remainder of the year." (*Id.*) During the conference call associated with the financial results, Defendants also revealed that "with historically high savings rate and low delinquency rates some consumers buoyed by stimulus and a recovering jobs market, we are observing prime providers stretching further down the credit spectrum to capture consumer transactions and our highest score bands, which is negatively impacting our volume." (*Id.* at ¶ 12) On this news, Katapult's share price opened down 40% and ultimately fell $5.47 per share, or more than 56%, to close at $4.26 per share on August 10, 2021, on unusually heavy trading volume. (*Id.* at ¶ 13)

Plaintiffs have alleged that beginning with its announcement of the business combination and throughout the Class Period, Katapult misrepresented and omitted to state two critical facts about its business: (i) first, the Proxy Statement/Prospectus filed on May 18, 2021 in connection with the business combination between FinServ and Katapult (the "Prospectus") failed to disclose the most critical risk factor and known trend that Katapult faced — namely, the fact that prime lenders who competed directly with Katapult for customer financing could and would, based on credit market conditions, simply extend credit further down the credit spectrum rather than passing those less desirable customers to Katapult, eating into Katapult' s target market customers; and (ii) second, the fact that the Company reiterated that it would achieve its full year 2021 financial guidance on June 15, 2021 notwithstanding existing year-to-date negative financial information undermining that rosy projection.  (*Id.* at ¶ 14)  Further, Plaintiffs have alleged the Prospectus disclosed nothing about the following: (i) Katapult's "waterfall" system of payments whereby Katapult only gets access to customers who have been passed over by lenders above Katapult in the credit lending chain; (ii) how prime lenders could open up their lending spectrum and directly cannibalize Katapult's target client base; (iii) that the cyclical nature of the business cycle would directly affect Katapult's bottom line; and (iv) how lending and credit would have a dynamic effect on Katapult's business model.  (*Id.* at ¶ 17)

Plaintiffs have alleged that in reaffirming annual guidance on June 15, 2021, just two weeks prior to the close of the financial quarter, Defendants misled investors.  (*Id.* at ¶ 19)  As a

result, Plaintiffs have alleged that they and other Class members have suffered significant losses and damages.  (*Id.* at ¶ 21)

II.    Procedural Background

This action was filed on August 27, 2021.  ("Compl." ECF No. 1)  On May 26, 2022, the Honorable J. Paul Oetken granted Plaintiff's motion to appoint Matis Nayman as Lead Plaintiff and approve Wolf Haldenstein Adler Freeman & Herz LLP as lead counsel.  (ECF No. 40) Thereafter, Plaintiff twice amended the complaint, after which Defendants filed a motion to dismiss.  (ECF No. 59, Second Amended Complaint)  On August 8, 2023, Judge Oetken granted in part and denied in part Defendants' motion to dismiss the second amended class action complaint, dismissing Plaintiffs Section 10(b) and Rule 10b-5 claim, as well as the Section 20(a) claim based thereon, and defendants Cupito and Medlin against whom only dismissed claims were brought.  (ECF No. 84)  Thus, only the Section 14(a) claim remained.  Thereafter, the parties exchanged some information and engaged in private mediation before experienced mediator Michelle Yoshida.  The parties ultimately agreed to settlement terms, accepting a mediator's proposal.  The settlement was reached prior to class certification briefing and contemplates approval of a settlement class.

On June 25, 2024, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to conduct all proceedings and entry of a final judgment to the undersigned.  (ECF No. 97)  They then presented the Court with their proposed class settlement on July 3, 2024, which this Court preliminarily approved on July 24, 2024 and set a date for a final fairness hearing and approval of the settlement for December 13, 2024.  (ECF No. 103)

Plaintiffs then sent class notices out to more than 12,000 potential investors and advertised the settlement in various ways. No potential class member has objected to the proposed settlement, nor opted out of it.

Plaintiffs now seek final approval of the proposed class action settlement and plan of allocation, certification of the settlement class and an award of attorneys' fees and costs and service awards for the Lead Plaintiff and additional plaintiff, Felipe de Castro Luna, who also assisted in prosecuting this matter. (ECF Nos. 106-111)

III.    Settlement Agreement

The proposed Settlement Agreement defines the "Settlement Class" as:

all persons and entities that (a) purchased or otherwise acquired Katapult securities (common stock and warrants) between June 15, 2021 and August 9, 2021, both dates inclusive (the "Settlement Class Period"), and/or (b) beneficially owned and/or held common stock of FinServ as of May 11, 2021 and were eligible to vote at FinServ's June 7, 2021 special meeting. Excluded from the Settlement Class are: (i) Katapult, Orlando Zayas, Karissa Cupito, Derek Medlin, Lee Einbinder, Howard Kurz, Robert Matza, Diane B. Glossman, Aris Kekedjian, and FinServ Holdings LLC ("FinServ Holdings"); (ii) any person who was an officer or director of FinServ or FinServ Holdings between November 5, 2019 and June 9, 2021; (iii) any person who was an officer or director of Katapult between May 18, 2021 and August 10, 2021; (iv) the immediate family members, meaning the parents, spouse, siblings, or children, of any of the foregoing persons; (v) any trusts, estates, entities, or accounts that held FinServ or Katapult shares for the benefit of the foregoing persons or entities; (vi) the legal representatives, heirs, successors-in-interest, successors, transferees, and assigns of the foregoing persons or entities. Also excluded from the Settlement Class will be any Person who timely and validly seeks exclusion from the Settlement Class.

(ECF No. 110-1 at ¶ 1) Members of the Settlement Class will be entitled to a share of the Settlement Amount, that is $2.5 million cash payment by Defendants. (ECF No. 110 at ¶ 4) The settlement consideration is comprised of: (i) a cash component of $1,775,000; and

(ii) an additional component worth $725,000 comprised of Katapult common stock and/or cash. (*Id.* at ¶ 31)  The plan of allocation, developed with the help of a damages expert, allocates settlement monies depending on when investors bought and sold Katapult common stock or warrants during the Class Period and/or whether they held FinServ shares that made them eligible to vote at FinServ's June 7, 2021 special meeting and subsequently exchanged these shares for Katapult common stock. (*Id.* at ¶ 9)  The plan of allocation divides the Class Members into two groups for the purpose of payment distribution – (1) those with claims under Section 10(b) arising from their purchase or acquisition of Katapult securities between June 15, 2021 and August 9, 2021, both dates inclusive, and (2) those with claims under Section 14 arising from their beneficial ownership or holding of FinServ common stock as of FinServ's stockholders of record at the close of business on May 11, 2021 and that were eligible to vote at FinServ's June 7, 2021 special meeting.  For purposes of the allocation of the settlement, the Section 10(b) claims relating to shareholders of Katapult are weighted at 50% of the Section 14(a) claims given that those claims were dismissed and could only be revived upon a successful appeal of Judge Oetken's decision dismissing them.  The plan of allocation provides for a pro rata distribution of the net settlement proceeds, taking into account the weighing mentioned above.

Lead Counsel requests that the Court approve the proposed award of attorneys' fees is in the amount of 33 1/3% of the Settlement, or $833,333.33, plus litigation expenses of $44,131.99. (*Id.* at ¶ 10)  Further, Lead Counsel requests that the Court

approve a reimbursement of $8,000 to Court-appointed Lead Plaintiff, Matis Nayman, who spent 100 hours representing the Class and achieving the proposed Settlement. (*Id.* at ¶ 12) Lead Counsel also requests that the Court approve a reimbursement of $2,000 to Court-appointed Plaintiff Felipe de Castro Luna who spent 10 hours representing the Class and achieving the proposed Settlement. (*Id.* at ¶ 13)

Pursuant to the July 24, 2024 Preliminary Approval Order (ECF No. 103), 12,733 copies of the Individual Notice were mailed or disseminated to potential Class Members and nominees. (*Id.* at ¶ 14) Over 12,000 mailings were sent. The notices apprised Class Members of their right to object to the Settlement, the Plan of Allocation, Lead Counsel's application for attorneys' fees of up to 33 1/3% of the settlement fund, plus expenses of up to $60,000, as well as the proposed $10,000 reimbursement to Plaintiffs. (*Id.* at ¶ 15) As of the date of the fairness hearing, more than 250 claims had been submitted to the claims administrator.

## LEGAL STANDARD

In the Second Circuit, "[t]here is a strong judicial policy in favor of settlements, particularly in the class action context." *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 330 (E.D.N.Y. 2010) (quoting *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks omitted)). "[C]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *Id.* Rule 23(e) provides that "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's

approval." Fed. R. Civ. P. 23(e).  Court approval of a class action settlement must be premised

on a hearing and subsequent finding that the settlement is "fair, reasonable, and adequate"

and not the product of collusion or some other malfeasance.  *See* F.R.C.P. 23(e)(3); *see also*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citing *Joel A. v.*

*Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)).

Before approving a class action settlement, the district court must conclude that the

proposed class meets the requirements for class certification set forth in Rule 23(a) and the

relevant subsection of Rule 23(b).  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir.

2012).  When considering a request for certification of a settlement class, the Court does not

need to inquire whether the case, if tried, would ". . . present intractable management problems,

for the proposal is that there be no trial."  *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 620 (1997)).  "At the same time, however . . . other specifications of [Rule 23]—those

designed to protect absentees by blocking unwarranted or overbroad class definitions—demand

undiluted, even heightened, attention."  *Id.* (quoting *Amchem*, 521 U.S. at 620) (internal

quotation marks omitted).  "Thus, in the context of settlement, Rules 23(a) and (b) continue to

serve the purpose of 'focus[ing] court attention on whether a proposed class has sufficient unity

so that absent members can fairly be bound by decisions of class representatives."  *Id.*

The determination of whether the class should be certified and the terms of the proposed

settlement are "fair, reasonable, and adequate" rests in the discretion of the district court.

*Denney v. Deutsche Bank AG,* 443 F.3d 253, 273 (2d Cir. 2006); *see* Fed. R. Civ. P. 23(e)(2).  In

exercising its discretion, the district court must engage in careful balancing but "must stop short

of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). As such, "[i]t cannot be overemphasized that neither the trial court in approving the settlement nor [the Circuit Court] in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." *Grinnell*, 495 F.2d at 456. "Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)." *In re Am. Int'l Grp., Inc. Sec. Litig.,* 689 F.3d 243-44 (2d Cir. 2012).

Courts tasked with approving a settlement then consider its procedural and substantive fairness, determining whether the terms of the settlement and the negotiation process leading up to it are fair. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (citing *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (internal quotation marks omitted)). When a settlement is the product of "arms-length negotiations between experienced, capable counsel after meaningful discovery," it is afforded a "presumption of fairness, adequacy, and reasonableness." *Wal-Mart,* 396 F.3d at 116. Additionally, when considering the benefits achieved by a settlement, courts must keep in mind that "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

## DISCUSSION

I.    Class Certification

After a careful review of the briefing and settlement, the Court finds that the prerequisites for certification of the proposed settlement class are satisfied.

a.    Rule 23(a)

Rule 23(a) imposes four threshold requirements for certification of a class action: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").  Fed. R. Civ. P. 23(a).

With regard to the first requirement, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  "The movant need not provide a precise quantification of their class, since a court may make common sense assumptions to support a finding of numerosity . . . [n]evertheless, the movant must show some evidence of or reasonably estimate the number of class members."  *Kalkstein v. Collecto, Inc.*, 304 F.R.D. 114, 119 (E.D.N.Y. 2015) (internal quotation marks and citation omitted).  Here, the Settlement Class is comprised of all persons and entities that (a) purchased or otherwise acquired Katapult securities (common stock and warrants) between June 15, 2021 and August 9, 2021,

both dates inclusive (the "Settlement Class Period"), and/or (b) beneficially owned and/or held common stock of FinServ as of May 11, 2021 and were eligible to vote at FinServ's June 7, 2021 special meeting.  (ECF No. 110-1 at ¶ 1)  The parties estimate the potential class to be comprised of thousands of investors, and as of the December 13, 2024 fairness hearing, more than 250 claims had been submitted.  Therefore, numerosity is satisfied.  *See In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997) (quoting *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1401 (D. Conn. 1988) ("In securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period").

Additionally, the commonality and typicality requirements are met here.  The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites.  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 n.5 (2011); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).  A class may only be certified if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality demands that the class's claims "depend upon a common contention . . . capable of classwide resolution" such that "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011).  "'[F]actual differences in the claims of the class do not preclude a finding of commonality.'"  *Newman v. RCN Telecom Servs., Inc.,* 238 F.R.D. 57, 73 (S.D.N.Y. 2006) (quoting 5 *Moore's Federal Practice* § 23.23).  Commonality may be found were the plaintiffs' alleged injuries "derive from a unitary course of conduct by a single system."  *Marisol*

*A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Similarly, with the typicality requirement, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of [those] of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.,* 126 F.3d at 376. "[M]inor variations in the fact patterns underlying [the] individual claims" do not preclude a finding of typicality. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, the common questions of law and fact in this case all relate to whether Defendants engaged in a common scheme to defraud their investors who relied on certain alleged misrepresentations and omissions when buying and selling Katapult stock—the proposed Settlement Class. Thus, all of the members of the proposed class are alleged to have suffered the same harm based on the same acts and omissions of Defendants, and the Lead and additional plaintiff are relying on the same conduct and suffered the same harm as the other settlement class members. Accordingly, the commonality and typicality requirements of Rule 23(a) are met. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409-10 (S.D.N.Y. 2015); *see Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 233 (E.D.N.Y. 2014).

In order to meet the final requirement, adequate representation of the class's interests, Plaintiffs must demonstrate that: (1) the class representatives do not have conflicting interests with other class members; and (2) class counsel is qualified, experienced and generally able to conduct the litigation. *Marisol A.*, 126 F.3d at 378. To satisfy the first prong, courts in this Circuit have required plaintiffs to show that "no fundamental conflicts exist" between the class'

14

representatives and its members.  *See Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013)

(citing *In re Literary Works*, 654 F.3d at 249).  Here, Plaintiffs and the other Settlement Class

members do not have conflicting interests as they were all injured by the same alleged acts and

omissions.  (ECF No. 59 at ¶ 21)  Moreover, Plaintiffs have demonstrated their commitment to

this litigation by retaining qualified and experienced counsel and spending time litigating this

case and participating in settlement negotiations.  Both Lead Plaintiff and additional Plaintiff

have submitted affidavits describing the work they performed on this matter and time spent.

(*See* Lead Counsel's Firm Resume, ECF No. 19-4).  Thus, the Court finds that Lead Plaintiff and

additional Plaintiff are adequate representatives.   Lead Counsel too is experienced in

prosecuting securities class actions in Federal Court and throughout the country and have

vigorously litigated this action against qualified defense counsel, reaching a favorable

settlement for the class.  (*Id.*)  Thus, the Court finds that Lead Counsel satisfies Rule 23(a)

adequacy requirements.

      b.   Rule 23(b)(3)

In addition to satisfying the Rule 23(a) requirements, certification must be appropriate

under Rule 23(b).  *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2021 WL 234550, at *20

(E.D.N.Y. Jan. 19, 2021) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  "Certification

under Rule 23(b)(3) requires both that (1) questions of law or fact common to class members

predominate over any questions affecting only individual members, [predominance] and that (2)

a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy [superiority]. *B & R Supermarket, Inc.*, 2021 WL 234550, at *20 (citing Fed. R. Civ. P. 23(b)(3)) (internal quotation marks omitted).

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Tesla, Inc.*, 2021 WL 3160795, at *10 (E.D.N.Y. July 26, 2021) (citing *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Wang,* 2021 WL 3160795, at *10 (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)) (internal quotation marks omitted). Plaintiffs need not prove, however, that the legal or factual issues that predominate will be answered in their favor. *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013). With regard to the second prong, to satisfy the superiority requirement, the moving party must show that "the class action presents economies of 'time, effort and expense, and promote[s] uniformity of decision.'" *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 130 (2d Cir. 2013). The superiority requirement is designed to avoid "repetitious litigation and possibility of inconsistent adjudications." *B & R Supermarket, Inc.,* 2021 WL 234550, at *33 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)).

Here, as already discussed, the Plaintiff and Settlement Class members suffered the same harm, albeit to different degrees, because of the same alleged acts and omissions of Defendants.

16

There is no question that common questions predominate here.  *See Amchem*, 521 U.S. at 625

("Predominance is a test readily met in certain cases alleging consumer or securities fraud or

violations of the antitrust laws").  And, because class certification is only for purposes of

settlement, the Court need not inquire as to whether the case, if tried, would present

management problems that would render class treatment inferior.  *See In re AXA Equitable Life*

*Ins. Co. COI Litig.*, 2020 WL 4694172, at *7 (S.D.N.Y. Aug. 13, 2020) (citing *Public Emps.' Ret. Sys.*

*v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (finding superiority where "there is

no overwhelming interest by class members to proceed individually"); *see also Amchem Prods.,*

*Inc.,* 521 U.S. at 617 (The policy at the very core of the class action mechanism is to overcome

the problem that small recoveries do not provide the incentive for any individual to bring a solo

action prosecuting his or her rights.) (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344

(1997)).  Thus, the Court finds that the Rule 23(b)(3) factors are met.

## II.    The Settlement Is Fair In Light of Rule 23 and the *Grinnell* Factors

Rule 23(e)(2), as amended on December 1, 2018, instructs the Court to determine whether

the Settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Whether a settlement is "fair, reasonable, and adequate" entails a review of both procedural and substantive fairness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "Fairness is determined upon review of both the terms of the stipulation and the negotiating process that led to such agreement." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184 (W.D. N, Y. 2005).

Prior to the 2018 amendments to Rule 23 pertaining the settlements, courts in the Second Circuit had long considered whether a settlement was fair, reasonable, and adequate" under the nine factors set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463, *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Importantly, "not every factor must weigh in favor of [the] settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

The Advisory Committee Notes to the 2018 amendments to Rule 23 indicate that the four new Rule 23(e) factors were intended to supplement rather than displace the *Grinnell* factors. *See* 2018 Advisory Notes to Fed. R. Civ. P. 23, Subdiv. (e)(2). Accordingly, the Court considers both sets of factors in its analysis. *See In re GSE Bonds Antitrust Litig.,* 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019).

18

Finally, "[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007). And, indeed, courts routinely find securities class action settlements like this one satisfy Rule 23(e)'s requirements. Notably, "[s]ettlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'" *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (citation omitted); *see also Wal-Mart Stores*, 396 F.3d at 116 (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotation marks and citation omitted).

    a.  <u>Procedural Fairness</u>

"With respect to procedural fairness, . . . a District Court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the [necessary] experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *McReynolds*, 588 F.3d at 804 (citing *D'Amato*, 236 F.3d at 85) (alterations in original) (internal quotation marks omitted). Accordingly, "[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *Hall v. ProSource Techs., LLC*, 2016 WL 1555128, at *4 (E.D.N.Y. Apr. 11, 2016) (citing *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *2 (E.D.N.Y. Nov. 20, 2012) (internal quotation marks omitted).

Here, as discussed *supra*, Counsel for both sides are experienced in class action litigation, conducted extensive investigations of the facts, engaged in sufficient exchange of information to understand facts pertinent to the settlement negotiations, and engaged in substantial motion practice, which also illuminated the risks of litigation to the parties.  (*See* ECF Nos. 19-4, 65, 78, and 82)  All of this supports a finding that counsel and Lead Plaintiff and additional plaintiff were well informed as to the risks of litigation and benefits of compromise. Moreover, the Settlement is the product of arm's length negotiations between the parties' counsels, before a neutral and experienced mediator.  *Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012), *aff'd*, 559 F. App'x 151 (3d Cir. 2014) (noting a presumption of fairness when a settlement is reached with the assistance of a mediator).  Additionally, notice of the settlement was widely distributed and advertised, giving all potential class members an opportunity to learn about the case and object or opt-out of the settlement.  These facts support the conclusion that this settlement process was procedurally fair and that the "plaintiffs' counsel . . . possessed the experience and ability, and have engaged in the discovery[] necessary to effective representation of the class' interests."  *In re Parking Heaters,* 2019 WL 8137325, at *3 (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).  Therefore, the Court concludes that the settlement was procedurally fair.

      b.  <u>Substantive Fairness</u>

As to substantive fairness, the Court considers whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  Rule 23(e)(2)(C)(i) incorporates the factors set

out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), and courts in this Circuit have long utilized the *Grinnell* nine-factor test in determining whether a settlement is substantively fair, reasonable, and adequate. *See, e.g., Ouellette v. Cardenas (In re Sony Corp. SXRD)*, 2011 WL 4425361, at *2, 448 Fed. Appx. 85 (2d Cir. Sept. 23, 2011) (summary order).

The first and third *Grinnell* factors evaluate the complexity, expense, and likely duration of the litigation, the stage of the proceedings and the amount of discovery completed – all of which favor approval of the proposed settlement. "Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate." *Mikhlin v. Oasmia Pharm. AB*, 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021) (internal citations and quotation marks omitted). This case is no exception, as it involves allegations of misrepresentations and omissions concerning a niche business that was affected by complex economic factors. Moreover, this case has been pending for over three years and both sides have spent significant time and expense on it. The Court has already dismissed an important portion of the claims brought by Plaintiffs. If the case did not settle, Plaintiffs would have to appeal the decision dismissing certain of their claims to recover anything meaningful for a substantial portion of the class, and the appeal would likely be costly with an uncertain outcome. There is also substantial additional expense that would be incurred in connection with a contested class certification motion. In short, it this case did not settle, it would likely take several additional years to come to a conclusion at significant expense to the parties. While the parties have not engaged in extensive discovery, it is clear from the parties' briefing and representations at the fairness hearing that they were able to exchange information

needed to properly evaluate the claims and potential outcomes and did so through an adversarial process best suited to testing the claims and defenses.  *Martens v. Smith Barney, Inc.,* 181 F.R.D. 243, 263 (S.D.N.Y. 1998) ("the pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . [, but] an aggressive effort to ferret out facts helpful to the prosecution of the suit.").  Based on the above, the Court finds that the first and third *Grinnell* factors weigh in favor of approval of the settlement.  *In re Austrian and German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000).

*Grinnell* factors four and five – the risks of establishing liability and damages also favor the proposed settlement.  In considering these factors, the Court need not adjudicate the disputed issues or decide unsettled questions; rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).  Regarding the risks in establishing damages, ". . . proof of damages in a securities fraud case is always difficult and invariably requires expert testimony."  *Mikhlin,* 2021 WL 1259559, at *6 (internal quotation marks and citation omitted).  Here, Plaintiffs acknowledge there is simply no guarantee that the evidence will support their remaining claims against Defendants.  (ECF No. 100 at p. 19)  And even if Plaintiffs could prove liability, Plaintiffs would have to establish loss causation and damages, which may be difficult to do.  (*Id.* at p. 20)  Further, Plaintiffs would need to convince a jury that Defendants acted with the requisite scienter.  Proving scienter is hard to do – especially here where Defendants have asserted that the alleged hidden information was in fact publicly available and that certain statements were inactionable forward-looking statements.  *See, e.g.,*

*Kalnit v. Eichler*, 99 F. Supp. 2d 327, 327 (S.D.N.Y. 2000) ("The element of scienter is often the most difficult and controversial aspect of a securities fraud claim.").  Equally, for damages, Plaintiffs would have to disaggregate the losses caused by changed economic circumstances, changed investor expectations, new industry-specific facts and other market conditions from losses allegedly caused by the identified "truthful disclosures" that revealed the alleged material misrepresentations and omissions of Defendants.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 36 (2d Cir. 2009).  Furthermore, to resolve all disputed issues regarding damages and liability, the parties would have to rely on expert testimony, which creates further litigation risk and uncertainty, particularly if expert testimony is subject to a *Daubert* motion.  Thus, *Grinnell* factors four and five support approval of the settlement.

        Four of the *Grinnell* factors concern the reaction of the class to the settlement, the risks in maintaining the class action through the trial, and the range of reasonableness of the settlement fund in light of the best possible recovery in light of all of the risks of litigation.  *In re Payment Card*, 330 F.R.D. at 47. ("The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis.")  After careful review, the Court finds all of these factors favor approving the proposed settlement.  "Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied."  *Mikhlin,* 2021 WL 1259559, at *6 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (internal citation omitted).  Here, the

parties stipulated to class certification solely for the purpose of settlement.  If the class action were litigated, however, Defendant would likely oppose certification of a litigation class and may have meaningful arguments for this opposition, the risk of which supports approval of the proposed settlement.  *See Garland v. Cohen & Krassner*, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (citing *In re Med. X–Ray*, 1998 WL 661515 (possibility that defendants would challenge maintenance of a class in the absence of settlement was considered a risk to the class and potential recovery)).

"In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation."  *In re Payment Card*, 330 F.R.D. at 48.  The range of reasonableness for a settlement is a range which recognizes the uncertainties of law and fact in any particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Mikhlin,* 2021 WL 1259559, at *8 (citing *Wal-Mart*, 396 F.3d at 119) (internal quotation marks omitted).  Here, the parties agreed to the Settlement Amount after negotiations before a neutral mediator and, indeed, at an amount recommended by the mediator.  The Settlement Amount represents a recovery of 5.22% of the Settlement's Class's maximum estimated damages.  (ECF No. 110 at ¶ 5)  This percentage recovery is well within the range found to be fair and reasonable, especially at this stage of the litigation before contested class certification briefing and after dismissal of certain core claims and the risks that the class might recover nothing.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.,* 246 F.R.D. 156, 167 (S.D.N.Y. 2007) ("A recovery of between approximately 3% and 7% of estimated damages is within the range of reasonableness for recovery in the settlement of

large securities class actions."); *Hicks v. Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *19 (S.D.N.Y. Oct. 24, 2005) (finding a recovery of 3.8% of estimated damages to be within the range of reasonableness); *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court award of 6.1% of total damages as fair, reasonable and adequate); *Mikhlin,* 2021 WL 1259559, at *9 ("Courts in this Circuit commonly find that settlements for less than half of potential damages are within the range of reasonableness") (citing *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *4 (S.D.N.Y. Dec. 16, 2019) (finding a settlement valued at 10.9 percent to 21.3 percent of the total possible recovery to be reasonable)).

The final *Grinnell* factor – the ability of the defendant to withstand a greater judgment – is neutral.  This factor stands for the proposition that if a defendant could not withstand a greater judgment than what is provided for in the settlement, then the settlement is more likely to be reasonable, fair, and adequate.  *See In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd sub nom., In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997).  Here, while it is possible Defendants could withstand a greater judgment, even if they could, it does not necessarily preclude a finding that the settlement is fair.  *See In re Payment Card*, 330 F.R.D. at 47 (citing *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 201 (S.D.N.Y. 2012)).  On balance, the *Grinnell* factors weigh in favor of approval of the settlement.

    c.   <u>Remaining Rule 23(e) Factors</u>

With regard to the remaining 23(e) factors, the costs, risks, and delay of trial and appeal favor approval of the settlement agreement.  As discussed above, this case has been pending for

over three years.  Relatedly, there significant substantive and procedural hurdles Plaintiffs face in proving their claims, as detailed above.  A settlement avoids all of these risks and the delay associated with further litigation, providing immediate relief to the class (albeit at a fraction of their total alleged damages).  Avoidance of the costs, risks and time involved in further litigation support approval of the settlement.

The Court also considers the proposed allocation plan for distributing the Settlement Amount to the class members.  *See* Fed. R. Civ. P. 23(e)(2)(C)(ii).  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *In re Payment Card*, 330 F.R.D. at 40 (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).  "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair and adequate . . . [a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re Payment Card*, 330 F.R.D. at 40 (citing *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (internal citations and quotation marks omitted); *see also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014) ("When formulated by competent and experienced class counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis").  Here, the method for processing Settlement Class members' claims was developed with the aide of an economic expert and the distribution plan includes well-established, effective procedures for processing claims and efficiently distributing the Net settlement fund on a pro rata basis to Class Member Claimants.  (ECF No. 107 at p. 30)  The

Claims Administrator will process claims under the guidance of Lead Counsel, allow Claimants an opportunity to cure any claim deficiencies or request the Court to review a denial of their claims, and, lastly, mail or wire authorized Claimants their pro rata share of the settlement fund per the Plan of Allocation.  (ECF No. 107 at p. 30)  This methodology is appropriate, and consistent with prior cases, and therefore, the Court approves it.

        d.  <u>Attorneys' Fees and Costs</u>

The Court next addresses attorneys' fees that will be paid from the settlement.  See Rule 23(e)(C)(iii).  Lead Counsel seeks an attorneys' fee award of 33 1/3% of the Settlement Amount and $44,131.99 in litigation expenses and costs, as well as $10,000 service awards in total to the Lead Plaintiff and additional named Plaintiff ($8,000 for Lead Plaintiff, Matis Nayman, and $2,000 for Court-appointed Plaintiff, Felipe de Castro Luna).  (ECF No. 110 ¶¶ 10-13)  The Court has reviewed the documents in support of their request for attorney's fees and costs, including attorney declarations, billing records, and receipts/invoices for the claimed costs.  For the reasons discussed below, the Court finds that an award of 33 1/3% of the Settlement Amount, $44,131.99 litigation expenses and costs, and an award of $10,000 total for the Lead Plaintiff and additional named Plaintiff is reasonable.

        i.  <u>Attorneys' Fees</u>

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "Both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees . . ."  *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

"The trend in this circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *In re Parking Heaters,* 2019 WL 8137325, at *7 (citing *Wal-Mart*, 396 F.3d at 121) (internal quotation marks omitted). "A court applying either method should consider the following *Goldberger* factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Parking Heaters,* 2019 WL 8137325, at *7 (citing *Goldberger*, 209 F.3d at 50).

Plaintiffs seek fees equal to one-third of the settlement fund. Courts in this Circuit routinely find that a percentage of fund award is appropriate and that a one-third percentage is fair and reasonable. *See, e.g., Levine v. Atricure, Inc.,* ECF No. 85, slip op. at ¶6 (S.D.N.Y. May 27, 2011) (awarding 33 1/3% and stating "[t]he requested fee 33 1/3% of the settlement is within the range normally awarded in cases of this nature") (*See* Ex. 14); *Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases and noting that "Class Counsel's request for 33% of the settlement fund is typical in class action settlements in the Second Circuit."); *Anwar v. Fairfield Greenwich Ltd*., 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (33% fee request of the approximate $7.7 million settlement fund "is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations"); *Puddu v. 6D Glob. Techs., Inc.,* 2021 WL 1910656, at *6 (S.D.N.Y. May 12, 2021) (Awarding attorney's fees in the amount of one-third (33.3%) of the settlement fund is within the

range for rates in this district and thus reasonable). *See In re Parking Heaters*, 2019 WL 8137325, at *7 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 445-47 (E.D.N.Y. 2014) (adopting a graduated schedule that dictated, in relevant part, a fee award of 33 percent for settlements up to $10 million and 30 percent for settlements between $10 million and $50 million). Thus, Lead Counsel's request for fees amounting to a third of the total settlement are reasonable.

The claimed fees are also reasonable under the lodestar method. In this case, Plaintiffs' counsel attests that a total of 1096.8 hours were spent working on this litigation. (ECF No. 110 at ¶ 68) As the Court stated *supra*, class counsel in this case is experienced in complex securities class action cases. The time and labor expended by class counsel is supported by time records and reasonable considering the procedural posture of this case, which has been pending for over three years, and the advocacy needed to respond to the motion to dismiss and negotiate an advantageous settlement for the class, the complexity of the case and uncertainty of the outcome, as discussed above. (ECF No. 110 at ¶ 68) The hours spent, multiplied against counsels' rates, which are also reasonable, result in a total loadstar amount of $814,237.50.[1] (ECF No. 110 at ¶ 68) This results in a loadstar multiplier of 1.02. This lodestar cross-check demonstrates that the percentage of the fund sought for attorneys' fees is reasonable. The Court also notes that Lead Counsel will incur additional time in connection with implementation of the Settlement.

---

[1] Plaintiffs' Counsel's rates range from $350 to $850 for lawyers, and $210 to $375 for paraprofessionals (ECF No. 110 at ¶ 68), and "are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *14 (S.D.N.Y. 2014) (approving rates "ranging from $425 to $825 per hour" in 2014); *see also* Ex. 10 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

Finally, "[p]ublic policy favors the award of reasonable attorneys' fees in class action settlements." *Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, at *12 (S.D.N.Y. June 27, 2012). Courts in this Circuit have recognized the importance of private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis. *See In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515-16 (S.D.N.Y. 2009). Moreover, "the Supreme Court has . . . emphasized that private actions provide a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 373–74 (S.D.N.Y. 2002) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (alteration in original) (internal quotation marks omitted). This case is no exception.

In sum, for the reasons discussed above, Plaintiffs' counsels' application for attorneys' fees in the amount of 33 1/3% of the settlement fund is granted.

ii. <u>Costs</u>

Lead Counsel requests an award of $44,131.99 in costs, which is less than the total costs that counsel could seek under the terms of the Settlement. (ECF No. 110 at ¶ 10) "Courts routinely note that counsel is entitled to reimbursement . . . for reasonable litigation expenses." *Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (citing *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 283 (2d Cir. 1987)). In this case, Plaintiffs' counsel submitted documentary evidence supporting their requested costs, which were incurred for expert fees, notice costs, computerized research, copying and travel—

all reasonable expenditures in this type of action.  (See ECF No. 110 at ¶ 71)  Accordingly, the

Court grants the motion for costs in the amount of $44,131.99.

      e.  <u>Incentive Awards</u>

Plaintiffs also request incentive awards of $8,000 for the Lead Plaintiff, Matis Nayman,

and $2,000 for the additional Plaintiff, Felipe de Castro Luna.  (ECF No. 110 at ¶¶ 12-13)

Collectively, this amounts to $10,000.  Incentive awards "are common in class action cases and

are important to compensate plaintiffs for the time and effort expended in assisting the

prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any

other burdens sustained by plaintiffs."  *Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101

(E.D.N.Y. 2015) (internal quotation marks and citation omitted); *see also Dornberger v. Metro.

Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001) ("An incentive award is meant to compensate

the named plaintiff for any personal risk incurred by the individual or any additional effort

expended by the individual for the benefit of the lawsuit.").

Both the Nayman and Luna submitted declarations detailing their efforts in this action.

(*See* Nayman Decl. and de Castro Luna Decl. at ECF Nos. 110-2 and 110-3)  Nayman estimates

having spent at least 100 hours representing the Class, including by (i) gathering relevant

documents for my motion to be appointed as lead plaintiff: (ii) reviewing the amended

complaint and opposition to Defendants' motion to dismiss; (iii) communicating regularly with

counsel regarding strategy and developments in the Action; (iv) participating in settlement

negotiations; and (v) reviewing and approving the Settlement.  (ECF No. 110-3 ¶ 18)  Luna

estimates having spent at least 10 hours representing the Class, including by: (i) gathering

relevant documents for my motion to be appointed as lead plaintiff: (ii) reviewing the amended complaint and opposition to Defendants' motion to dismiss; (iii) communicating regularly with counsel regarding developments in the Action; (iv) participating in settlement negotiations; and (v) reviewing and approving the Settlement.  (ECF No. 110-2 ¶ 16)  The incentive awards requested are in line with or less than others awarded in our Circuit.  *See Kindle*, 308 F. Supp. 3d at 718 (E.D.N.Y. 2018) (awarding named plaintiff $10,000 and collecting cases granting incentive awards in this amount).  Therefore, the Court grants the requests for incentive awards in the amount of $8,000 for Nayman and $2,000 for Luna.

## CONCLUSION

For all the above reasons, the motion for final approval of the settlement, plan of allocation, and certification of class (ECF No. 106) is GRANTED.  The motion for an award of attorneys' fees, reimbursement of litigation expenses, and incentive awards to Plaintiffs Nayman and de Castro Luna (ECF No. 108) is also GRANTED.

**SO ORDERED.**

DATED:      New York, New York
            December 17, 2024

_____
KATHARINE H. PARKER
United States Magistrate Judge

32